1          IN THE UNITED STATES DISTRICT COURT
              SOUTHERN DISTRICT OF ILLINOIS
2

3    DON HAMPTON,                    )
                                     )
4              Plaintiff,            )
                                     )
5    v.                              )  No. 3:18-cv-00550-NJR-RJD
                                     )  East St. Louis, Illinois
6    JOHN BALDWIN, et al.,           )
                                     )
7              Defendants.           )

8

9
                    TRANSCRIPT OF PROCEEDINGS
10
          **EVIDENTIARY HEARING - DAY 1 - P.M. SESSION**
11
          BEFORE THE HONORABLE NANCY J. ROSENSTENGEL
12                UNITED STATES DISTRICT JUDGE

13                    SEPTEMBER 12, 2018

14

15

16

17

18

19

20

21          Stephanie Rennegarbe, RDR, CRR, CBC
                  IL CSR #084-003232
22                301 West Main Street
                  Benton, IL  62812
23                  618-439-7735
            Stephanie_Rennegarbe@ilsd.uscourts.gov
24

25

1    APPEARANCES:

2    FOR THE PLAINTIFF:      Vanessa del Valle, Esq.
                             Sheila A. Bedi, Esq.
3                            Ms. Allison Elder
                             Roderick and Solange MacArthur
4                                 Justice Center
                             375 E. Chicago Avenue
5                            Chicago, IL  60611
                             312-503-1271 (Ms. Del Valle)
6                            312-503-2492 (Ms. Bedi)
                             vanessa.delvalle@law.northwestern.edu
7                            sheila.bedi@law.northwestern.edu

8                            Elizabeth Mazur, Esq.
                             Uptown People's Law Center
9                            4413 N. Sheridan Road
                             Chicago, IL  60640
10                           773-769-1411
                             liz@uplcchicago.org
11
     FOR THE DEFENDANT:      Christine G. McClimans, Esq.
12                           Christopher L. Higgerson, Esq.
                             500 S. Second Street
13                           Springfield, IL  62701
                             618-236-8621 (Ms. McClimans)
14                           217-782-1841 (Mr. Higgerson)
                             cmcclimans@atg.state.il.us
15                           chiggerson@atg.state.il.us

16

17

18

19

20

21

22

23

24

25

1                              I N D E X

2

   **WITNESSES CALLED ON BEHALF OF THE PLAINTIFF:**

3
                                          <u>DX</u>    <u>CX</u>    <u>RDX</u>
4
   DAN PACHOLKE                            81    132    155
5  BRANDON LUKE JAMES (KIERRA)             159
   SCOTT RANFT                             183
6

7
                           E X H I B I T S
8

9  <u>Exhibit No.</u>        <u>Description</u>              <u>ID'd</u>        <u>ADMT'd</u>

10 Plf's 15            Pacholke CV               82            82
   Plf's 16            Pacholke Report           86            87
11 Plf's 17            IDOC 04.03.104            90            91
   Plf's 18            GID Committee Reports     93            94
12 Plf's 19            Substantiated PREAs       98            98
   Plf's 20            Disciplinary Tracking    127           127
13 Plf's 21            7/16/18 GID email        129           129

14

15

16

17

18

19

20

21

22

23

24

25

```
 1              (Following a recess, proceedings continue in open
 2    court at 11:31 a.m.)
 3              THE COURT:  Ms. del Valle, you may call your next
 4    witness.
 5              MS. BEDI:  Plaintiff calls Dan Pacholke.
 6              THE COURT:  All right.  Deana, if you would please
 7    administer the oath.
 8              (Plaintiff witness, Dan Pacholke, sworn).
 9              THE CLERK:  Would you please state your name and
10    spell your last name for the record?
11         MR. PACHOLKE:  My name is Dan Pacholke.  My last name
12    is spelled P-A-C-H-O-L-K-E.
13
14                         DIRECT EXAMINATION
15    BY MS. DEL VALLE:
16    Q.  Good morning, Mr. Pacholke.  Do you have your CV in front
17    of you?
18    A.  I do.
19    Q.  Okay.  And is it four pages?
20              MS. DEL VALLE:  And, Your Honor and Defense Counsel,
21    it's tabbed 16 in the binder.
22              THE COURT:  Okay.  Thank you.
23    Q.  (By Ms. del Valle) Mr. Pacholke, is this your current
24    resume?
25    A.  Yes, it is.
```

1   Q.  Does this document accurately describe your experience and

2   qualifications?

3   A.  Yes.

4          MS. DEL VALLE:  Your Honor, I would like to mark this

5   as Exhibit 15 and move it into evidence.

6          THE COURT:  All right.  15 will be admitted.

7   Q.  (By Ms. Del Valle) Mr. Pacholke, could you please describe

8   your current occupation?

9   A.  I'm an independent consultant that works in the field of

10  corrections.

11  Q.  And how long have you worked in the field of corrections?

12  A.  Probably just shy of 36 years.

13  Q.  And prior to your work as a full-time consultant where

14  were you employed?

15  A.  I was employed at the New York University, Marron

16  Institute of Urban Management.

17  Q.  And what were you doing at the New York University?

18  A.  Primarily we were working on innovation in the field of

19  corrections, so it could be jails, parole and probation, and

20  prisons.  So, we work with just a variety of jurisdictions

21  around the country on innovative practices.

22  Q.  And through your work and NYU did you work on issues

23  related to placement and housing in corrections?

24  A.  I did.

25  Q.  What kind of work did you do related to placement and

1    housing?

2    A.  Well, a lot of it had to do with, you know, efforts to

3    reduce violence within systems or within, you know, given

4    prisons, so, you know, there's ways to array the population in

5    more compatible units or compatible groups that will bring

6    down violence overall.  So, some it just had to do with

7    advising and consulting people on violence reduction, and

8    through that you would usually end up making recommendations

9    concerning how the population is configured in different

10   prisons, but in the system overall.

11   Q.  So, through that work, then, did you do work-related to

12   the topic of safety in corrections?

13   A.  Yes.

14   Q.  Now, prior to working at NYU where did you work?

15   A.  Well, I was briefly with the Pepperdine University, as

16   well, so the program at Pepperdine really shifted to NYU, so I

17   consider that the same type of work.  It was Government

18   innervation.

19        Prior to that, in 2016, I was the head of corrections

20   for the Washington State Department of Corrections.

21   Q.  Okay.  How long did you work for the Washington State

22   Department of Corrections?

23   A.  33 years, four months.

24   Q.  And did you hold various positions within the Department

25   of Corrections?

1    A.  I did.  I started as a correctional officer, I retired as

2    the head of the agency, I was Deputy Secretary of Operations,

3    I was the head of the prison system, Deputy Director in

4    Prisons, I was a Warden at three different prisons, at one

5    point head of Staff Training, head of Emergency Operations,

6    Officer, Sergeant, Lieutenant, Captain, so just a wide range

7    of positions.

8    Q.  You said your last position was Secretary of Prisons?

9    A.  Correct.

10   Q.  And is that basically the top director of the prison

11   system in Washington State?

12   A.  It's the top director of the correctional system, so I

13   was, you know, a member of the Governor's cabinet and oversaw

14   both community supervision, work releases, the prison system,

15   so the system in total.

16   Q.  Now, in your work at the Washington State Department of

17   Corrections did you have any responsibilities related to the

18   Prison Rape Elimination Act, known as PREA?

19   A.  I did.  When I was Director of Prisons, I was the

20   executive sponsor, I was the lead of overseeing the

21   implementation of the PREA standards, you know, once again in

22   prisons, in work release, in community supervision, just the

23   policies, staff training, just the overall implementation

24   strategy.

25   Q.  And around what year was that?

1    A.  Probably 2011, '12, '13, you know, kind of that span.  It

2    took several years.

3    Q.  Now, in your various positions in the corrections field

4    have you had to draw conclusions about prison operations based

5    on your reviews of relevant files?

6    A.  Yes.

7    Q.  Can you briefly describe your methodology for reaching

8    these conclusions?

9    A.  Well, I mean, some of it, of course, is just reviewing

10   the, you know, applicable documents that you are presented

11   with, having some understanding of best practice nationwide,

12   having an understanding of whether it's ACA standards, related

13   PREA standards.  It could be training programs offered through

14   the National Institute of Corrections, you know, maybe perhaps

15   even legal case law within the system.  But you would

16   integrate those documents with your own experience and your

17   own understanding of broader standards that have an impact on

18   that issue.

19   Q.  Okay.  And in drawing those conclusions did you rely on

20   documents like disciplinary reports?

21   A.  Yes.

22   Q.  Did you rely on documents like prisoner's medical records?

23   A.  Yes.

24   Q.  Did you rely on institutional level policies?

25   A.  Yes.

```
 1   Q.  And did you rely on national best practices?

 2   A.  Yes.

 3   Q.  Now, did you draw conclusions about the Illinois

 4   Department of Corrections and specifically Dixon Correctional

 5   Center's practices in this case?

 6   A.  Yes.

 7   Q.  And in drawing those conclusions did you use the

 8   methodology that you just described?

 9   A.  Yes.

10   Q.  Okay.

11         MS. DEL VALLE:  Your Honor, at this point I would

12   like to tender Mr. Pacholke as an expert in the field of

13   security corrections.

14         THE COURT:  Any objections?

15         MR. HIGGERSON:  No.

16         THE COURT:  You may proceed.

17         MS. DEL VALLE:  Your Honor, if you could turn to tab

18   17 in your binder.

19   Q.  (By Ms. Del Valle) Mr. Pacholke, do you have the expert

20   report that you authored related to Ms. Hampton in front of

21   you?

22   A.  I do.

23   Q.  And you authored this -- When did you author this report?

24   A.  December 6, 2017.

25         MS. DEL VALLE:  Your Honor, I would like to mark this
```

1  as Exhibit 16 and move it into evidence.

2        THE COURT:  All right.  16 will be admitted.

3  Q.  (By Ms. Del Valle) Now, in this expert report did you

4  develop opinions related to the IDOC's placement of Ms.

5  Hampton?

6  A.  I did.

7  Q.  And did you develop opinions related to the IDOC's

8  disciplinary process as it relates to Ms. Hampton?

9  A.  I did.

10 Q.  Now, you wrote this report in December 2017.  In arriving

11 at your opinions in this report did you review Ms. Hampton's

12 disciplinary records?

13 A.  I did.

14 Q.  Did you review some of her mental health records?

15 A.  Yes.

16 Q.  Did you review the Gender Identity Disorder Committee

17 reports?

18 A.  Yes.

19 Q.  And did you review department policies?

20 A.  Yes.

21 Q.  And did you consult national standards?

22 A.  Yes.

23 Q.  Before writing this report did you do anything else -- Did

24 you do anything else before arriving at your opinions in this

25 report?

1    A.  I talked to two staff that I believe have an expertise on

2    the management of the transgender population and also on

3    implementation of PREA standards.  So, I talked to two

4    additional people that I see as having expertise in this

5    particular area.

6    Q.  Okay.  Now, since you wrote this report in December 2017,

7    have you reviewed any more of Ms. Hampton's records?

8    A.  Yes, I have.

9    Q.  What have you reviewed?

10   A.  Cumulative Counseling Reports; I have reviewed additional

11   disciplinary reports, you know, including the findings that

12   were drawn in those cases.  I have reviewed additional

13   grievances, you know, mental health reports concerning

14   Ms. Hampton; PREA investigations; you know, segregation

15   documents; just a wide range of documents.

16   Q.  So, have you reviewed what is Ms. Hampton's entire

17   disciplinary file up to the point of -- that was produced by

18   IDOC?

19   A.  Yes.

20   Q.  And have you reviewed videos?

21   A.  Yes; yes.

22   Q.  Okay.  Now, did your review of Ms. Hampton's updated

23   records change the opinions you put forward in your report in

24   any way?

25   A.  It only strengthened the initial conclusions that I drew

1    in the first report.

2    Q.   Okay.   Now, can you briefly describe your current opinions

3    related to the placement of Ms. Hampton in the men's prison?

4    A.   It's just inappropriate.   I mean, when I look at

5    Ms. Hampton and I consider the PREA standards that -- I mean,

6    what we have here is an individual who at the age of five

7    started identifying as a female to her own family.   By the age

8    of nine she was outwardly identifying as a woman to -- a

9    child, a girl to the community.   You know, as a juvenile, you

10   know, she was raped in a juvenile facility by a correctional

11   officer and, you know, certainly suffers trauma from that, and

12   the officer was convicted of those charges.

13        By the time she gets into the Illinois Department of

14   Corrections she is diagnosed with gender dysphoria.   She is

15   given feminising hormones, she is issued feminising clothing,

16   a sports bra, she is given accommodations for showers.   And,

17   so, really, in my mind while IDOC has done everything they

18   possibly can to acknowledge both in a clinical fashion and an

19   operational sense that she is a woman, at the same time they

20   have done everything in their power almost exhaustively in

21   order to place her anywhere but within a female facility.   So,

22   to a certain degree it almost feels like IDOC exhibits that

23   she needs to earn her way into the proper gender placement

24   rather than acknowledging this on all their own internal

25   documents and their own internal diagnosis that the best

```
 1   placement for her and the placement that she has requested is

 2   to be within a woman's facility.  It's kind of paradoxical in

 3   some ways.  They do everything to support the fact that she's

 4   a woman, then they work exhaustively in order to keep her from

 5   a woman's facility.

 6   Q.  Now, you are familiar with the PREA standards, correct?

 7   A.  I am.

 8   Q.  Do the PREA standards allow for inmates to be housed

 9   exclusively on external genital anatomy?

10   A.  They do not.

11   Q.  And do the PREA standards require some consideration of

12   the individual's sense of her own safety when determining

13   placement?

14   A.  They do.

15   Q.  Now, in arriving at your conclusions you examined IDOC

16   policy, correct?

17   A.  I did.

18   Q.  If you -- Do you have in front of you IDOC Administrative

19   Directive 04.03.104 tabbed 18 in the binder?

20   A.  Yes, I do.

21   Q.  And is this the administrative directive that you

22   reviewed?

23   A.  Yes, it is.

24   Q.  Okay.

25           MS. DEL VALLE:  Your Honor, I would like to mark this
```

1    as Exhibit 17 and move it into evidence.

2          THE COURT:  Is 17 the right number?  I thought we had

3    a 17.

4          THE CLERK:  17 is right.

5          THE COURT:  17 is the Administrative Directive.

6          MS. DEL VALLE:  Okay.

7          THE COURT:  04.03.104?

8          MS. DEL VALLE:  Correct.

9          THE COURT:  Okay.  That will be admitted.

10   Q.  (By Ms. Del Valle) Mr. Pacholke, does IDOC's policy as

11   laid out in this administrative directive on issues related to

12   offenders with gender identity disorders and housing those

13   offenders, does this policy comport with national best

14   practices?

15   A.  Here's what the policy does and doesn't do:

16         If you look under policy statement -- So this would

17   be I-B, the second bullet, where it indicates that *will*

18   *extensively evaluate offender's perception standard to ensure*

19   *appropriate facility placement*.  So, it does have a policy

20   statement that indicates they will evaluate placement, proper

21   placement for people.  As you read your policy in total, what

22   it lacks is any definition of what that placement may be or

23   any definition around how that will occur or who will make the

24   recommendation or how the placement will occur.  So, once

25   again, to me, I mean, I really think of it as almost a

1    checklist in some ways.  And when you think of Hampton, I
2    mean, you know, diagnosed with gender dysphoria, feminising
3    hormones, sports bra, accommodation on showers, past history
4    of sexual abuse in a juvenile facility that certainly has
5    resulted in some sort of trauma, been housed in a segregation
6    unit repetitively for over a year, two past attempts of
7    suicide, I mean, to me these are the kinds of like
8    bullet-point criteria that you would have in a policy that
9    would indicate that there should be some due diligence around
10   strong consideration for placement within a woman's facility.
11   From what I can tell in reviewing all the documents, it really
12   wasn't until probably less than a month ago that IDOC even
13   gave it any consideration in writing to move her to a woman's
14   facility.
15          So, what it lacks is any objective criteria around
16   how you would be placed or under what criteria you would be
17   placed in a woman's facility.
18   Q.  Now, based on your review of IDOC policies what is the
19   Gender Identity Disorder Committee?  It's gone by various
20   names throughout the various years, but we will use the GID
21   Committee for shorthand.
22   A.  I think the Gender Identity Committee is really intended
23   as a way to assist in the overall case management of
24   transgender people, that somehow this committee is going to
25   review the case in total, they are going to make some sort of

1    recommendations around appropriate placements, you know,

2    medical intervention, mental health, you know, her routines,

3    but really serves overall as a case management arm.

4    Q.  Now, if you can turn to tab 19 in your binder.  Now, Mr.

5    Pacholke, do you have in front of you three Gender Identity

6    Committee meeting reports from March 17, 2017, that's Bates

7    607, and then from January 26, 2018, that's Bates 225 to 229?

8    A.  Give me one second or two.  So can you start with the

9    first number you gave me again?

10   Q.  Sure.  Bates 607, March 17, 2017, GID Committee report.

11   A.  Can you give me that Bates number at the bottom again?

12   Q.  Sure.  607.

13   A.  607, yes, I do.

14   Q.  Okay.  And do you have Bates 225 through 229?  That's the

15   January 26, 2018 report.

16   A.  225 and which one?

17   Q.  225 through 229.

18   A.  I do.

19   Q.  The last one doesn't have a Bates number, but it's the

20   April 10, 2018 report.

21   A.  I do.

22   Q.  Okay.  And are these three of the GID Committee reports

23   that you reviewed?

24   A.  Yes, they are.

25           MS. DEL VALLE:  Your Honor, I would like to mark

```
 1    these as Exhibit 18 and move them into evidence.

 2              THE COURT:  Any objection?

 3              MS. HIGGERSON:  No objection.

 4              THE COURT:  All right.  18 will be admitted.

 5    Q.  (By Ms. Del Valle) Mr. Pacholke, I want to focus on the

 6    first GID Committee report you have in front of you from March

 7    17, 2017.  That's Bates 607.

 8    A.  Okay.

 9    Q.  Can you describe what this document is?

10    A.  This is Illinois Department of Corrections Gender

11    Dysphoria Disorder Committee Update from Pinckneyville

12    Corrections Center on Deon Hampton.  It provides -- It talks

13    about the date of review, provides some basic information,

14    some recommendations, and is signed off by a variety of

15    committee members.  And, some of the committee members didn't

16    sign off of it, but it provides some background information,

17    provides some recommendations.

18    Q.  In your opinion does the process memorialized on this

19    paper comport with nationally-accepted standards?

20    A.  Well, I mean, what it doesn't do is it -- And certainly

21    the forms change as we go along here.  What it doesn't do is

22    it doesn't provide a lot of other information; you know, as an

23    example, the amount of time that she spent in segregation and

24    any negative impacts it might have on her mental health

25    condition.  It doesn't take into consideration any
```

1    disciplinary history and recommendations that mental health

2    may have around that, it doesn't take into consideration

3    transfer or placement or, you know, are we achieving a

4    stabilizing influence by her current placement.  So, this one

5    to me really lacks any real detail.  And I don't believe it

6    comports to what would be considered comprehensive or meet a

7    national standard.  This form is very brief and very cursory.

8    Q.  Does this form say anything about her past history of

9    sexual assault?

10   A.  It does not.

11   Q.  Does this form mention anything about Ms. Hampton's own

12   views about her own personal safety?

13   A.  It does not.

14   Q.  Does it mention any of her PREA complaints?

15   A.  It does not.

16   Q.  Now, let's go to the next report from January 26, 2018.

17          Can you describe this document and explain how it

18   differs from the one we just reviewed?

19   A.  Well, I mean, this one, once again, is Illinois Department

20   of Corrections Transgender Care Review Committee

21   Recommendations from Lawrence Correctional Center.  It has,

22   you know, Section 1 which talks about, you know, the offender

23   involved being Deon Hampton.  It gives a little background on

24   gender identity in the sense of natural birth and then how she

25   views herself today.  It talks a little bit about genitalia,

1   it gives some background on gender identity history to

2   include, you know, the age in which she started identifying as

3   a female, some background on hormone therapy, reassignment,

4   surgical procedures, sexual preference and potency, mental

5   health, substance abuse history, medical history, predatory or

6   vulnerable status, and committee recommendations.  So, it's a

7   much more elaborated form than the one we just reviewed.

8   Q.   In your opinion does this form comport with nationally-

9   accepted standards?

10  A.   I mean, once again, what it doesn't do is it doesn't take

11  into consideration appropriate placement or it doesn't take

12  the characteristics or the findings of the report and add them

13  up in total in order to give you a better sense of what would

14  we do for ongoing case management.  So, although it's much

15  more extensive almost in a diagnostic sense, it doesn't really

16  say *here's what we should do with her*.

17          I will give you an example.  It's just like on the

18  Predator Vulnerable Status in Section 9 is they decide not to

19  consider her vulnerable or a predator, but it indicates in the

20  narrative, "Mental health and DOC are currently working

21  together for careful placement of patient which supersedes

22  need for vulnerable status."  So, in some ways the narrative

23  indicates she's vulnerable in her current situation, but they

24  are reluctant to check the box that says *vulnerable* and they

25  make no attempt to say, you know, "Here would be a placement

1    that would enhance Ms. Hampton's safety."  So, they kind of

2    say it and they kind of don't, and I think that one just

3    stands out to me.  But, overall it doesn't really draw any

4    conclusions around her own safety, the operation of the

5    facility, nor really make any strong recommendations.  It's

6    more of a checklist of *have we done this or this or this*, and

7    when you run into an area like vulnerable or predatory they

8    stay mute, they stay silent.

9    Q.  Does the report say anything about her past history of

10   sexual assaults?

11   A.  It does not.

12   Q.  Does it mention any of her PREA complaints?

13   A.  It does not.

14   Q.  Okay.  Let's go to the last report, April 10, 2018.

15          Can you describe this document?

16   A.  It's a Illinois Department of Corrections Gender Identity

17   Committee Recommendation from Dixon Correctional Center.  Once

18   again, the form is slightly different.  It has some background

19   on GID history, mental health history, medical history.  It

20   indicates committee recommendations on areas like housing,

21   showers, hormone therapy, and that's about it.

22   Q.  Does this report mention anything about Ms. Hampton's

23   views about her own personal safety?

24   A.  It does not.

25   Q.  Does this report say anything about her past history of

1   sexual assault?

2   A.  It does not.

3   Q.  Does it mention any of her PREA complaints?

4   A.  It does not.  And, actually, on this particular form, too,

5   there's many sections of it that are left blank and not even

6   completed.

7   Q.  Now, would you agree that this document indicates that the

8   committee did not consider whether it would be appropriate to

9   transfer Ms. Hampton to Logan?

10  A.  Well, under the placement with recommendation for housing,

11  it's left blank.  So, they made no recommendation, and there's

12  certainly no indication that they considered.

13  Q.  Do you think that the committee -- Based on this document,

14  do you think that the committee did a meaningful review of

15  Ms. Hampton?

16  A.  No.

17  Q.  Now, Mr. Pacholke, did you review the three substantiated

18  PREA complaints from Lawrence -- two from Lawrence and one

19  from Dixon?

20  A.  I did.

21        MS. DEL VALLE:  Your Honor, these are in tabs 8, tab

22  5, and tab 6.  I would like to mark all of the three reports

23  as one group exhibit, as Exhibit 19, and move it into

24  evidence.

25        THE COURT:  Okay.  So this is Exhibit 19?

```
 1              MS. Del VALLE:  Correct.
 2   Q.  (By Ms. Del Valle) Now, Mr. Pacholke, do you have in front
 3   of you the PREA investigation, Bates -- the PREA investigation
 4   from Dixon, Bates 658 through 688?
 5   A.  I do.
 6   Q.  Okay.  Can you briefly describe what's in these documents?
 7   Or let me scratch that.  Can you briefly describe what
 8   Ms. Hampton's PREA complaint was here?
 9   A.  Well, I mean, this is the RPEA investigation dated May 8,
10   2018, for Jacob Blackburn from Internal Affairs, and it's on a
11   PREA allegation at Dixon Correctional Center, the GP
12   segregation yard on Offender Deon Hampton.  So, what Hampton
13   stated in her interview, for about a week and a half -- the
14   offender's name has been blacked out -- would grab her
15   buttocks and breasts out in the segregation yard and had done
16   this repeatedly for over a week and a half or so.  This
17   allegation was investigated by Internal Affairs, and under the
18   conclusion the PREA claim was substantiated.  So, they found
19   merit to her claim that, in fact, she was being sexually
20   assaulted on that yard.
21   Q.  What's the significance of a substantiated PREA complaint?
22   A.  It's a high threshold.  I mean, I think PREA violations,
23   especially when they are inmate against inmate, are really
24   difficult to substantiate.  I don't think it's easy to do.  As
25   a matter of fact, a relatively small percentage of inmate-on-
```

1    inmate PREA claims are ever substantiated.  So, it's a high

2    threshold and it's probably indicative that there's, you know,

3    harassing behavior going on.

4    Q.  Now, based on the documentation what actions did IDOC take

5    after they substantiated Ms. Hampton's PREA complaint?

6    A.  Well, oddly enough, the perpetrator of this violation, the

7    one that sexually assaulted Ms. Hampton, was released from

8    segregation on May 3, for time served, and Ms. Hampton was

9    retained in segregation.  So, essentially they released the

10   predator from segregation and maintained the victim in

11   segregation.

12   Q.  What's the significance to you of the fact that the

13   perpetrator was released from segregation, but Ms. Hampton was

14   kept in segregation?

15   A.  Well, on one hand if you are Ms. Hampton or if you are

16   another inmate or even a staff member that witnessed this, it

17   really challenges the legitimacy of the system.  Here you have

18   a substantial claim of sexual assault, your Internal Affairs

19   went through and validated.  Essentially that should result in

20   another rule violation and you decide that the perpetrator

21   will be let go and the victim will be maintained in a much

22   more coercive and less desirable housing unit, being

23   segregation, solitary confinement, however you want to refer

24   to it.  I'm certain in the eyes of Deon Hampton that she's

25   just thinking to herself, "I'm getting punished for being

1 sexually assaulted."

2    THE COURT:  That broke up there.  What did you say?

3 A.  I think it delegitimizes the system of discipline.

4 Q.  What should IDOC have done after substantiating this PREA

5 complaint?

6 A.  Well, I mean, to me it would make perfect sense that you

7 would maintain the perpetrator, you know, either on

8 administrative segregation status or prehearing confinement

9 pending on the outcome of the hearing.  For documented sexual

10 assault they should probably go through and update his PREA

11 file to reflect that he involves himself in predatory behavior

12 and he should have went through the disciplinary process.

13    Ms. Hampton should have been removed from the

14 immediate environment, certainly from around this particular

15 offender that's been sexually assaulting her and transferred

16 to an environment that would enhance her safety.

17 Q.  All right.  Should the Gender Identity Disorder Committee

18 have received this PREA investigation?

19 A.  Yes.

20 Q.  Did you see any evidence in the record that the Gender

21 Identity Disorder Committee considered this PREA

22 investigation?

23 A.  I did not.  I did not.

24 Q.  Why should this PREA investigation have gone to the Gender

25 Identity Committee?

1   A.  Because if they are working on case management activities

2   around transgender offenders who we know are subject to sexual

3   assault within the community or even at a higher rate within

4   prison who we know have one of the highest rates of suicide in

5   the nation, that if you are dealing with comprehensive case

6   management you would want to know about abuses occurring to

7   this person and what safeguards are we taking in order to

8   ensure it doesn't happen again.

9   Q.  Now, I want you to turn to the next PREA investigation

10  which is 270 through 316.  That's tab 5.

11  A.  Yes.

12  Q.  This is the PREA for the January 23, 2018 incidents.

13          Can you describe what Ms. Hampton's PREA complaint

14  was here?

15  A.  She's describing that an inmate, while she's in

16  segregation, in the segregation yard, had exposed his penis to

17  her while in the segregation yard on at least two occurrences,

18  excuse me, January 20 and January 22.  She also stated that he

19  had offered to pay -- pay her to have sex with him and then

20  threatened to rape her.  At one point he exposed his penis,

21  started stroking it, and indicated that he would use that in

22  order to do forcible rape on her and other sexual assaults.

23  Q.  And what was the outcome of the IDOC investigation into

24  this PREA?

25  A.  It was deemed substantiated.

1    Q.  And based on the documents what actions did IDOC do after

2    they substantiated this PREA complaint?

3    A.  They did issue a misconduct report.  But, once again, it

4    doesn't look like there was any real measures taken in order

5    to ensure the safety as Ms. Hampton or anything in order to

6    strengthen her placement for her own personal safety.  So, it

7    looks like they issued an infraction to her.

8    Q.  What should IDOC have done after they substantiated this

9    PREA?

10   A.  Well, once again, I mean, to me this would be the type of

11   document that would go to the gender committee, the

12   transgender committee, and that they would consider this in

13   overall case management, that they would remove Ms. Hampton

14   from that immediate vicinity, that they would somehow take the

15   perpetrator and make sure he's not around Ms. Hampton from

16   that point forward, so there would be some placement issues in

17   order to keep the two of them apart.  There would be some

18   broader consideration now not only on this one substantiated

19   PREA claim, but on the two in total, and they would start

20   considering what do we do in order to keep her in a safe

21   environment, how do we, you know, increase her access to

22   perhaps mental health treatment or mental health counseling

23   now that we know she suffered the trauma of a couple of these

24   events and plus her conscious history of trauma.  But, they

25   would look at some ways in order to provide safety and provide

1    a better environment for Ms. Hampton.

2    Q.  Let's go to the third PREA investigation, which is about a

3    month later on February 21, 2018.  Again, in Lawrence.  It's

4    Bates 567 to 597 and that's in tab 6.

5    A.  Yes.

6    Q.  Mr. Pacholke, is it your understanding that this PREA was

7    also involving the same offender from the one in January?

8    A.  Yes.

9    Q.  Can you describe what Ms. Hampton's PREA complaint was in

10   this PREA?

11   A.  Ms. Hampton -- This was on 2/21/18.  Ms. Hampton made an

12   allegation stating that an inmate had made threatening remarks

13   to her while in segregation via shower, that his ticket had

14   been dropped and that he was being transferred; also stated

15   that he also made threats of raping her again and if he could

16   expose himself to Hampton he would again, and once again the

17   report itself indicates this is the same offender from the

18   incident the PREA, substantiated PREA investigation that

19   occurred on 1/23/18 for exposing his penis, and the findings

20   were substantiated by the investigator.

21   Q.  Should this offender have been housed in the same

22   segregation wing as Ms. Hampton?

23   A.  No, no.  No, I mean, they should not have.  This is --

24   Once again, it's a place safety issue, it's a mental health

25   issue especially for a victim of a sexual assault.  I don't

1    know if it's true or not, but, I mean, this is where he

2    alleges that the violation report -- although the PREA

3    investigation was substantiated, that the violation was

4    dropped, he was being transferred out, and for whatever reason

5    was placed in an area adjacent to Ms. Hampton where he could

6    actually threaten her some more and indicate that he had

7    gotten away with it.  It's either exceptionally sloppy

8    management work or it's intentional, I'm not sure which.

9    Q.  Now, do you place any significance on the fact that

10   Ms. Hampton has three substantiated PREA complaints at two

11   different men's prisons within four months?

12   A.  I'm sorry, I lost my video there for a second.

13          It's substantial in several different ways.  I mean,

14   the first one is when we were at court probably a year ago we

15   recommended that she be placed at a women's facility for all

16   the reasons that IDOC has documented, and I went over those a

17   couple of times, whether it's the gender designation dysphoria

18   or the feminising hormones or background or the past history

19   of trauma, it really feels as if that IDOC wants Ms. Hampton

20   to earn her way into the appropriate gender-assigned committee

21   and will work exhaustively in order to ensure that she doesn't

22   get there, and they will maintain her in segregation

23   repetitively, irrespective the mental health recommendations,

24   and they will transfer her to and from different male

25   facilities in order to continue down this path, irrespective

1    of the harassment, sexual assault, or substantiated PREA

2    claims.  To me it just shows an intention that you have to

3    earn your way into the right gender assignment.

4    Q.  Now, what effect do these substantiated PREA complaints

5    have on your conclusion regarding Ms. Hampton's placement in

6    the men's prison?

7    A.  I mean, once again, to me it just reinforces the fact that

8    the placement was wrong.  You know, the recommendation that we

9    had in December of 2017, it made, you know, multiple moves to

10   different male facilities.  Each one of those at this point I

11   would consider a failure.  This last PREA investigation is

12   just a prime example.  I mean, not only do you put her in the

13   wrong facility in the sense of putting her back in a male

14   facility, but you co-locate her to someone that you have

15   already substantiated sexual assaulted her, I mean, without

16   any regard for her mental health, without any understanding of

17   the past two suicide attempts, without any understanding of

18   the trauma that this will do to the victim.

19   Q.  Now, did you review videos of Ms. Hampton depicting her on

20   the yard?

21   A.  I did.

22   Q.  Okay.  And is it your understanding that these videos were

23   around July 30, 2018?

24   A.  Yes.

25   Q.  Okay.  Can you describe what you saw in those videos?

1   A.  Well, I mean, what you will see in the video is, you know,

2   four to five people on a segregation yard, so it's to the yard

3   and a cohort.  Ms. Hampton to a certain degree, you know,

4   shows feminising characteristics in her dress, you know, in

5   the way that she wears shorts, in the way that she puts on and

6   wears T-shirts, in the way that she moves through the yard.

7   There's a certain degree of, I guess, flirty behavior or, you

8   know, more overbehavior.  Certainly there's a lot of attention

9   from the men that are on that yard as far as paying attention

10  to her.  What it reminds me of in some ways, in my own

11  experience, to give you a little story here is back in the

12  '90s, in Washington State there was a period of time in which

13  we had co-correctional facilities.  So, we had men and women

14  in the same prisons, although there was physical separation.

15  They could not necessarily be right next to each other, but

16  they were in the same prisons at the same time.  There's a

17  certain degree of the population, a certain subset of that

18  women population that will be flirty, that will be somewhat

19  suggestive, that will be somewhat cute in the way they portray

20  themselves.  They will try and modify, you know, the state-

21  issued clothing in order to fit what in their minds is more

22  gender appropriate.

23        So, when you watch that video, in my estimation, and

24  certainly the people in the courtroom can see it today, what

25  you see is a woman on a male yard.  That to me is what you see

1   there.

2   Q.   Now, how long were the videos that you watched?

3   A.   One of the videos that I watched was 53 minutes.

4   Q.   Okay.  Now, what's your opinion regarding the conduct of

5   the officers filming Ms. Hampton in that 53-minute video?

6   A.   Well, if you watch that video -- And, like I say, you will

7   see flirty and kind of overbehavior that starts out, you know,

8   pretty friendly.  You will see some flashing, you will see

9   some really suggestive dancing, you will see some hugging, you

10  will see some, to a certain degree -- there may be a kiss on

11  the cheek or something in that regard, and you will see some

12  touching, okay?  But, really, when you sit back and you watch

13  that video, that 53-minute video, what you really get a sense

14  is that the Department of Corrections is compiling this

15  videotape in order to build a case that Ms. Hampton is

16  misbehaving, she is completing multiple rule violations, and

17  they are documenting it in order to issue violation reports.

18  What you don't see is the first point in time when she tries

19  to modifies her clothes and has shorts on or when she, you

20  know, starts dancing inappropriately or she starts to a

21  certain degree being flirty.  What you don't see is a response

22  and intervention.  What you don't see on behalf of the

23  Department of Corrections is any acknowledgment that this is

24  inappropriate and unsafe in that environment.  So, it really

25  does seem like what they are trying to do is just build a case

```
 1   in order to give more rule violations in order to maintain her
 2   in segregation for a longer period of time.
 3   Q.  Is it your understanding that Ms. Hampton was then
 4   punished for her actions depicted on the video?
 5   A.  Yes.
 6   Q.  What should IDOC have done after that incident on the
 7   yard?
 8   A.  Well, I mean, first off, to me they should have
 9   intervened, you know, much quicker and got her off the yard,
10   you know, for her own safety.  Second of that is to me that
11   would have been a very appropriate piece of evidence for the
12   Gender Identity Committee.  And I think if they would have
13   looked at it, what they would have seen is a woman on a male
14   yard and the inappropriateness of just keeping her in a male
15   high-security unit, and they would have looked for some sort
16   of placement options that would have increased place safety
17   for her and everybody else.
18   Q.  If you were running the IDOC where would you have
19   Ms. Hampton housed?
20   A.  In a woman's facility.
21   Q.  What level of security?
22   A.  You know, I would probably look somewhere around medium
23   security with a mental health, either inpatient or outpatient
24   component to the unit, you know, if it's available.  I mean,
25   typically women's facilities do have more mental health
```

1  coverage, because, you know, the vast majority of women in

2  prison, you know, suffer from some form of trauma.  So, I am

3  assuming the same holds true in the Illinois Department of

4  Corrections.  But, I'm looking for something below a high

5  facility, like a medium where the perimeter security is about

6  the same as a high security, but has some sort of enhanced

7  mental health treatment.

8  Q.  When you were running the Washington State Prisons did you

9  ever house transwomen in women's facilities?

10  A.  You know, when I was in charge of the implementation and

11  we were going through and writing policies, doing the staff

12  training and briefing the staff and doing some cultural

13  assessments inside our prisons, a case never came forward that

14  -- where we had a recommendation or we even had a person that

15  we believed should be placed.  So, in my time whenever I was

16  there, I don't believe we did.

17  Q.  Today are there transwomen in women's facilities in

18  Washington State?

19  A.  Yes, there are.  I mean, when I talked to some of the

20  experts when I was writing the December report, there are

21  transmen in male facilities in Washington and there are

22  transwomen in women's facilities in Washington.

23  Q.  Mr. Pacholke, you reviewed Ms. Hampton's entire

24  disciplinary file, correct?

25  A.  I did.

1    Q.  Now, in your review of Ms. Hampton's disciplinary file did

2    you make any conclusions about the disciplinary process as it

3    has been imposed on Ms. Hampton?

4    A.  Well, in a really -- in a really broad sense the --

5    there's a lot of low-level violations, you know, inside

6    Ms. Hampton's disciplinary file, and then there are some high-

7    level violations, but there's infraction reports in there for

8    walking up to a control room and referring -- and saying to

9    the officer, "Hey, girl."  There are violations in there for

10   the destruction of state property, but when you read them

11   carefully it really is about like modifying state jeans.

12   There's other violations in there for destruction of state

13   property, which is really making thong underwear.  There's

14   additional violations in there for thong underwear where

15   someone observed her walking and, you know, pulled her over

16   and whatever and searched her and saw her have thong

17   underwear.  There are some stuff around there for three-way

18   phone calls.  But, a lot of it is fairly low-level violations

19   that would, you know, support her own view of her gender

20   identity.

21   Q.  I want to draw your attention to a few disciplinary

22   records, so Bates 540 to 553, and this is in tab 7 of your

23   binder.  This is the disciplinary ticket for the incident with

24   Officer Burley on February 18, 2018.

25   A.  Yes.

1   Q.   Do you have that ticket in front of you?

2   A.   I do.

3   Q.   Can you briefly describe what happened on that day?

4   A.   Officer Burley was escorting Ms. Hampton to the

5   segregation yard in mechanical restraints, Hampton began to

6   pull away from the officer, basically stating to him he wanted

7   -- Deon was stating to the officer that she wanted to go to

8   her special cage.  And I'm assuming that refers to recreation

9   yard.  The officer attempted to regain control of Hampton,

10   explained to him where he was going.  That resulted in, you

11   know, physical confrontation in the sense of the officer

12   trying to forcibly move Deon Hampton in the direction he

13   wanted her to go.  And the infraction report indicates that

14   Ms. Hampton mule-kicked him or kicked him in the leg, so

15   Hampton would be in front in restraints of her escort and

16   kicked backwards striking the officer.

17   Q.   Do you give any significance to the fact that according to

18   this ticket the whole incident started as a result of

19   Ms. Hampton wanting to go into her special cage?

20   A.   I do.  I do give significance to that.

21   Q.   And why is that?

22   A.   Well, I mean, some of it, once again, is, you know, if you

23   have read the PREA investigations and you have seen

24   substantiated PREA claims and the type of assault or behavior

25   or verbal threats that Ms. Hampton has been exposed to, that

1   perhaps all she was doing was saying, "This yard is safer for

2   me" or "This yard is better for me," and trying to get in a

3   position where she's not being harassed when she's on the

4   yard.  I mean, that's one possible conclusion to draw.

5   Whether or not the officers at the officer level are aware or

6   whether or not there's been any accommodation to say, "Hey,

7   you know, Ms. Hampton should be in yard alone, Ms. Hampton

8   should be in yard, you know, X distance away from other

9   offenders, I mean what considerations have been given."  Now,

10  I mean, I think all those considerations are important and I

11  think they should be completed.  Certainly striking the

12  officer was inappropriate.

13  Q.  Now, would you -- in deciding disciplinary here would you

14  taken into consideration her substantiated PREA from a few

15  weeks before?

16  A.  Yes, I would.

17  Q.  Why is that?

18  A.  Because, I mean, to me it just demonstrates, you know,

19  having her in a recreation setting on a maximum security male

20  yard when she portrays herself so strongly as a female is she

21  knows -- I mean, I think I know from watching that videotape

22  there's going to be verbal harassment, that there's going to

23  be physical harassment, there's going to be taunting to a

24  certain degree that's going to occur.  And, like I said, I

25  mean, you know, even if you are Ms. Hampton you know to a

1   certain degree staff are going to let it go on and they are

2   going to videotape you.

3          So, it just once again strikes to not necessarily a

4   case management approach in the sense of trying to make what's

5   the best decision for Hampton's safety and the overall

6   operation of this institution.  It's more or less a decision

7   based on Hampton is going to do what we tell her to do.

8   Q.  Now, would you take into consideration the length of time

9   she had spent in segregation up until that point when

10  determining the appropriate discipline here?

11  A.  Yes.

12  Q.  Why is that?

13  A.  Well, there's been multiple times where the mental health

14  reviews of violations, Ms. Hampton's violation behavior have

15  indicated over and over again at least six times that I think

16  I referenced in 2016 where they said that, you know, long-term

17  segregation is not recommended because of its negative impacts

18  on a seriously mentally ill population.  Now, people have said

19  that repetitively to these mental health reviews.  No one sits

20  back and stops and thinks for a minute, "We have kept her in

21  here for over a year solid.  Is it merely the placement and

22  the continued placement in long-term maximum security that

23  results in these negative outbursts?"  From a case management

24  standpoint it's like there's no creativity to it in the sense

25  of looking at cause and effect.  It really looks more like eye

1    for an eye; you know, "We said you are going to do 30 days,

2    you are going to do 30 days."  On the next one, "We say you

3    are going to do 60 days, you are going to do 60 days.  I don't

4    care if it's 90 in total."  On the next one, "We say you are

5    going to do three months.  By God, you are going to do three

6    months."  It doesn't really matter what the impacts are on her

7    for the mental health standpoint, it doesn't matter the

8    environmental factors she's exposed to.  It really feels like

9    a disciplinary system that is more geared for around an eye

10   for an eye than case management safety for the operation of

11   the institution.

12   Q.  Now, would this incident with Officer Burley have caused

13   you, if you are running IDOC, to reevaluate Ms. Hampton's

14   placement?

15   A.  Yes.

16   Q.  Why is that?

17   A.  Well, I mean, once again, I mean, this is kind of what,

18   you know, you see missing from the transgender committee

19   overall.  I have certainly seen it -- I have not seen it

20   reflected in any other documents -- is, you know, here you

21   have a transgender woman that has three substantiated PREA

22   violations that both physical and mental abuse, you know,

23   feminising hormones, given them feminising clothing, you know,

24   asked to be showered alone, but yet the institution still

25   makes mistakes and puts, you know, Ms. Hampton right next to

1    someone that had previously, you know, physically assaulted

2    her.  It's like no one has looked at the case in total.  It's

3    like no one has considered all the elements to include, like I

4    said, 2018 there must be six recommendations from mental

5    health staff that says long-term segregation for SM population

6    is not recommended.

7            So, they haven't really attempted, nor have they even

8    considered that placement might drive the behavior.  You know,

9    by merely having her in these maximum-security male

10   environments and her seeing delegitimizing activity by placing

11   her next to the predator that just assaulted her, it's that in

12   her own mind she kind of feels like she's left on her own and

13   no one really cares what happens to her and can that lead to

14   misbehavior, can the trauma that she suffers lead to

15   misbehavior.  You know, no one has considered an alternative

16   that would safely integrate her in general population, that

17   would allow her to be around support groups or treatment or

18   around a population that comports with her own views and

19   beliefs, nor have they considered that having her off that

20   male maximum security yard might be better for that

21   population, too, and make that facility run smoother.  So, to

22   me the focus is on punishing her and not necessarily trying to

23   solve the issue.  So, they are not looking at the case in

24   total.

25   Q.  Now, assuming what Officer Burley alleged happened is true

1    and that Ms. Hampton did kick him, does Ms. Hampton's actions

2    here give you any concern as it relates to placement of her in

3    a woman's facility?

4    A.   The action itself of kicking Burley is serious.  No one

5    should be allowed to assault a correctional officer, period.

6    So, I do think it's a serious activity.  Does that sway me or

7    would that sway my opinion about safely placing her in a

8    women's facility?  No.  I think you could safely manage her in

9    a women's facility.

10   Q.   Do her actions in any way indicate that she would be a

11   security threat to other women in a women's facility?

12   A.   You know, I have spent time in women's facilities both

13   within Washington State when I was prison director -- I

14   managed some of them and I have certainly seen them out of

15   state and reviewed them out of state, as well, and there are

16   some tough women in prison.  I mean, there are some strong

17   women in prison, there are some assaulted women in prison,

18   there are women that get in fights in prisons.  So, to a

19   certain degree I would say no, that you will see -- if, in

20   fact, you know, you tour a women's prison, you will see, you

21   know, women with physical prowess around them that are

22   physically strong and intimidating, you will see women that

23   have been in fights and assaults.  So, you know, my question

24   would be if you have a woman at Logan that assaults somebody

25   or even if it's a serious assault, do you send them to Menard?

1    I mean, is that the discipline that if you can't survive in a

2    women's facility we are going to put you in an environment

3    that we know is abusive?  I mean, is that the right response

4    to that or do you manage the discipline within the system of

5    Logan?  Do you look for some sort of sanctioning routine?  You

6    know, does it require mental treatment or counseling or

7    whatever the case may be in order to manage that population

8    within that facility.  So, I don't see Deon Hampton as being

9    an intimidator or predator within that facility.

10   Q.  I want to direct your attention to the ticket, which is

11   Bates 858 to 863, and this should be in tab 20.

12          Now, this is the ticket dated June 26, 2018.  Do you

13   have that in front of you?

14   A.  I do.

15   Q.  Okay.  Now, can you briefly describe what happened in this

16   ticket?

17   A.  You know, an investigation was completed, you know, based

18   on confidential sources that Hampton was having an argument in

19   North Hall housing unit 42.  That confidential source observed

20   Hampton throw an open-handed slap at another offender striking

21   him on the left side of the face and throwing four or five

22   punches at this offender.  They were observed going to ground

23   where Hampton was observed as the aggressor, and then at one

24   point Hampton got behind this other offender and began to

25   choke him.

1  Q.  Now, do you place any significance to the fact that

2  Ms. Hampton wanted this inmate to say *I'm sorry* and that after

3  he did she walked away?

4  A.  I mean, the significance to that is what we don't know or

5  what wasn't given a lot of credibility is what did this inmate

6  say or do.  I mean, what was the behavior that resulted in her

7  lashing out at him?  Once again, that doesn't justify the

8  behavior.  I mean, you know, fighting with another offender is

9  inappropriate irregardless of what occurred, but it certainly

10  looks as if the inmate did something to her that provoked the

11  attack.

12  Q.  Now, if you turn to page Bates 862, I want to read into

13  the record what is said on that page.  Bates 862.

14  A.  Yes.

15  Q.  So, on this page this is the Mental Health Disciplinary

16  Review.  It says, "It is this MHP's opinion that consideration

17  for segregation placement of this offender is appropriate

18  based on the offender's mental health symptoms and needs;

19  however, it should be noted that lengthy segregation time for

20  the SMI population is not recommended."

21       If you received this report from a mental health

22  professional what would you have done?

23  A.  Well, I mean, the irony of this is that those two

24  sentences are basically in conflict of each other.  You have

25  the opening sentence that says that the placement in seg is

1    appropriate based on the mental health symptoms, and then of

2    course you have the notation, "However, it should be noted

3    that lengthy segregation time is not recommended for SMI

4    population."

5          What it doesn't note, nor does it speak to, is the

6    overall cumulative time that she's already spent in

7    segregation, which would be considered, I think, long-term by

8    anybody's estimation.  So, that would be my question, how long

9    has she been in seg.

10   Q.  Now, when deciding discipline for Ms. Hampton in this

11   instance would you take into consideration the amount of time

12   she has spent in segregation?

13   A.  Yes.

14   Q.  Now, assuming what is described in this ticket is true,

15   does Ms. Hampton's actions give you any concern as it relates

16   to placement of her in a woman's facility?

17   A.  No, it doesn't.

18   Q.  Okay.  Now, I want you to turn to Bates 885 to 892, and

19   that is the June 26, 2018, ticket for assault and disobeying a

20   direct order.

21   A.  885, is that what you said?

22   Q.  Yes, 885.  This is the June 26, 2018 ticket Ms. Hampton

23   received for refusing to cuff up and was pepper-sprayed.  Do

24   you have that in front of you?

25   A.  Yes, I recall the incident, but I don't know that I have

1    the ticket.

2         THE COURT:  It should be just a few -- I don't know

3    how the exhibits occur, but just a few pages past the one we

4    were just looking at.

5    Q.  Yeah, it should be right after the one we just went over.

6         If you can't find it, what do you recall --

7    A.  I do.  I do.

8    Q.  What do you recall -- Can you describe what is described

9    in this ticket?

10   A.  So, Internal Affairs was conducting an interview with

11   Hampton pertaining to an assault ticket he was going to

12   receive for assaulting another inmate.  During the course of

13   the interview it was determined that Hampton assaulted the

14   offender, along with the inmate, when Officer McGee escorted

15   Inmate Hampton from the Internal Affairs office to building

16   49.  Major Provost was contacted for segregation and placement

17   when the assault had took place.  Hampton indicated that he

18   was going to file a PREA complaint, he wasn't going to

19   segregation, he wanted to go back to housing unit 42, and that

20   they would have to get a tac team in order to cuff him up and

21   remove him.

22        The lieutenant proceeded to spray bursts of pepper

23   spray to the facial area of Hampton in order to get him to

24   comply with the order to cuff up and move to segregation, gave

25   him several more orders to place his hands behind his back; he

1    refused.  At one point Hampton began to throw closed-fist

2    punches it looks like at one of his staff members and the

3    lieutenant, jumped up on chairs striking him with closed-fist

4    punches.  So, refusing to go to segregation, ended up getting

5    pepper-sprayed, and then ended up assaulting staff.

6    Q.  Now, assuming what is described in this ticket is true,

7    does Ms. Hampton's actions here give you any concern as to her

8    placement into a woman's facility?

9    A.  Once again, I mean, you know, there's no way to condone,

10   you know, assault against staff, and there's certainly no way

11   to condone it and this is a serious misconduct report I think

12   in any correctional system anywhere you go.

13        And when you look at it only on the surface, what you

14   would do is, you know, you would consider the fact that, you

15   know, Ms. Hampton needs to go to segregation in order for this

16   misconduct.  Once again, though, when you back up and look at

17   her placement in total -- I'm sorry.  I'm sorry about that.

18        But, I mean, when you look at the violation on its

19   own, it stands alone.  You know, it's a serious violation, you

20   know, it's something that should be punished, but you do have

21   to look at the context around Ms. Hampton's overall experience

22   within the system.

23        What I go back to over and over again is you

24   shouldn't have to earn your way into the right gender

25   assignment facility.  I think the intention of PREA is to make

```
 1   sure that you are placed in the right gender assignment
 2   facility, something that comports to, you know, some of your
 3   own views and needs.  You know, the mechanics of the female
 4   facility are different than a male, you know, the staff
 5   training of a female facility are different than the male.
 6   The behaviors that women demonstrate in a correctional
 7   facility are very different than a male.  So, I don't believe
 8   you should have to earn your way into the right gender
 9   facility.  Should she be held accountable for this behavior?
10   Yes.
11   Q.  Now, for the other disciplinary tickets that Ms. Hampton
12   received at Lawrence did you see any sort of pattern there
13   with those tickets?
14   A.  I mean, once again, I think I stated this earlier, but
15   they are lower-level violations around the destruction of
16   property, around, you know, modifying jeans to make them feel
17   -- fit tighter, to being in the possession of or wearing, you
18   know, thong underwear, that what the violations to me in total
19   indicate is that she sees herself as a woman and she's
20   modifying clothing in order to make them more appropriate for
21   her viewpoint.  You know, is it appropriate for her to modify
22   state-issued clothing?  No.  But, once again, to me it kind of
23   reinforces that the placement is just incorrect, she should be
24   in a women's facility.
25   Q.  So, do any of these violations, then -- Do you believe
```

1    that they are due to her placement in a men's prison?

2    A.   I do.  I mean, I do.  I think some of it is just the

3    totality of the impacts of, you know, past history of sexual

4    assault by, you know, a staff member in a juvenile facility,

5    about substantiated harassment and sexual assault within male

6    prisoners around.  On the one hand just the confliction of

7    being diagnosed with gender dysphoria, being given feminising

8    hormones, being given a sports bra, given special

9    accommodations for shower, I mean, they do everything they can

10   to support the fact she has lots of feminising characteristics

11   and identifies as a transgender woman, but, you know, they

12   will put her in direct vicinity of someone that's already

13   sexually assaulted her, they will put her on videotape for 53

14   minutes in order to record her behavior in order to give her

15   additional rule violations, in order to substantiate and say

16   that you don't belong in a women's facility.

17        So, I think for someone, even the most rational

18   person, this would be hard to, you know, understand.  I think

19   for someone with, you know, a serious mental health diagnosis,

20   a seriously mentally-ill diagnosis that's on other

21   medications, that none of it seems rational and I think it

22   results in a lot of frustration on her part.  Somebody acting

23   out is probably due to that frustration and the inability of

24   being in general population, inability to go to groups or the

25   inability just to be in a setting that comports with her own

1    identity.  And certainly female facilities are very different

2    than male facilities.  So, I think the placement does drive

3    some of this misconduct.  Certainly the long-term segregation

4    drives some of the misconduct.

5    Q.  Now, based on your review of Ms. Hampton's entire

6    disciplinary records are there any security reasons to keep

7    Ms. Hampton in a men's prison?

8    A.  No.

9    Q.  Now, if you were running IDOC would you continue to house

10   Ms. Hampton in segregation?

11   A.  No.

12   Q.  Why not?

13   A.  Well, once again, I mean, I think it's an orientation

14   around what segregation is used for.  I mean, in my estimation

15   Illinois Department of Corrections is one of those systems

16   that really views punitive segregation, you know, kind of in

17   the sense of an eye for an eye, you know, *you did this, we are*

18   *going to give you 30 days, 60 days, 90 days; you do something*

19   *else, that's going to stretch to six months; you do something*

20   *else, it's going to stretch to nine months or 12 months*, is

21   that they really view it in kind of a punitive, consecutive

22   kind of sentencing fashion.

23        For me, okay, in my experience in Washington State,

24   we really viewed segregation as more of a triage in the sense

25   that you get someone in there, you try and stabilize them, you

1    try and afford them the rights that either counseling or some

2    sort of programmatic intervention so that you could stabilize

3    them and get them back in a general population with the

4    ultimate goal of having them stay in general population so

5    they can attend, you know, any target intervention that

6    reduces their criminal orientation, in a sense reduce

7    recidivism.  I mean, we took it so seriously in this state we

8    even collected statistics on people that recidivated, that

9    were in segregation and were released and came back, because

10   we wanted to treat that population in a way that they stayed

11   out there longer, largely because statistically if you release

12   someone from segregation directly to the community their

13   recidivism rate is about twice as high as anybody else.

14        So, my background and my orientation really is it

15   really is a triage point; you stabilize, you provide some

16   intervention, you get them back in general population.  It

17   really feels as if IDOC has a punitive orientation with a

18   consecutive sentencing mindset that is more an eye for an eye

19   irregardless of its impact on that person, on that offender or

20   on the overall operation of the facility in total.  I disagree

21   with that approach, I don't think it comports to national

22   standards.

23   Q.  Now, I want to direct your attention to Bates 1033 to

24   1037, and this is tab 36 of the binder.

25   A.  Which documents are these?

```
 1   Q.  This is the disciplinary committee profiles for women

 2   offenders at Logan, the aggregate data.

 3   A.  I'm sorry.  I know I have it.  I just -- I'm sorry.  I

 4   just reviewed it yesterday, but I don't know where I placed

 5   it.  It might almost be faster for me to print another copy,

 6   but if you wanted to I certainly have reviewed the document.

 7   I can speak to it if that's --

 8   Q.  Okay.  We will talk you through it.

 9   A.  Okay.

10   Q.  So, you did review this document?

11   A.  Yes.

12   Q.  Okay.

13        MS. DEL VALLE:  Your Honor, I would like to mark this

14   as Exhibit 20 and move it into evidence.

15        THE COURT:  Okay.  So, this is in tab 36.  We are

16   going to mark it as Exhibit 20?

17        MS. DEL VALLE:  Correct.

18        THE COURT:  Any objection?

19        MS. HIGGERSON:  No objection.

20        THE COURT:  All right.  20 will be admitted.

21   Q.  (By Ms. Del Valle) Now, Mr. Pacholke, can you briefly

22   describe what was in this document?

23   A.  It was just an aggregate role of a report that shows the

24   type of violations that occur at Logan Correction Center for

25   women.
```

1   Q.  Okay.  And I know you don't have it in front of you, but

2   did this data say that 132 women at Logan were punished for

3   assaulting an offender?  Do you remember?

4   A.  It was somewhere in that.  It was somewhere like 267 that

5   had fights.

6   Q.  Yes, 296.

7   A.  296, yeah.  So, I know it was a hundred and something in

8   the assault area and over 260 in fighting.

9   Q.  And then there were 692 that were punished for insolence.

10  Do you remember that?

11  A.  Yes.

12  Q.  Now, does this data make it clear that there are women at

13  Logan who engage in fights?

14  A.  Well, yeah, of course, and -- of course it does.

15  Q.  And does this data make it clear that there are women at

16  Logan that break the rules?

17  A.  Yes.

18  Q.  So, does this data make it clear that women at Logan are

19  engaging in similar behavior to what IDOC is trying to use to

20  justify Ms. Hampton's exclusion from Logan?

21  A.  Yes.

22  Q.  Okay.  Go to what is tab 37 in the binder.  Mr. Pacholke,

23  these are the GID Committee notes from June -- sorry, from

24  July 16, 2018, which are in e-mail form.  Do you have those

25  notes in front of you?

1   A.  I do.  I do.  This is July 23, 2018?

2   Q.  Correct.  That's the date that's the date of the e-mail?

3   A.  Yes.

4   Q.  But it's the GID Committee note from July 16, 2018,

5   correct?

6   A.  Correct, 3:30 p.m.

7   Q.  And have you reviewed these notes?

8   A.  I have.

9          MS. DEL VALLE:  Your Honor, I would like to mark this

10  as Exhibit 21 and move it into evidence.

11         THE COURT:  All right.  Any objection?

12         MR. HIGGERSON:  No objection.

13         THE COURT:  21 will be admitted.

14  Q.  (By Ms. Del Valle) Now, Mr. Pacholke, can you briefly

15  describe what's in these notes?

16  A.  Well, there's a variety of people, you know, that sat down

17  with the chief attorney, and they were discussing Deon Hampton

18  going to a women's facility and they talk about a wide range

19  of issues, everything from facility to capability of getting

20  an erection to questions about mental health impacts and

21  behavioral health and, you know, medications.  So, just a wide

22  range of issues around -- that they saw significant and they

23  saw important in making a determination about Hampton's

24  request to go to a women's prison.

25  Q.  Would you agree in these notes the GID Committee is

1    focused on the safety and security of the women at Logan and

2    if they transferred Ms. Hampton?

3    A.  Yes.  As importantly, I mean, to me -- And I don't mean to

4    jump ahead, but you can certainly see this on the second page,

5    it's down towards the end, it says -- it indicates in here, it

6    has -- this is a quote -- "Has Deon Hampton been told

7    previously that her behavior requires stability in order to

8    transfer"?

9           So, once again, I mean, to me that is like a

10   statement that they want her to earn her way to the correct

11   gender placement.  But, it does focus on the safety of Logan.

12   Q.  And are the GID's security concerns valid based on your

13   review of Ms. Hampton's records?

14   A.  No.  No.  And, once again, I mean, which has been

15   consistent with all the documents I have reviewed, is that

16   they seem to pick and choose what they analyze and what they

17   talk about and they don't necessarily look at the case in

18   total like from a case-management standpoint.

19          What I don't hear them talk about in here is the

20   three documented PREA complaints or the verbal and physical

21   abuse that's happened within IDOC male prisons.  What I don't

22   see is an acknowledgment, although I'm assuming they know it,

23   that they have diagnosed her with gender dysphoria and that

24   they prescribed feminising hormones.  What I don't see them

25   indicating here is that she's assigned, you know, a sports

1    bra, that she's given shower accommodations, that she has a

2    past history of being raped in a correctional facility by a

3    staff member, that she's been, you know, maintained in

4    segregation for almost a year with repetitively mental health

5    reviews indicating it's not productive for a person with

6    mental health reviews to maintain long-term segregation.  What

7    I don't see in here is a notation that she's had two past

8    suicide attempts and that transgender population probably has

9    the highest suicide rate in the country.

10           So, although they do talk about Ms. Hampton and her

11   request to go to a women's facility, it seems like they pick

12   and choose what is important to them rather than look at it

13   comprehensively from a more broad case management viewpoint.

14   Q.  I want to direct your attention to the second-to-last

15   bullet point on the first page where it says, "If put in a

16   female facility she could be too aggressively strong to

17   encounter with females in case of an altercation."

18           Do you see that there?

19   A.  I do.

20   Q.  Now, if a woman prisoner is particularly strong, should

21   that mean that she should get transferred out of the women's

22   division?

23   A.  Of course not.

24           MS. DEL VALLE:  One moment, Your Honor.

25           I have no further questions.

```
 1              THE COURT:  All right.  Cross-examination?

 2

 3                      CROSS EXAMINATION

 4  BY MR. HIGGERSON:

 5  Q.  Mr. Pacholke, you said that during your time in the

 6  Washington Department of Corrections that you never had the

 7  opportunity to consider the placement of a transgender inmate,

 8  is that correct?

 9  A.  In the time I was Director of Prisons and implementing

10  PREA, a case did not come to my attention.  Prior to, you

11  know, me being in that position and prior to the Washington

12  Department State of Corrections, I'm not sure whether or not

13  there were transwomen placed in a women's facility.

14  Q.  Okay.  During your time with the Washington Department of

15  Corrections did you ever participate in a decision on where to

16  place a transgender inmate?

17  A.  I did not.

18  Q.  Do you know if there were transgender inmates in the

19  Washington Department of Corrections while you were there?

20  A.  I do not.  I'm sure there were, but I don't know.

21  Q.  Do I take it from that that there was no equivalent to the

22  Illinois Department of Corrections Gender Identity Committee

23  that would consider those issues in Washington?

24  A.  Well, once again we are talking about work that I was

25  doing in 2011 and '12, and I think the existence of those
```

1   committees was fairly uncommon nationwide.  So, no, there

2   wasn't one there at the time and I don't know that there was

3   any nationwide, you know, prior to the implementation of PREA.

4   Q.  How many years were you a warden?

5   A.  In total about five.

6   Q.  And it was never brought to your attention during that

7   time that you had transgender inmates in your facility?

8   A.  No.

9   Q.  You talked about your current employment as looking for

10  innovations within the correctional field.  Have you worked

11  with the Illinois Department of Corrections as part of that?

12  A.  When I was with -- I'm currently an independent

13  consultant.  I mean, I have done that for almost a year now.

14  Prior to that when I was with NYU I did do some work with the

15  Illinois Department of Corrections.

16  Q.  What work was that?

17  A.  We had two projects.  I was the Co-Director of Segregation

18  Solution, which really looks at safe alternatives to

19  segregation.  So, we started doing some preliminary work

20  around segregation issues in the Illinois Department of

21  Corrections.  Second to that -- and this project is still up

22  and running -- was working with parole, prison staff, and

23  probation on a Graduated Reintegration called GRI.

24  Q.  Can you repeat that?  The Court Reporter didn't get it.

25  A.  The second initiative was a Graduated Reintegration

1    Initiative, so a GRI.  Basically a reentry program.

2    Q.  Okay.  You said that's still ongoing?

3    A.  Yes.  I'm not involved.  The project is still ongoing.

4    Q.  During the time that you were involved in either of those

5    projects did you visit the Illinois Department of Corrections?

6    A.  I did.

7    Q.  Which facilities?

8    A.  Stateville, Pontiac, Pinckneyville, Hill Correctional

9    Center, and there was one small minimum facility, I can't

10   remember the name of it.  So, a handful of facilities.

11   Q.  Were any of them women's facilities?

12   A.  No.

13   Q.  You've mentioned PREA several times.  Does PREA require

14   that transgender inmates who are female be placed in female

15   institutions?

16   A.  No.

17   Q.  Okay.  It acknowledges that some may be properly placed in

18   male institutions, is that right?

19   A.  Well, I think it would be silent to that.  It would

20   indicate -- It would set in place a set of standards around

21   how you would deem it appropriate or how you would, you know,

22   work through the process in order to determine where to

23   permanently place them in the correct gender facility that

24   they comport with.

25   Q.  Okay.  So, it leaves to the judgment of the administrators

1    of any given Department of Corrections whether a transgender

2    inmate should be placed in a male or female facility, correct?

3    A.   I think it does defer to their judgment.  That's partially

4    why I was mentioning earlier around the one policy that what

5    it does is lack of objective criteria.  So, without objective

6    criteria you are right, it is just judgment, it is just to a

7    certain degree without any framework or without any rumble

8    strips around it.

9    Q.   When you are talking about the lack of objective criteria,

10   you are talking about in the Illinois Rule?

11   A.   Correct.

12   Q.   Okay.  Does the -- Does PREA give specific objective

13   criteria that have to be considered?

14   A.   I think it would -- I think it would, you know, weigh very

15   strongly that, you know, if you are taking, you know, a

16   federal statute or federal law and you are driving down a

17   policy or you are even driving down administrative code that

18   typically you get greater levels of granular detail as you

19   move from the law down to institutional policy.  And when you

20   look at issues like in Ms. Hampton's case around the diagnosis

21   of gender dysphoria, the feminising hormones, the

22   accommodations around a bra, the accommodation around shower

23   routine, past history of sexual assault, it's hard for me to

24   imagine anybody meeting the criteria more than Deon Hampton.

25   Q.   Okay.  Is it objective criteria that you can absolutely

1   look at, though, and say, yes, this box is checked or, no,

2   this box is not checked?

3   A.  I think you have to take the law, as is in the case with

4   many laws, you have to put more operational detail around

5   those in a policy format.

6   Q.  Okay.  The Illinois policy for transgender inmates does

7   not bar the placement of transgender females in female

8   facilities, does it?

9   A.  It does not.

10   Q.  Are you aware if any transgender female inmates have been

11   placed in female facilities?

12   A.  I don't know that I understand your question.

13        THE COURT:  Are you talking about in Illinois?

14   Q.  In Illinois.  I'm sorry.  Are you aware of Illinois having

15   placed transgender female inmates in female facilities?

16   A.  I think I reviewed a document that referred to one, but

17   other than that one, yeah, I don't really know.

18   Q.  Okay.  Have you reviewed any records related to that

19   placement?

20   A.  Well, like I said, I mean, I think I read that in a

21   document, so that would, you know, at least reinforce you

22   state the fact you are trying to get to here.  I'm aware of

23   one transgender female inmate that's placed inside a female

24   facility.

25   Q.  What I was trying to get to with my last question was have

```
 1   you reviewed records related to that specific placement?

 2   A.  I have not.

 3   Q.  You don't have any mental health training yourself, do

 4   you?

 5   A.  No.

 6   Q.  Were there times when you were determining placement of

 7   inmates in Washington -- this doesn't have to be transgender

 8   inmates -- but where you would rely on input from mental

 9   health professionals?

10   A.  Of course.

11   Q.  And who made the ultimate decision on where somebody would

12   be placed; mental health professionals or the administration?

13   A.  Well, it really depends on the context, to a certain

14   degree.  So, like with maximum security offenders, we ran a

15   joint centralized committee where there was some shared

16   responsibility between operations staff and mental health

17   staff.  So, it's a committee of four or five people on some of

18   the more high-risk cases where maximum security placement

19   removal in particular.  On more routine placements it would be

20   done more by operations staff.  However, on placement, mental

21   health facilities is almost exclusively mental health staff

22   that made those determinations.

23   Q.  Were there any circumstances when you were working in

24   Washington where the operations staff overruled the

25   recommendation of mental health staff?
```

1    A.  Yes.

2    Q.  What considerations would lead to that?

3    A.  Well, you would have to put a case in front of me so I

4    could look at the case more in total.  I mean, did it occur,

5    yes.

6    Q.  You discussed the PREA report, which is at tab 8, Bates

7    stamped 658.  I don't know if you still have that.

8    A.  I'm sure I do.

9    Q.  Well, it's the report from Dixon Correctional Center, May

10   8 of 2018, and it's the allegation of the inmate grabbing

11   Ms. Hampton.

12   A.  So, this is Bates number 858?

13   Q.  Yeah.  658, I'm sorry.

14   A.  658, yes, I have it in front of me.

15   Q.  You said it's very difficult to substantiate a PREA

16   complaint, is that correct?

17   A.  I think it's challenging to substantiate PREA allegations,

18   and I think statistically there are many more allegations than

19   there are substantiated claims.

20   Q.  But the department did substantiate this, correct?

21   A.  They did.

22   Q.  That would indicate they were taking Ms. Hampton's

23   complaints seriously, wouldn't it?

24   A.  That would certainly indicate for this complaint that they

25   found substantiated evidence that the violation occurred.

1   Q.  They didn't disregard the complaint, did they?

2   A.  No, they substantiated it.

3   Q.  Okay.  And have you seen any evidence of anything -- in

4   anything you have reviewed that Ms. Hampton had any further

5   contact with this particular inmate?

6   A.  I don't believe so.

7   Q.  You did criticize -- And I am looking at page 660 of that

8   same exhibit right now.

9        You criticized the fact that the offender who was

10  accused of misbehaving was released from segregation because

11  Ms. Hampton was in segregation, correct?

12  A.  Yes, I was critical of it, yes.

13  Q.  Okay.  Do you know why Ms. Hampton was being placed in

14  segregation at that time?

15  A.  Please restate that.

16  Q.  Do you know why Ms. Hampton was being placed in

17  segregation on May 3 of 2018?

18  A.  No.

19  Q.  So, you don't know whether or not -- how significant the

20  issue was that led to that segregation placement, do you?

21  A.  Well, here's what I know, is that the perpetrator that

22  they substantiated the PREA violation against they let out of

23  segregation.  That's what they did, is they released this

24  person to general population.

25  Q.  But you don't know why Ms. Hampton was going to

1    segregation at this time?

2    A.  I think we are talking about two different issues.  If in

3    fact you have these two offenders around each other and

4    substantiated that this person completes a PREA violation to

5    include physical assault against Ms. Hampton and you release

6    that person from segregation, it talks a little bit about your

7    orientation around that type of misconduct.  That was my

8    point.  Why Ms. Hampton was in segregation -- My assumption

9    was she was in segregation and had been in segregation for

10   some period of time when that violation occurred.

11   Q.  Well, but Ms. Hampton and the other inmate -- There's no

12   indication that they were both in segregation at the time he

13   was first placed in seg, is there?  It talks about releasing

14   him 21 days after he was there because she's in segregation.

15   A.  You certainly know more details around the specifics on

16   this individual than I did.  I just, once again, was asked the

17   question about do I see irony about releasing that person from

18   segregation when a PREA violation was substantiated against

19   them.  I see conflict in that.  I see a conflict in the sense

20   that if you read the investigation, it's pretty clear.  We

21   found it substantiated, we released the perpetrator, we

22   released a predator from segregation.  That's what the

23   investigation says, that's what I read.  I am not making any

24   other valued judgments about what happened before that.  I

25   don't know that I understand completely what happened before

1  that.  I know what the PREA investigation states.

2  Q.  Okay.  Once this allegation was substantiated it would be

3  better to keep those two inmates separate, wouldn't it,

4  Ms. Hampton and the person she accused?

5  A.  That's certainly consistent with what I testified to, yes.

6  Q.  It would be appropriate to take him out of the unit she

7  was in if she was going to segregation on May 3, correct?

8  A.  It would be appropriate to keep them separated, yes.

9  Q.  You talked about another substantiated PREA report which

10  is at tab 5, and it's Bates number 271 is the first page, and

11  this was out of Lawrence Correctional Center.

12  A.  Are you talk about 70, Bates number 270?

13  Q.  No, it starts with 271.

14        THE COURT:  Well, 271, and the next page is 270.

15  Q.  Sorry, 270 is after 271.

16  A.  Yes, I do have the PREA investigation in front of me.

17  Q.  What was substantiated here was that the inmate made

18  threatening statements to Ms. Hampton and exposed himself to

19  Ms. Hampton, correct?

20  A.  Correct.

21  Q.  And, again, the department substantiated this, correct,

22  even though it's a difficult thing to do?

23  A.  Yes.

24  Q.  And they disciplined that other inmate, correct?

25  A.  Yes.

1   Q.  Have you seen any evidence that that inmate was ever able

2   to harm Ms. Hampton?

3   A.  If I'm not mistaken, this is the same offender that was

4   involved in the third PREA investigation that was

5   substantiated that starts with 0567, so to the degree in which

6   this offender is now placed around Ms. Hampton again and is

7   giving another threat to Ms. Hampton I would say, yeah, he did

8   harm her again.

9   Q.  He didn't make physical contact with her, did he?

10  A.  There's a substantiated PREA investigation that said he

11  harassed her again.  I can read the details of that one, if

12  that's helpful.

13  Q.  I don't need you to read the details.  My question was was

14  he ever able to physically attack her?

15  A.  The answer to your question is no.

16  Q.  And, again, that's a third substantiated complaint which

17  again demonstrates that her complaints are being taken

18  seriously, doesn't it?

19  A.  Yes and no.  Yes and no.  It's, like I said, I mean,

20  there's a relationship between the substantiated PREA claim 2

21  and 3, and although in the third one starting with Bates

22  number 00567 he did not physically touch her, I don't believe,

23  he did make threats of raping her.  It's the same offender

24  that was involved.  He was placed again in a situation where

25  he could get to Deon Hampton.  He wasn't separated, he wasn't

1    placed in a different area.  So, yes, the claim was

2    substantiated.  Do they take it serious?  To some degree they

3    take it serious, but they also put the victim in the same

4    proximity as a predator that had already offended against her.

5    Q.  And the other inmate -- Sorry.

6    A.  Sorry; no.

7    Q.  That inmate was sent to Pontiac Correctional Center after

8    that, wasn't he?

9    A.  I'm not sure of where he was sent to.

10   Q.  Doesn't the report indicate that?  I'm looking --

11   A.  It might.

12   Q.  Let's look at tab 6, page 567.

13          Do you see at the end of the large paragraph that it

14   references the inmate being transferred to Pontiac

15   Correctional Center?

16   A.  Yes, I do.

17   Q.  Okay.  Are you aware of what the difference between

18   Pontiac and Lawrence Correctional Center is as far as security

19   levels?

20   A.  I am.

21   Q.  Okay.  And what is the difference?

22   A.  Pontiac is maximum security prison.

23   Q.  What's Lawrence?

24   A.  I believe Lawrence is a medium or a medium and a high

25   medium.

1    Q.  So, that inmate was transferred out to a higher security

2    facility, which is essentially a disciplinary transfer,

3    correct?

4    A.  Correct.

5    Q.  And he was removed from where he would have any contact

6    with Ms. Hampton?

7    A.  Correct.

8    Q.  You also discussed the incident where there was a 53-

9    minute video made of Ms. Hampton out on the yard, is that

10   correct?

11   A.  Yes.

12   Q.  And you were critical of the fact that they allowed the

13   behavior to go on without going in and intervening, correct?

14   A.  Correct.

15   Q.  Were there ever times when investigations were conducted

16   under your authority when you were the warden of a

17   correctional center?

18   A.  Of course.

19   Q.  Okay.  Did the investigators jump in immediately upon

20   knowing that something was -- some misconduct was going on, or

21   did they watch it play out and get a full record?

22   A.  I mean, what we are talking about here is that, you know,

23   you have a woman on a male yard and you are seeing those types

24   of behavior.  Would it be appropriate in my estimation to

25   allow that to go on?  No.

1   Q.   Okay.  Didn't answer the question.

2           My question was do investigators allow misconduct to

3   continue so they could get a full record or do they go in the

4   minute they first see something wrong?

5   A.   I have never allowed an investigator nor have I sanctioned

6   an investigator to allow misconduct to occur when they know

7   it's occurring.

8   Q.   Did they record phone calls when you were a warden?

9   A.   Of course.

10  Q.   Were those ever monitored by Internal Affairs?

11  A.   Of course.

12  Q.   If they found out that an inmate was conducting improper

13  business on the phone, did they go in and stop the first time

14  something was said or did they record the entire phone call?

15  A.   Well, they would download the entire phone call.  We

16  really didn't do realtime monitor.  The ability to monitor

17  realtime phone calls, you are lucky if you are doing one

18  percent of phone calls in any prison system.  The ability to

19  monitor phone calls is extremely low.  In this particular case

20  it looks like they were live monitoring that video.

21  Q.   And was Ms. Hampton ever injured during that video?

22  A.   No.  Was Ms. Hampton touched?  Yes.

23  Q.   Was it an instance of her being touched more or touching

24  somebody else more?

25  A.   I don't know that.  I can't give a judgment to which way

1    that went.

2    Q.  She did, in fact, initiate some of the contact, though,

3    didn't she?

4    A.  Correct.

5    Q.  You talked about a low level of discipline and

6    specifically about modification -- modifying clothing.

7    Modifying clothing is generally, within the Department of

8    Corrections, not allowed, correct?

9    A.  Correct.

10   Q.  And that's true at a men's or women's facility?

11   A.  Correct.

12   Q.  And I think you said that, you know, you understood that

13   she was changing and modifying her clothing because she wanted

14   to be more feminine.  Are you aware of what the female inmates

15   wear at Logan?

16   A.  I'm sure they are issued state-issued clothing.

17   Q.  Did you see in the video from Dixon, the 53-minute video,

18   there was a time when Ms. Hampton's clothes were modified so

19   they looked like very short tight shorts?

20   A.  I did.

21   Q.  Do you think that any of the inmates at Logan are allowed

22   to wear that?

23   A.  No.

24   Q.  Looking at tab 7, that's a disciplinary report from

25   Lawrence Correctional Center and it's the time that

1    Ms. Hampton was accused of kicking Officer Burley.

2    A.  Yes.

3    Q.  Part of that same exhibit is page 552.

4    A.  Yes.

5    Q.  That's a Mental Health Disciplinary Review, correct?

6    A.  Correct.

7    Q.  Are you aware of when those are conducted in the Illinois

8    Department of Corrections?

9    A.  I believe they are conducted when they believe that a

10   disciplinary hearing is being conducted on a seriously

11   mentally ill offender.

12   Q.  Do you know the purpose of the report or the review?

13   A.  I think it's to take into consideration the mental health

14   condition of the offender before discipline is issued,

15   specifically solitary confinement or a placement in a max

16   custody facility or segregation.

17   Q.  On page 552, the mental health summary says, "In this

18   mental health professional's opinion, Offender's mental health

19   did not contribute to the behavior outlined in the

20   corresponding disciplinary ticket," is that correct?

21   A.  That is correct.

22   Q.  So, this is a disciplinary infraction completely separate

23   from any kind of mental health condition, correct, according

24   to the mental health professional?

25   A.  I think -- I don't know that I can fully understand what

1    you just said, but clearly the mental health provider is

2    quoted as saying in their opinion the offender's mental health

3    did not contribute to the behavior outlined in that

4    compilation.

5    Q.  And you would have no mental health expertise that would

6    allow you to second-guess that, do you?

7    A.  No.  What I would offer to you, though, is in the year

8    2018, there's been five or six occurrences where when these

9    reviews are being conducted they are stating that long-term

10   placement in segregation is not productive for an SMI

11   offender.  So, although you are isolating this one and I

12   understand what it says and I understand what the mental

13   health provider is indicating, I could also show you five more

14   in the calendar year 2018 where they said long-term

15   segregation is not recommended.

16   Q.  Right.  We will talk about those in a second.

17   A.  That's where my -- That's where my opinion would come in.

18   I can't second-guess this provider on this one isolated

19   opinion.  But, if I was reviewing this in my official role

20   within the Department of Corrections, I would also have to

21   take into consideration there's been a handful of times when

22   other mental health providers have said this is not -- you

23   know, long-term segregation is not productive.

24   Q.  Looking at the next page, which is 553, that's the second

25   part of the mental health review.

1    A.   Uh-huh.

2    Q.   The mental health professional makes a recommendation as

3    to what segregation term would be appropriate, correct?  It's

4    a quarter way down the page.

5    A.   Correct.

6    Q.   Right.  And the recommendation is 45 days, correct?

7    A.   Correct.

8    Q.   Going back to the beginning of the exhibit, the second

9    page, which is Bates-stamped 541 --

10   A.   I don't know what page you are looking at.

11   Q.   Okay.  It's the second page of this exhibit, Bates stamp

12   541 at the bottom.

13   A.   Oh, okay.  Yes.

14   Q.   This shows the results of the disciplinary process,

15   correct?

16   A.   It does.

17   Q.   And the final imposition is one month of segregation,

18   correct?

19   A.   Along with other stipulations on C grade and loss of

20   privileges, loss of visitation.

21   Q.   Right.  One month of segregation?

22   A.   Correct.

23   Q.   That's less than what the mental health professional said

24   could be the term given to Ms. Hampton, correct?

25   A.   Correct.

1    Q.  And looking at what's been tabbed in tab 20, beginning

2    with Bates stamp 33, as I understood it one of your criticisms

3    was that they are not taking the segregation as a whole, they

4    are only looking at it piece by piece and not considering that

5    somebody that has several tickets could be in seg for a more

6    extended term, is that correct?

7    A.  Yes.

8    Q.  Looking at what's been Bates-stamped as 862 within that

9    same exhibit, this is another mental health review, correct?

10   A.  Yes.

11   Q.  And on the second page, 863, it again has a recommendation

12   for how much segregation would be appropriate, correct?

13   A.  Yes.

14   Q.  And that says zero to six weeks?

15   A.  Yes.

16   Q.  And then further down the page it indicates that the

17   mental health professional who conducted this review was Randy

18   Block, correct?

19   A.  Yes.

20   Q.  And then turning within the same exhibit to page 946,

21   that's another mental health review, is that correct?

22   A.  Yes.

23   Q.  Okay.  And this is another one that on its second page

24   allows for zero to 90 days of seg time?

25   A.  Yes.

1    Q.  And that's conducted by N. Frederick, correct?

2    A.  Yes.

3    Q.  Okay.

4    A.  I mean, however, on both of these two that you have

5    recommended, that you referenced here, the last two documents

6    that you recommended, if you go to page one, on both of these

7    last two it does indicate, "However, it should be noted that

8    lengthy segregation time for SMI population is not

9    recommended," on both of these last two forms.

10   Q.  Right.  Looking at page -- within the same exhibit, page

11   887 --

12   A.  I'm sorry.  887?

13   Q.  Yes.  And I know the pages within the exhibit, I don't

14   think, are in order.

15        THE COURT:  Mental Health Disciplinary Review, dated

16   June 27.

17   A.  Yes; yes.  Yes, okay.  I have it now.  887.

18   Q.  This is an additional mental health review, correct?

19   A.  It is.

20   Q.  It also includes the language that you talked about

21   lengthy segregation time for SMI population is not being

22   recommended, correct?

23   A.  Correct.

24   Q.  And then on the second page, 888, the recommended time is

25   zero to eight months, correct?

1    A.  Correct.

2    Q.  And the inmate who performed this review is Randy Block

3    again, correct?

4    A.  Correct.

5    Q.  So, the mental health staff is aware that there's more

6    than one disciplinary segregation term at issue, correct?

7    A.  I believe so; I hope so.

8    Q.  Well, we have seen one person perform two of these

9    reviews, correct?

10   A.  We have.  But what I don't see is an indicator -- I mean,

11   like on this form what I don't see is how long has the person

12   generally been in seg before this review is conducted.  So, I

13   don't see any notation that, you know, *how long has the person*

14   *-- well, they have been in six months, now they have this rule*

15   *violation, what's your recommendation*?

16   Q.  Right, but the mental health person who knows there's more

17   than one seg term at issue is still saying that segregation

18   term is appropriate, correct?

19   A.  The person that made this recommendation has done multiple

20   recommendations, yes.

21   Q.  And is still saying that seg placement is appropriate,

22   correct?

23   A.  They are certainly indicating that seg placement is

24   appropriate.

25   Q.  You stated in your expert report -- And I'm on page five

1    of that report.

2    A.   Okay.

3    Q.   You said at the very top that Ms. Hampton is an average

4    size transgender woman.  I just want to clarify, are you

5    talking about average size for a transgender woman or average

6    size for a woman once she's -- once she is presenting as a

7    woman?

8    A.   What I was trying to note here is that she is an average

9    size -- she is an average-size person, meaning that she's

10   neither physically large or physically small.

11   Q.   Do you know whether men of the same size are generally

12   stronger than women of the same size?

13   A.   Well, certainly the assumption would be that men of the

14   same size would be stronger than women of the same size.

15   However, in Ms. Hampton's case, the expert report that I read

16   indicated that biologically is more akin to a woman, that her

17   testosterone levels are so low they are almost nonexistent.

18   So, from a biological standpoint Ms. Hampton is more akin to a

19   woman than a man.

20   Q.   And that's while she's taking hormones, correct?

21   A.   Correct.

22   Q.   On page six of your report you state that in the first

23   full paragraph that she should be placed in a women's prison

24   because she would be less likely to be ridiculed, is that

25   correct?

1   A.   That's certainly one of the things that I have said in

2   that paragraph.

3   Q.   Okay.  You have never been to Logan Correctional Center,

4   though, correct?

5   A.   I have not.

6   Q.   So, how would you know how likely the inmates or staff at

7   that facility are to ridicule Ms. Hampton?

8   A.   Well, what I do know is what it's like to place a woman

9   inside a male facility only because of my experience when we

10  ran co-correctional facilities in here, a woman is going to

11  stand out in a male facility.  Men in general are more prone

12  to make verbal comments.  So, I guess that's an experiential

13  standpoint that being in a women's facility she's going to

14  blend in more.

15  Q.   Men are more likely to make verbal comments than women

16  are?

17  A.   I think when you place both genders together in one

18  prison, my experience has been you are going to get more

19  hooting and hollering out of men, more comments out of men

20  than you are women.

21  Q.   That's what we are talking about here.  You are talking

22  about a transgender inmate within a male facility versus a

23  transgender inmate within a female facility.  You are not

24  talking about a different -- a separate gender in each

25  facility, right?

1    A.  I guess what I'm trying to explain to you is that based on

2    this statement is that I believe she would be less ridiculed

3    in a women's facility than she will in a male.  What I liken

4    that to is when we had men and women to in the same facility,

5    what happened is there are some more verbal comments that men

6    will display towards women, especially in prison, when they

7    are isolated from them and get exposed to them.  There are

8    going to be more comments, men are going to do more than

9    women.

10   Q.  Have you ever observed a transgender female placed in a

11   female facility?

12   A.  I have not.

13   Q.  So you wouldn't know what the reaction is there, would

14   you?

15   A.  Well, I certainly have experience with men and women being

16   located in the same facility and that's certainly, I guess,

17   the discussion here is whether or not it's appropriate to

18   place Ms. Hampton in a women's facility.

19   Q.  That is all the questions I have.

20            THE COURT:  All right.  Any redirect?

21            MS. DEL VALLE:  Yes, briefly, Your Honor.

22

23                    REDIRECT EXAMINATION

24   BY MS. DEL VALLE:

25   Q.  Mr. Pacholke, can I direct you back to your report on page

1    four?

2    A.  Yes.

3    Q.  Are these some of the PREA standards that you were

4    referring to earlier in your testimony?

5    A.  Yes.

6    Q.  And do these PREA standards outline the objective

7    standards that you were speaking of?

8    A.  Yes, I think they can be further operationalized in the

9    sense of using very specific examples; but, yes, these are

10   some of the PREA standards.

11   Q.  And what are some of the objective standards that PREA

12   indicate that should be considered when determining placement?

13   A.  A mental, physical or health facility, the age of the

14   inmate, the physical build of the inmate, whether the inmate

15   has been previously incarcerated, whether the inmate's

16   criminal history is exclusively nonviolent, whether inmate has

17   prior criminal convictions for sex crimes against an adult or

18   child, whether the inmate is or is perceived to be gay,

19   lesbian, bisexual, transgender, intersex, or gender

20   nonconforming, whether or not the inmate has previously

21   experienced sexual victimization, inmate's own perception of

22   vulnerability and whether the inmate is retained solely for

23   civil immigration purposes.

24   Q.  Now, based on your review of IDOC's policy, did that

25   policy include any of these objective standards?

1    A.  No.

2    Q.  Now, you were asked some questions about the two

3    substantiated PREA complaints from Lawrence.  Do you remember

4    those questions on cross?

5    A.  I do.

6    Q.  Now, is an offender who exposes himself to Ms. Hampton and

7    threatening Ms. Hampton, should that be considered harmful?

8    A.  Yes.

9    Q.  And that's why he was disciplined, correct, because he was

10   harming Ms. Hampton?

11   A.  Correct.

12   Q.  Now, aside from the discipline that that offender

13   received, was there anything else that was done?  Did IDOC do

14   anything else to protect Ms. Hampton?

15   A.  Not that I can tell.

16   Q.  Were there any operational changes as a result of the

17   substantiated PREAs?

18   A.  Not that I'm aware of.

19   Q.  Now, you were asked some questions about the video that

20   you watched of Ms. Hampton on the yard.  Do you remember

21   those?

22   A.  I do.

23   Q.  Now, based on your review of all the records and your

24   review of the video, were you under the impression that the

25   officers who were filming Ms. Hampton were initially filming

1   her as part of an investigation?

2   A.  I was not.

3   Q.  And did the video and officers comments within the video

4   give you any impression that they were conducting some type of

5   investigation that required live monitoring?

6   A.  No.

7   Q.  Now, even if Ms. Hampton initiated contact with some of

8   the other men on the yard, does that absolve IDOC from its

9   obligation to protect her?

10  A.  No.

11  Q.  I have nothing further.

12          THE COURT:  All right.  Thank you, Mr. Pacholke.

13          So, Deana, that will end the video.

14          Deana has moved our next video witness to 2:00, so we

15  will break until 2:00 and then resume with Mr. James via

16  video.

17          (Following a recess, proceedings continue in open

18  court.)

19          THE COURT:  All right.  Call your next witness.

20          MS. ELDER:  Can everybody here me if I stand here?

21          (Plaintiff witness, Brandon James, sworn.)

22          THE CLERK:  Please state your name for the record.

23          MR. JAMES:  My Government name or the name that my

24  family calls me?

25          MS. ELDER:  Your Government name, Ms. James.

```
 1           MR. JAMES:  All right.  Brandon Luke James.

 2

 3                     DIRECT EXAMINATION

 4  BY MS. ELDER:

 5  Q.  Ms. James, what is your preferred first name?

 6  A.  Kierra Lacey James.  Kierra.

 7  Q.  And how do you spell Kierra?

 8  A.  K-I-E-R-R-A.

 9  Q.  And, Ms. James, what is your gender identity?

10  A.  Female.

11  Q.  Okay.  And are you classified as transgender within IDOC?

12  A.  Yes.

13  Q.  Ms. James, where are you currently housed?

14  A.  Dixon Correctional Center, housing unit 42, cell 41.

15  Q.  Okay.  And when did you arrive at Dixon?

16  A.  May 12 of 2017.

17  Q.  Do you know Strawberry?

18  A.  Yes.

19  Q.  And when did you first meet Strawberry?

20  A.  Around January of 2006.

21  Q.  Where was that?

22  A.  Kewanee, IYC Kewanee, the juvenile.

23  Q.  Sorry.  Go ahead and finish your answer.

24  A.  Yeah, the juvenile prison for -- Back then it was a

25  juvenile facility.
```

1   Q.  Okay, thank you.  And at that time was Strawberry

2   transgender?

3   A.  Yes.

4   Q.  Did she identify as a woman?

5   A.  Yes.

6   Q.  And when was the second time you saw Strawberry?

7   A.  In Pinckneyville in 2016, right around September -- Yeah,

8   right around like September/October of 2016.

9   Q.  Okay.  And how long were you housed in Pinckneyville?

10  A.  From September 23 until May 12 of 2017.  I mean, from

11  September 23 of 2016 to May 12 of 2017.

12  Q.  Okay.  So, you were housed at Pinckneyville with

13  Strawberry from approximately September/October of 2016, until

14  you were transferred in May of 2017?

15  A.  Yes, ma'am.

16  Q.  And where were you housed in Pinckneyville?

17  A.  Initially I was housed in 6-A for several months, because

18  they had a policy, an unwritten of not allowing transgender

19  inmates into general population housing units.  They tried to

20  keep us on the intake unit.  And then after that I was finally

21  allowed to go to a population unit, to 2-C, for about a month

22  and a half, and then they moved me to the segregation housing

23  unit which is pretty much where they put people who are in seg

24  or people who have just gotten out of segregation to keep them

25  pretty much away from the rest of the population because they

```
1    get in a lot of trouble.  They put me over there on 5-D, cell
2    25, and then I ended up being placed on 6-B, which is pretty
3    much a unit where there's only a few cells, and it's the most
4    isolated environment that they could possibly put someone
5    who's in population.  There were only like nine or ten people
6    on the unit with me, and only one of them was I even allowed
7    any other contact with, and that was a transgender inmate.  We
8    only got two hours of recreation per week, and we were celled
9    alone and on a wing essentially by ourselves.
10   Q.  So, am I understanding correctly, are you stating that you
11   were in general population only for a month and a half in
12   Pinckneyville?
13   A.  Oh, no, I was in -- Yeah, no, I was in general population
14   for about a year --
15   Q.  Okay.
16   A.  -- and two or three months.  About a year and two or three
17   months, and then they segregated me from the rest of the
18   facility.  While I was still in general population I wasn't on
19   segregation status, I wasn't on room restriction or anything
20   like that.  They segregated me because I was transgender and
21   put over there with another transgender inmate who had
22   transferred from Logan to Pinckneyville.
23   Q.  Okay.  And do you know where Strawberry was housed in
24   Pinckneyville?
25   A.  At that time she was in 5 house.  She was in segregation
```

1    when I was moved, but mostly she was on 5-D in segregation.

2    Q.  Were you ever housed in the same unit as Strawberry at

3    Pinckneyville?

4    A.  Yes, I was on 5-D with her for about a month.

5    Q.  Okay.  And did you ever witness any incidents involving

6    Strawberry at Pinckneyville?

7    A.  Yes.

8    Q.  Can you describe those incidents?

9    A.  So, you know, Pinckneyville is an environment where it's

10   extremely discriminative and there's a lot of sexual

11   harassment.  The officers are very, very vulgar and they say

12   very sexually explicit things to people that are transgender

13   down there.  That was an everyday thing.  Some type of

14   derogatory comment was made every single day.  But

15   specifically, on, I think it was, December 2 of 2016, she was

16   going into commissary, I was on my way out of commissary, in

17   the line going back to the unit, and when she walked into the

18   commissary, the commissary lady, she saw Strawberry and

19   screamed, "Everybody get the fuck out of commissary now.  None

20   of you are shopping."  And then so everyone is like, "Why?

21   What happened?"  And they are like, "That fucking faggot" --

22   She was like, "That fucking faggot won't shut up."  And

23   Strawberry wasn't talking, nobody was talking, everyone was

24   quiet, and so everyone came out of the commissary, and then

25   she said, I think, that Strawberry threatened her, but

1    Strawberry was already outside of the commissary.  So, they

2    tried to take Strawberry to seg.  She refused.  She was like,

3    "No, I didn't do anything wrong, not going to seg, I didn't do

4    anything wrong."  And the entire commissary line that walked

5    in was telling the officer she didn't do anything wrong, that

6    the commissary lady was lying on her.  And, so, the entire

7    commissary line pretty much refused to go back, and they had

8    to call the warden and everybody over there.  But they cuffed

9    Strawberry up and they pretty much drug her to seg, but they

10   drug her to the corner over by the chow hall, and then they

11   stopped and they had us -- our line that was ready to go back

12   from commissary, they had us walk into the unit, and then they

13   take her into 5 House so they could put her in seg.

14   Q.  Okay.  And you also mentioned that officers made vulgar or

15   derogatory comments.  What were those comments?

16   A.  "I bet you can suck a good dick.  You will never be a

17   woman, you are a man.  You have got a dick between your legs,"

18   you know, that type of just horrible things like that.

19   Q.  And did you hear officers make those comments to

20   Strawberry?

21   A.  Yes, they made it to anybody who was transgender down

22   there.

23   Q.  And they made those comments to you, as well?

24   A.  Absolutely, almost every single day.

25   Q.  What was the culture like for trans individuals at

1    Pinckneyville?

2    A.   Basically a culture of fear.  You were always afraid you

3    were going to get sent to segregation at any given time.

4    Anyone who's transgender or identifies as being gay or

5    bisexual, sometime within a one-year period they have spent

6    time in segregation, because basically Pinckneyville looks for

7    ways to harass us.  It was the worst place I have ever been

8    to.  I have been to quite a few prisons, maximum security

9    prisons, and Pinckneyville was by far the most scary place.  I

10   was scared to walk to the chow hall, I was scared to go to

11   yard, scared to go to gym, and I wasn't allowed to do

12   anything, wasn't allowed to get a job, wasn't allowed to get

13   into school to further my education so I could rehabilitate

14   myself, I wasn't allowed to go in to participate in chaplain

15   services, like Bible studies and that type of thing.  Like

16   they pretty much did everything they could to segregate us and

17   keep us in our cells as much as possible.

18   Q.   Ms. James, were you ever sexually abused or harassed by

19   staff at Pinckneyville?

20   A.   Yes, I was sexually harassed almost every day.

21   Q.   And can you describe in general terms what officers did to

22   you?

23   A.   I had an officer that used to come up to my cell and he --

24   when he would give -- be ready to give me my medication he

25   would grab his penis and say, "You like this, don't you?"  Or,

```
 1   "No, you like black ones, huh?"  His name started with an H.

 2   I can't remember fully his last name off the top of my head.

 3   It's just you kind of try to blur that type of thing out.

 4   But, I have been strip-searched and had the officers call

 5   numerous other officers over just so that they could see me

 6   get strip-searched.  "I didn't know she -- her boobs looked

 7   like that," or, "I didn't know her penis looked like that,"

 8   and say that type of stuff, you know what I mean?  And it was

 9   just like all the time, all the time.

10   Q.  And did you report any abuse by officers?

11   A.  No, it's the scariest thing to do, you know what I mean?

12   Because if you report one officer for what they are doing,

13   then another officer goes ahead and retaliates against you for

14   what you reported.  It's the scariest thing in the world, and

15   they act like it don't happen, but it happens.

16   Q.  And, Ms. James, were you sexually abused or harassed by

17   other prisoners at Pinckneyville?

18   A.  Yes, I was sexually abused by an inmate in Pinckneyville.

19   I was raped in September of 2016.

20   Q.  Did you report that incident?

21   A.  I did, in January of 2017.

22   Q.  What happened when you reported it?

23   A.  Absolutely nothing.  They treated me like I was lying,

24   they treated me like I was a criminal.  They treated me like I

25   had to be falsifying what I was saying about the guy, and
```

1    truth of the matter is the reason why I even reported it is

2    because he had gotten out of segregation for something

3    unrelated and came over to my housing unit on my wing and I

4    had to see the man who raped me every single day whenever I

5    went anywhere.  I had to look at the man who sexually abused

6    me, sexually assaulted me every single day, and it hurt and I

7    didn't know how to deal with it, so I talked about it at the

8    transgender group that we had.  And they made a PREA

9    complaint, they took the guy to segregation that night.  But,

10   when Internal Affairs came to talk to me, the initial Internal

11   Affairs officer told me flat out when he got to see how I was

12   reacting, how -- he got to hear everything that I was saying,

13   he got to -- he said, "I am trained to know when people are

14   lying." He said, "You are telling the truth."  But then when

15   the first shift, which is the regular Internal Affairs

16   officers, when they started investigating it, you know, I

17   ended up on suicide watch that day.  The very next day the IA

18   Officer Lind came to my door and said, "I know you are fucking

19   lying.  I'm going to get you.  I'm going to fucking smoke you.

20   I'm going to prove it."  It just made me feel like why do I

21   have to be lying about being sexually abused?  You can't just

22   take it for what it is?  And he didn't want to investigate the

23   claim.  Nothing was really done, they unsubstantiated it, they

24   let the guy out of seg, and nothing happened.

25   Q.  And, Ms. James, you just stated that after you spoke at

1   transgender group there was a PREA complaint that was filed.

2   Before that complaint was filed did you know about PREA?

3   A.  I had heard of PREA, but I didn't really know what it was.

4   I didn't understand what it was.  They didn't have anything

5   posted in the living unit about PREA, they didn't have a phone

6   number put up like they do now.  None of that type of stuff

7   was up.  I was aware of what PREA was, but I was not aware of

8   anything else.  Like we knew what Prison Rape Elimination Act

9   was, but we didn't know how to utilize it.  We didn't know how

10  to utilize the hotline or anything like that.  They didn't put

11  that stuff up until right around the beginning of 2017, when a

12  PREA auditor came through in 2017, around April or March of

13  2017 is when they actually spray-painted the phone number

14  around.  And before that there was nothing around, you had no

15  idea what PREA was.

16  Q.  Ms. James, you said you arrived at Dixon in May of 2017.

17  Were you transferred from --

18  A.  No, 2015.  Oh, Dixon, I'm sorry.  I thought you said

19  Pinckneyville.

20  Q.  No, that's okay.  Let me repeat that for the record.

21          So, you arrived at Dixon in May of 2017.  Were you

22  transferred from Pinckneyville to Dixon at that time?

23  A.  Yes, ma'am.

24  Q.  Okay.  And have you ever been housed together with

25  Strawberry at Dixon?

```
 1   A.  Yes, we were cellies for about a month.

 2   Q.  And when was that?

 3   A.  From like May 26, or May 25 or 24th, something like that,

 4   until June 26 or 27, somewhere around there.

 5   Q.  Okay.  And where were you housed together?

 6   A.  Housing unit 42, cell 42.

 7   Q.  Was that in general population?

 8   A.  Yes, ma'am.

 9   Q.  How was it being housed with Strawberry?

10   A.  Extremely stressful.  Every single day it was something.

11   I have really never seen so -- such a -- I have never

12   experienced such a chaotic environment where every other day

13   there was a ticket being wrote, our cell was being shook down,

14   people would come in and there were PREA calls being made on

15   officers and inmates, and it was just -- it was extremely

16   stressful for me.

17   Q.  And when you say your cell was shook down, what do you

18   mean?

19   A.   Okay.  Well, like the officers would -- There were never

20   any formal shakedowns, but she would go out to the yard and

21   they would bring her back in from the yard, tell her to take

22   her shorts off, check and see if they are altered, go through

23   her property box to see if any clothes are in there that are

24   altered, and they did that about once every two or three days.

25   Q.  And what --
```

1    A.   They took -- They took our blues one time.   Took our blue

2    pants and just completely took both of our pants, literally

3    just took them, didn't even give us any replacements.

4    Q.   What's your understanding of why they took your pants?

5    A.   They said they were altered, but down here at Dixon

6    Correctional Center there's a sewing shop, so when pants are

7    damaged or are torn you send them to the sewing shop and they

8    are repaired, and when they are sent back, they are not in

9    their original form.   And they tried to say that we had

10   altered them, but they had literally like two days before just

11   been at the sewing shop.

12   Q.   And what other types of altered clothing were they looking

13   for, if there were others?

14   A.   So, being transgender, we wear what are called gaffs.   We

15   wear something that keeps our male genitalia from moving

16   around, touching the rest of our body, being in contact with

17   anything, that way we don't have to feel it, see it, nobody

18   else can see it.   We can't -- It's just gone away and tucked

19   away, you know, so it's just a form of -- I don't know how to

20   explain it.   It's just a way to conceal that part of your

21   anatomy.

22   Q.   And where are the correctional officers in the unit in

23   relation to your cell?

24   A.   You said what?   I didn't understand.

25   Q.   That was not a clear question.   I'm sorry.   Let me

1    rephrase that.

2          Are there correctional officers in unit 42, like

3    during the day, monitoring prisoners?

4    A.  Oh, yes.  Oh, yes, there are.

5    Q.  And where are they in unit 42?

6    A.  Generally they are in what's called *the bubble* or *the*

7    *control pod*.

8    Q.  And where is the bubble in relation to your cell, the cell

9    that you shared with Strawberry?

10   A.  Directly in front of it so that they could just look

11   straight into the cell at any time they wanted.

12   Q.  And would correctional officers look into your cell?

13   A.  All day long from the second the door opened at 8:00,

14   until the second the door closed at 2:40, we had some officer

15   staring at our door.  The second the door opened at 4:30,

16   until that door closed again at 9:30, there was an officer

17   sitting there staring at our cell nonstop.

18   Q.  Would they do that to other prisoners in unit 42, stare at

19   their cells?

20   A.  Absolutely not.  Absolutely not.  People walk past with --

21   Q.  Sorry, you may finish.

22   A.  People walk past with giant bags of commissary, walking

23   from one side of the building to the complete other side of

24   the building, and they don't say anything.  But, the second

25   somebody gets too close to our door they tell them they have

1    to get away from our door.

2    Q.   Do you know the names of any of the officers that stared

3    into your cell?

4    A.   Officer Blackburn.  Specifically she was the main one.

5    Q.   Okay.  And did you ever hear staff misgender Strawberry at

6    Dixon?

7    A.   That's one of the tools that they pretty much used against

8    us.  They tried -- They purposely call us hes and hims, say we

9    are men and we are guys, "Act like a man, you are in a male

10   prison."  That's one of their tools against us, and then if we

11   react to it and say something rude or disrespectful to them in

12   the way that they are disrespecting us, now we are getting

13   wrote a ticket and we're getting potentially being put in

14   segregation, but we are only responding to the ignorance and

15   the disrespect that is being put towards us.

16          THE COURT:  What was the word that you used?  Have

17   you ever heard --

18          MS. ELDER:  Misgender.

19          THE COURT:  Okay.

20   Q.   (By Ms. Elder) Do you know a prisoner named Armond

21   Clemons?

22   A.   Yes.

23   Q.   And was Clemons at Dixon with you and Strawberry?

24   A.   Yes.

25   Q.   Where was Clemons housed in relation to you and Strawberry

1    in June of 2018?

2    A.  He was housed in the dayroom cell around the corner.

3    Q.  And can you describe the layout of unit 42?

4    A.  Okay.  So, when you walk into the door, immediately as

5    soon as you walk into the door, straight ahead is cell 30,

6    which is where Armond Clemons is, right in front of the

7    bubble, and then if you look down to your left there's a wing

8    that goes down this way, but it's not set up like where the

9    wing is straightforward.  It's horizontal.  So, when you look

10   down the cells are against the wall, so that it's not just

11   looking straight down a hallway; you're looking -- you can see

12   two cells were specifically looking down our hallway.  You can

13   see a total of five cells directly from the bubble.  You can

14   see 56, 57, 58 cell, you can see 41 cell and 42 cell.

15   Q.  Okay.  And is there a day room in unit 42?

16   A.  Yes.  And inside of the day room there's 30 cell and 33

17   cell that are functioning, and it's right in front of the

18   housing unit's control pod, the bubble, as well.

19   Q.  Can the people in the different wings of unit 42 interact

20   with each other?

21   A.  Yes.

22   Q.  Did they see each other?

23   A.  Yes.  You can cross directly from one side of the unit to

24   the other.  It's not a lockdown facility.

25   Q.  And can everyone access the day room?

1   A.  Yes.

2   Q.  Did you ever witness Clemons do anything inappropriate to

3   Strawberry?

4   A.  Yeah, he -- So, there was a moment -- there was a time

5   when Strawberry was trying to get into the shower, and he came

6   over to the shower and groped her breasts and said, "When are

7   you going to let me fuck you," and I also walked up on -- I

8   was going to get ice, which is around the corner.  30 cell is

9   right where you had to go around the corner to go get ice at,

10  and he called her to his door and was masturbating to her,

11  saying, "I bet you want to suck this big dick.  I bet you want

12  to do it, huh?"

13  Q.  And regarding the first incident you just spoke of, how is

14  it that Clemons and Strawberry were at the shower at the same

15  time?

16  A.  Well, the showers, the way they are set up is there's two

17  showers on the wing, there's a dayroom shower, but she was

18  getting into the shower on the wing closest to our cell, and

19  when she's trying to get in there's a little wall that sticks

20  about two and a half feet to about two feet out from the

21  shower, so somebody can stand next to that wall and they won't

22  be able to see that person right there.  But, Strawberry --

23  But, and that's where Armond Clemons was.  Armond Clemons

24  walked over to that section of the wall while Strawberry was

25  trying to get into the shower and groped her breast.

1    Q.  And how could you see that?

2    A.  I was standing in the doorway of my cell and I could see

3    directly straight to the shower, because it's about maybe ten

4    feet away from my cell.

5    Q.  How can you see when you are in your cell?  Is it open

6    bars, open door?  How can you see?

7    A.  Well, the door is open.  It's dayroom time, so my door was

8    open.

9    Q.  Okay.

10   A.  But, even if my door was closed you could still see out

11   the window directly into the shower.

12   Q.  And before Strawberry came on your unit did you have any

13   reason to think that Clemons would sexually harass her?

14   A.  Absolutely.  He is the most predatory individual I have

15   ever met in all my years in IDOC.  He attempted to sexually

16   abuse me and numerous other inmates, as well.  He was a very

17   despicable individual.

18   Q.  Did he ever talk to you about Strawberry?

19   A.  Yes, before she even got out of seg he came up to me and

20   was like, "Hey, will you give your celly" -- what's called a

21   kite in jail.  It's a letter.  It's a handwritten letter, it's

22   a note.  And I told him, "No, I'm having no part in that."

23   And he said, "Why?"  I'm like, "Because of the type of person

24   you are.  You are a despicable person."  And so before she

25   even got out of seg his intent was already improper.

1  Q.  And do you know whether Strawberry ever reported Mr.

2  Clemons to correctional staff?

3  A.  Yes; numerous times.

4  Q.  Did they do anything the first time she reported it?

5  A.  No, they -- Armond Clemons is a very notorious snitch.  He

6  is well-known to be a snitch.  He's self-admitted.  He's a

7  self-admitted snitch.  He's somebody who openly admits that he

8  has testified on behalf of IDOC, lying for officers and lying

9  on inmates, and he readily tells people this.  And so pretty

10 much they were trying to cover up for him.

11 Q.  Did IDOC officers ever do anything about Clemons?

12 A.  Well, yes, they did.  The second time she made a report

13 they actually took him to segregation.

14 Q.  And, in total how long was Clemons on the unit with you

15 and Strawberry?

16 A.  Maybe about two to three weeks.

17 Q.  Ms. James, you stated earlier you are a transgender woman,

18 you are a woman.

19 A.  Yes.

20 Q.  How long have you been living as a woman?

21 A.  Since I was 14.

22 Q.  And do you take hormones?

23 A.  Yes.

24 Q.  How long have you taken hormones?

25 A.  This time for almost five years.

1    Q.  Okay.  And when you say *this time*, you were on hormones

2    previously?

3    A.  Prior to my incarceration when I was 16, I was taking

4    hormones.  But when I got locked up at 16, IDOC would not

5    allow me to take hormones.  I did not get back on hormones

6    until 2013.

7    Q.  Okay.  And when did you first enter IDOC custody?

8    A.  Well, I was a juvenile transfer from the juvenile system

9    into the adult system, so do you want to know when I entered

10   the juvenile -- the Department of Juvenile Justice or the

11   Illinois Department of Corrections?  Because they are two

12   different --

13   Q.  When were you transferred from the juvenile department to

14   the Illinois Department of Corrections?

15   A.  June 23rd of 2008.

16   Q.  Did IDOC identify you as trans when you first entered

17   their custody?

18   A.  Yes.

19   Q.  Have you ever been housed in a women's facility in IDOC?

20   A.  No.

21   Q.  Has anyone within IDOC ever asked you if you would rather

22   be in a woman's facility?

23   A.  Yes, now they do ask on our transgender intake forms.

24   Q.  Who gives you the transgender intake form?

25   A.  Some mental health person.  They come and they ask you a

1   whole bunch of questions, and that is -- I believe, if I

2   remember correctly, that is one of the questions.

3   Q.  And, filling out that form would you rather be in a

4   woman's facility?

5   A.  Absolutely.  I'd actually feel safe.  I don't feel safe

6   any second of any day around a whole bunch of men.  I cannot

7   defend myself, I cannot protect myself.  I'm always fearful

8   that I will be raped.  Every time I walk in my cell I look

9   both ways before I even shut the door or open the door fully.

10  I always make sure somebody is around when I am getting in the

11  shower.  I always feel, because I'm transgender, one of these

12  guys, because I say something to them, they might snap off and

13  assault me or attack me.  I'm always in constant fear.  I

14  hardly ever go to the chow hall.  My mom has to send me money

15  that she can use in better places so that I can feel safe,

16  because I don't like being around 150, 200 men inside of any

17  type of setting.  I rarely ever go to yard, I rarely ever go

18  to gym, because I never feel safe.

19  Q.  Aside from Dixon and Pinckneyville what other prisons have

20  you been in in IDOC?

21  A.  Menard Correctional Center, Stateville Correctional

22  Center, Pontiac Correctional Center, and Logan Correctional

23  Center.

24  Q.  When you were in Logan was it a women's facility?

25  A.  No, it was a male facility.

1  Q.  And based on your experience how would you describe what

2  it's like to be transgender in men's prison in IDOC?

3  A.  It's hell, it's torture.  If it's not an officer harassing

4  you because you are transgender, it's an inmate harassing you

5  because you are transgender.  You are always worried if your

6  celly gets moved or goes to seg or anything because they might

7  try to put someone in the cell with you who tells you that you

8  can't live in that cell and if you stay they are going to beat

9  you up.  You are always worried about being sexually abused.

10  It's nonstop sexual harassment.  I'm an attractive transwoman,

11  and everywhere I go I have people staring, I have people

12  pulling their penis out, I have people saying all types of

13  vulgar comments.  I have people who if -- I just tapped a guy

14  on his arm in commissary about a month ago and told him -- you

15  told him to give you barbecue beef and he didn't give you

16  barbecue beef in your bin, and he said, "If you ever touch me

17  again I'm going to hit you in your fucking mouth."  It's that

18  type of environment.  You are trying to be a good person.  You

19  are scared to even be a good person here.

20  Q.  And have you ever requested transfer to a women's prison?

21  A.  No, I never felt like it's realistic.  IDOC does not do

22  the right thing about anything.  Rightfully I should be housed

23  with other women.  I'm not a danger to other women, I have not

24  -- I have no sexual case, I have never had any type of sexual

25  misconducts in the Illinois Department of Corrections, I have

1    no domestic batteries or anything that could make IDOC feel

2    like I would be a danger to being transferred to a female

3    institution.  I am sterile, I cannot have children, so I

4    cannot procreate.  There would be absolutely zero danger for

5    IDOC to send me to a female institution.  But, IDOC is so

6    unrealistic with how they treat certain people, they try to

7    lump everybody into one category and treat them all in this

8    manner, and so I never felt like it was a realistic request.

9    Q.  You mentioned that you're sterile.  Are you castrated, Ms.

10   James?

11   A.  No, I'm not castrated, but I have been on hormones for so

12   many years I'm impotent.  I'm impotent, I'm unable to have

13   children, I'm unable to even get an erection.

14   Q.  Have you ever requested castration?

15   A.  Yes.

16   Q.  When did you make that request?

17   A.  I have made numerous requests for castration.  The initial

18   request I just made was this year, March of this year, March

19   of 2018.  I was also recently resubmitted, re-recommended by

20   Dixon Correctional Center.  Dixon actually recommended I be

21   castrated to what's called the Gender Dysphoria Committee, and

22   they have yet to render a decision about it.  And that was in

23   August when they -- like August 7th or -- the first week of

24   August when the committee met, and my request, the

25   recommendation from Dixon that I be castrated was presented to

1    the Gender Dysphoria Committee, and they still have yet to

2    make a decision.

3    Q.  Who did you make your initial request to?

4    A.  Well, it's -- there's a committee.  My initial request was

5    made to the head of psychology here at Dixon Correctional

6    Center, which was Dr. Chess (ph), and also the head of the

7    transgender community here, which is Ms. Weigand.

8    Q.  Did you speak to the Gender Identity Committee at that

9    time?

10   A.  Oh, no, they don't let you talk to them at all.  They

11   don't let you speak, period.  They don't see you, they -- They

12   talk about you without you there.  So, they can't ask you any

13   questions, you can't give them a statement.  There's nothing.

14   Q.  So, how does the committee end up with the castration

15   request?

16   A.  So, in order for them to even bring forth the request, the

17   head of psychologists here, Dr. Chess (ph), and the head of

18   the transgender committee here, which is Ms. Weigand, have to

19   make a recommendation.  They have to say, "Yes, we feel at

20   this time it is appropriate for, you know, her to continue her

21   transition and that castration at this time is recommended."

22   And so they bring that to the committee and the committee is

23   supposed to make a decision on it.  But the committee has not

24   made a decision on it.  The doctor in charge, I guess his name

25   is Dr. Puga, he said he's never received a request of this

1   nature and he doesn't know how to deal with it and he would

2   address it in a few weeks.  And it's been now going on over a

3   month and they still have not rendered a decision.  So,

4   basically what they are doing is they are just never going to

5   make a decision on it.  That way they don't have to deal with

6   it.

7   Q.  And you mentioned an August meeting.  Did you participate

8   in that meeting?

9   A.  No, they don't allow you to see the Gender Dysphoria

10  Committee at all whatsoever.  They don't let you talk to them,

11  they don't let you see them, they don't let you ask any

12  questions, be asked any questions, answer any questions.  They

13  meet outside your presence and then you maybe find out two,

14  three weeks later what happened.

15  Q.  Ms. James, why do you want to be castrated?

16  A.  I mean, I can't deal with this part of my gender and my

17  anatomy anymore.  Like it hurts when I use the bathroom.  I

18  have not looked down in the shower in so many years, I can't

19  even think of how many years it's been since the last time I

20  have looked down at my genitalia.  I hate touching the area, I

21  hate feeling the area, I hate to walk.  I can't exercise.  I

22  can't do anything that I want to do because I feel that area

23  move around, I feel that area pressed against my body, against

24  my leg.  It is the most -- It's like having a tumor that flops

25  around all the time and you want it gone, and they are like,

1   "Well, no, you keep your tumor."

2   Q.  And do you think that you need to be castrated to be

3   transferred to a women's prison?

4   A.  Absolutely.  The only other inmate that I have ever known

5   of that was transferred to a female institution is a girl

6   named Annila Mahalbasic.  Her Government name was Ferid

7   Mahalbasic, F-E-R-I-D, M-A-H-A-L-B-A-S-I-C.  Her ID number is

8   Y54605.  Prior to her transfer from Lawrence Correctional

9   Center to Logan Correctional Center her ID number was M54605.

10  She is the only girl I know of that was transferred from a

11  male facility to a female facility.  And, prior to her

12  transfer Lawrence Correctional Center had her castrated before

13  she was allowed to be transferred to Logan.

14  Q.  Thank you.

15          MS. ELDER:  Your Honor, no other questions.

16          THE COURT:  All right.  Cross-examination?  Any

17  questions?

18          MR. HIGGERSON:  We don't have any questions.

19          THE COURT:  All right.  Thank you, Ms. James.  That

20  concludes your testimony.

21          MS. JAMES:  Thank you.  You have a good day.

22          THE COURT:  Thanks.  You, too.

23          THE CLERK:  Could I ask if Scott Ranft is in the

24  room.

25          THE COURT:  All right.  Mr. Ranft.

```
 1            MR. RANFT:  Yes.
 2            THE COURT:  Can you hear us okay?
 3            (Brief interruption in proceedings.)
 4            THE COURT:  Can you hear us now, Mr. Ranft?
 5            MR. RANFT:  Yes.
 6            THE COURT:  Deana, if you would please administer the
 7   oath.
 8            (Plaintiff witness, Scott Ranft, sworn).
 9            THE CLERK:  Please state your name and spell your
10   last name for the record.
11            MR. RANFT:  Okay.  My name is Scott Michael Ranft.
12   My last name is R-A-N-F-T.
13            THE COURT:  All right.  You may proceed.
14
15                         DIRECT EXAMINATION
16   BY MS. ELDER:
17   Q.  Where are you currently housed?
18   A.  In cellhouse unit 42, cell 55.
19   Q.  And at what prison?
20   A.  Dixon Correctional Center.
21   Q.  When did you arrive at Dixon?
22   A.  September 2016.
23   Q.  And do you know Strawberry?
24   A.  Yes.
25   Q.  When did you first meet Strawberry?
```

1   A.   While I was working as a porter in segregation.

2   Q.   And when was that?

3   A.   Around -- I believe around March of 2018.

4   Q.   Okay.  And what is a porter?

5   A.   A porter -- Well, my detail says that I'm seg help,

6   sanitarian.  So, I clean, I mop, and I do whatever the guards

7   tell me to do as far as help is concerned.

8   Q.   As a porter do you see and interact with prisoners in seg?

9   A.   Yes.

10   Q.   And how long have you been in unit 42 at Dixon?

11   A.   Since December of 2017.

12   Q.   Is that in general population?

13   A.   Yes.

14   Q.   And was Strawberry ever housed in unit 42 with you?

15   A.   Yes.

16   Q.   And when was that?

17   A.   She got out in May.  I think May 26, 2018.

18   Q.   And when you say *got out*, do you mean got out of seg?

19   A.   Yes, was released from seg.

20   Q.   And for how long was Strawberry in unit 42 with you?

21   A.   Until she went back to seg, around June 26, 2018.

22   Q.   Within housing unit 42, where were you housed in relation

23   to Strawberry?

24   A.   Almost across, because I'm in cell 55, and it's just right

25   around the corner, and her cell was cell 42.  So, it was

1    approximately adjacent to that cell.

2    Q.  And from your cell could you see into Strawberry's cell?

3    A.  Yes.

4    Q.  How could you see into her cell?  Were there bars or a

5    door?

6    A.  No, it was a door, but sometimes it could be -- you know,

7    it could be open or it would be open during dayroom time and,

8    you know, you could see in there.

9    Q.  And did you ever hear correctional officers verbally

10   harass Strawberry?

11   A.  Yes; heard it in the dayroom.

12   Q.  In the dayroom.  Can you describe what you heard?

13   A.  Specifically I heard Ms. Blackburn.  She was the control

14   officer in the bubble.  Strawberry came in one time and gave

15   her a compliment about her hair, and then she became angry and

16   called Strawberry a faggot and then said something like, "I

17   don't need surgery to be a woman."

18   Q.  And how could you see and hear that?

19   A.  I was sitting at the table.  They have got a table right

20   in front of the bubble, and the chuckhole was open and you

21   could hear everything that was being said.

22   Q.  You hear other officers call Strawberry names?

23   A.  No, I did not hear that.

24   Q.  Okay.

25   A.  Well, I would say this:  While I was in seg, you know,

1    they would make little derogatory comments, you know, like,

2    you know, "Hey, we got one here," or, you know, just, you

3    know, making jokes, trying to be funny.

4    Q.   And did you ever see correctional officers do anything

5    else to harass Strawberry?

6    A.   Yeah, shakedowns all the time.

7    Q.   What do you mean when you say *shakedown*?

8    A.   They would come in the cell and just ask for stuff, for

9    like -- They would come in here and tear the place up, like

10   thinking they were searching for contraband or something along

11   those lines.

12   Q.   How could you see that?

13   A.   From my cell, my cell is almost directly across from that

14   cell, and so whenever it would be a lieutenant and two other

15   officers there, and any time they show up, you know, you know

16   there's a problem.

17   Q.   You said *contraband*.  Do you know what type of contraband

18   they were looking for?

19   A.   Yeah, altered clothing.

20   Q.   Have you witnessed other prisoners alter their clothes?

21   A.   Yeah, that happens all the time.

22   Q.   Are other --

23   A.   I mean, altered is -- Yeah, altered is defined as not in

24   its original state.  So, I mean, if you want to get somebody,

25   you could get anybody.

1   Q.  So, was it your perception that Strawberry was targeted

2   for these shakedowns?

3   A.  Yeah; absolutely.

4   Q.  Do you know a prisoner named Armond Clemons?

5   A.  Yes.

6   Q.  Was Clemons housed on the same unit as you and Strawberry?

7   A.  Yeah, cell 30.

8   Q.  And when was he housed there?

9   A.  I'm going to say from around March till a few weeks after

10  Strawberry arrived there.

11  Q.  Did you ever see Clemons interact with Strawberry?

12  A.  Yes.

13  Q.  How did Clemons act towards Strawberry?

14  A.  Very sexual manner, constantly asking for sex and, yeah,

15  just harassing, you know.

16  Q.  Would he approach her physically?

17  A.  Yeah, and try to grab -- try to grab, you know, breasts or

18  buttocks.

19  Q.  And about when did Clemons start acting this way towards

20  Strawberry?

21  A.  Right away, as soon as Strawberry came out of the unit.

22  Q.  And where did you witness Clemons and Strawberry interact?

23  A.  Shortly before Clemons went to the seg under the PREA

24  investigation, I witnessed Clemons at Strawberry's door asking

25  for sex, trying to -- saying, "When are you going to let me

1    fuck you," and, you know, Strawberry was -- you know, cussed

2    Clemons out.

3    Q.  And where were you when you witnessed those interactions?

4    A.  I was in my cell, 55, witnessing that.

5    Q.  Were there officers in the bubble at the time of those

6    interactions?

7    A.  Yeah.

8    Q.  Can the officers in the bubble see Strawberry's cell?

9    A.  Yes.

10   Q.  Was there a point where Clemons stopped harassing

11   Strawberry?

12   A.  No, I was -- I mean, it had to take Clemons going to seg.

13   Q.  What is your understanding of why Clemons went to seg?

14   A.  Strawberry called PREA or filed a PREA claim or something

15   along those lines.

16   Q.  And did you see Clemons in seg while you were working as a

17   porter?

18   A.  Yes.

19   Q.  Is Clemons still in seg at Dixon?

20   A.  No.

21   Q.  Did you know where Clemons went after Dixon?

22   A.  From what Clemons told me, Clemons said he was going to

23   Robinson, which is a minimum security facility.

24   Q.  And how was Clemons saying that to you?  What was his

25   demeanor?  Strike that.  Let me rephrase.

1          What was his demeanor when he said that to you?

2  A.  You know, with a smile on his face, because, you know, you

3  are going to a better place.  That's a place I would want to

4  go to.  Yeah, so to me it looked more like a reward than

5  punishment.

6  Q.  Do you know a prisoner named Tyrone Robinson?

7  A.  Yes, they call him *Snake*.

8  Q.  And was Robinson also housed in unit 42 with you and

9  Strawberry?

10  A.  Yes.

11  Q.  When was he housed there?

12  A.  I'm not sure exactly when, but I would say around the same

13  time I was there, so December of 2017.

14  Q.  And how long was he housed there, if you know?

15  A.  He just went to seg recently, so he had -- he went to seg

16  I would say a month ago.

17  Q.  So, was he in unit 42 with you and Strawberry the entire

18  time?

19  A.  Yes.

20  Q.  Strawberry was in unit 42?

21  A.  Yes.

22  Q.  Did you ever see Strawberry interact with Mr. Robinson?

23  A.  Yes.

24  Q.  Can you describe those interactions?

25  A.  Well, there was one moment where he was at Strawberry's

1    cell door and the door was not open all the way, but it was

2    about halfway open, and he came in there and he wanted a kiss

3    and he tried to grab her butt, and then Strawberry turned

4    around and said, "I don't get down like that, I got a

5    husband," and they argued back and forth, and then he left

6    pretty angry and upset.  That was his demeanor.  That's what I

7    seen.

8    Q.  Are you aware that Strawberry and Robinson got into a

9    fight?

10   A.  Yes.

11   Q.  Did you witness the fight between Strawberry and Robinson?

12   A.  No.

13   Q.  Is Strawberry still in unit 42?

14   A.  No.

15   Q.  Do you know where Strawberry was housed after unit 42?

16   A.  Yeah, she went straight to seg.

17   Q.  And what is your understanding of why Strawberry went to

18   seg?

19   A.  Okay, my understanding is that Strawberry went to seg

20   because she was calling PREA on the staff.  That's the main

21   reason why she went to seg.

22   Q.  And how do you know that?

23   A.  Because I was on the yard one time getting -- It was the

24   very next day.  So, Strawberry went to seg on the 26th of

25   June.  So, on the 27th, I was on the yard and then Robinson

```
 1    was on the yard talking to an inmate, and I went to go get

 2    water and I heard Robinson say they weren't even worried about

 3    that fight, it was like she was doing too much, calling PREA

 4    on the staff and all that.  Those are the words that came out

 5    of his mouth.

 6    Q.  Finally, Mr. Ranft, you have testified today that you

 7    worked in segregation as a porter.  Do you still have that

 8    job?

 9    A.  No, I do not.  I'm unofficially fired.

10    Q.  What do you mean by *unofficially fired*?

11    A.  Well, I was wrote a ticket last week for socializing with

12    the inmates, which is -- It's a common thing, it's a pretty

13    minor offense, but, you know, that's how they got rid of me.

14    Q.  What -- Do you believe that was the real reason for you

15    being fired?

16    A.  No.

17    Q.  What do you believe -- You may answer.

18    A.  Because I'm a witness -- I'm a witness in this lawsuit

19    against Dixon Correctional Center.  The fact of the matter is

20    that before I became a witness they had no problems out of me

21    before that.  And I have been working as a porter in seg since

22    December of 2017, and up until after I became a witness,

23    that's when they started making comments to me and threatening

24    my job.  And it eventually happened, they fired me last week.

25    Q.  Thank you, Mr. Ranft.
```

```
 1              MS. ELDER:  Your Honor, no further questions.

 2              THE COURT:  All right.  Any cross-examination?

 3              MS. McCLIMANS:  None.

 4              THE COURT:  No questions.  Okay.  Thank you, Mr.

 5    Ranft.  That concludes your testimony.

 6              All right.  Do you have any other witnesses for us

 7    today?

 8              MS. BEDI:  We don't, Your Honor.

 9              THE COURT:  Tomorrow we are scheduled to begin at 9

10    a.m. with Dr. Brown, is that correct?

11              MS. BEDI:  That's correct.

12              THE COURT:  All of these other witnesses, are we

13    going to go back to back?

14              MS. BEDI:  That was our plan.

15              THE COURT:  Okay.  Do you agree, Mr. Higgerson?

16              MR. HIGGERSON:  Yes, Your Honor.

17              THE COURT:  Okay.  Anything else we can take up at

18    this time?

19              MS. BEDI:  Your Honor, would you like to hear any

20    closing arguments on Friday?

21              THE COURT:  Yes, I would like to have a summary of

22    your positions based on the testimony.  Like I said, I know

23    your positions going into it, but now in light of the

24    testimony I would like to have just brief closing arguments

25    once we finish.  I would like you to review exhibits with
```

1    Deana today before we leave.  Just like in a trial, I like to

2    do that at the end of every day.

3           One thing I did want to raise briefly.

4           I know there's a pending motion regarding exhaustion,

5    and originally I think that was going to be taken up before

6    this hearing, and then this got continued and I guess another

7    complaint was filed, and that's all been -- I guess it's still

8    being briefed and, of course, that's being handled by Judge

9    Daly.  One of the problems with our -- the way we do things

10   is, you know, sometimes two different things are going on at

11   one time.

12          I guess I think I know what Mr. Higgerson would say

13   the impact of that is.  What's your position on us proceeding

14   with this preliminary injunction hearing while the issue of

15   exhaustion is pending, Ms. Bedi?

16          MS. BEDI:  Well, Your Honor, I think I would like to

17   give it a little more thought before we give an official

18   response.  Off the top of my head, and we have admitted into

19   evidence numerous grievances that have gone through the

20   process, so I think that -- and, again, preliminarily I think

21   that we could argue that we have met our burden just through

22   the evidence that was put in here today.  I want to reserve

23   the right to perhaps supplement, but --

24          THE COURT:  I guess that's kind of my related

25   question, then.  If we are kind of taking up both now in a

1   way, then, I mean, I could just tell Judge Daly that she

2   doesn't need to hold another hearing.  I mean, I just don't

3   want there to be overlap in work.

4        Mr. Higgerson, I know -- I don't normally hold Pavey

5   hearings, but I know it's raised and that the -- I know that

6   the inmate has to exhaust remedies, but we are here on the

7   preliminary injunction, and the Department of Corrections is

8   clearly taking the position that they are not going -- even in

9   this hearing that they are not going to transfer Ms. Hampton.

10  So, I guess maybe sometimes I'm too practical.  What's the

11  point of going on, then, with a separate path of a Pavey

12  hearing when no matter what -- how many grievances she files

13  it's pretty clear that she's not going to get the relief that

14  she wants?

15       MR. HIGGERSON:  Well, I don't know that it's

16  absolutely clear she won't get the relief that she wants

17  because she has to go through the process and find out.  And

18  that's what the case law says is it's not unavailable just

19  because you don't get a result you don't like.  If the process

20  is there, you have to complete it before you come to court,

21  and that question has to be resolved before anything else is

22  done.

23       MS. DEL VALLE:  Your Honor, may I respond?  We

24  actually had a motion on this when they first filed their

25  Motion for Exhaustion, and it's our argument that she has

1    fully exhausted the process under the emergency grievance.  At

2    that hearing we were planning on calling the warden of Dixon,

3    John Varga, and also the director, Director Baldwin, to

4    explain the emergency grievance process and admit all of her

5    emergency grievances, which there are a lot more than we are

6    just submitting in this preliminary injunction hearing.

7    There's a number of them and we were going to admit all of

8    those and explain how she satisfied all the requirements under

9    the emergency grievance process and has fully exhausted all of

10   her claims.

11        THE COURT:  And, so what happened was then the

12   complaint was amended to add new Defendants and that's when

13   they started over?

14        MS. McCLIMANS:  The complaint was amended and it also

15   has allegations against several individuals at Dixon, and

16   there's clearly no exhaustion as to those individuals.

17        MS. DEL VALLE:  We also have a number which we will

18   do in response to their brief which is due at the end of this

19   month, I believe.  We will submit all of those emergency

20   grievances that she filed at Dixon and went through the

21   process for the emergency grievance process.  And we had --

22   And, Director Baldwin was personally involved in response to

23   some of her grievances and that's why we were planning on

24   calling him to testify at a hearing on exhaustion.

25        THE COURT:  So, if that -- then if that's still

1  ongoing, then, I mean, that has to be resolved before I make

2  any ruling on this motion one way or the other, then.

3        Mr. Higgerson, you agree, I assume?

4        MR. HIGGERSON:  That's what Pavey says, is nothing

5  else is supposed to proceed until exhaustion is resolved.

6        MS. DEL VALLE:  Your Honor, we also believe that you

7  could make a ruling on exhaustion given the grievances we have

8  submitted in the record and given the fact they are emergency

9  grievances and a lot of the underlying facts we would believe

10  that Defendants are going to argue that they actually weren't

11  emergencies and so she shouldn't have followed that process

12  and that's a factual determination that overlaps the previous

13  hearings.  So, if you make a factual determination that she

14  was in crisis, which necessitated the emergency grievances,

15  that's an issue that overlaps for both hearings.  We actually,

16  in our first response, the motion, requested that the hearings

17  be combined, essentially.

18        MR. HIGGERSON:  We think they could have been

19  combined.  I don't think they could be combined halfway

20  through when our witnesses aren't the right ones to address

21  that.  We haven't in any way set ourselves up to talk about

22  exhaustion in this proceeding.  Again, that's not what we have

23  prepared for.

24        MS. DEL VALLE:  We could be prepared to argue that.

25  We would just have to call the warden and Director Baldwin,

1    but we would be prepared to argue that she properly filed her

2    emergency grievances both at Lawrence and at Dixon.

3           THE COURT:  Who else would you want to call, Mr.

4    Higgerson, that you weren't planning to call?

5           MR. HIGGERSON:  We have listed somebody from the

6    Administrative Review Board.  I don't know, did we list

7    somebody from Dixon in the grievance process?

8           MS. McCLIMANS:  I can't recall.

9           THE COURT:  Well, take a look at that.  I don't mean

10   to catch anybody off guard.  You can take a look at that.  My

11   thought is maybe either if we could get those other witnesses

12   here, say, on Friday, or pick another day where we kind of

13   continue this hearing and address that.  And, you know, I

14   fault myself for not raising this with you before, but it just

15   seems that knowing that that issue is still hanging out there,

16   I mean, why have Judge Daly have another hearing?  We are all

17   here.  I'm not saying it has to be.  If we can't have

18   witnesses here, say, Friday afternoon, maybe we can find

19   another date next week and just continue it and wrap that

20   issue in with all of this.  I will let you think about it

21   overnight and we will discuss it again in the morning.

22          MR. HIGGERSON:  And just to add to that, too, they

23   said they want to call Director Baldwin.  We are going to

24   object whenever that request is made.  Director Baldwin is

25   not, you know, the person who handles grievances.  When they

1    come to his office somebody else looks at them.  Generally the

2    Director's not supposed to be called as a witness in

3    proceedings unless it is something he's directly involved in,

4    otherwise he would be at every Pavey hearing.

5         MS. DEL VALLE:  Your Honor, Director Baldwin is

6    obviously a Defendant in this case.  He personally sent

7    Counsel an e-mail, so he is directly involved.

8         THE COURT:  I will have to look at that.  And then

9    you are saying all of those emergency grievances are part of

10   the reason, correct?

11        MS. DEL VALLE:  Some of them we have entered into the

12   record today, but there are a lot more of them that haven't

13   been entered into the record.

14        THE COURT:  From your previous briefing they are not

15   in the record?

16        MS. DEL VALLE:  Correct, from the previous briefing.

17   That was specifically to Lawrence.  Then the Defendants filed

18   a new brief which included Dixon, too.

19        THE COURT:  All right.  Well, get all of those

20   together, and I will be thinking about it and we will talk

21   about it again tomorrow.

22        Okay.  So, go over exhibits with Deana, what's been

23   admitted.  I will need the final witness list, and everybody

24   be here and ready to go by 9 a.m.

25        Ms. Bedi, what time would you like your client to be

1  here tomorrow?

2          MS. BEDI:  8:30.

3          THE COURT:  Okay.

4          (Court in recess.)

5

6

7                    *   *   *   *   *   *   *

8

I certify that the foregoing is a correct transcript from the
9  record of proceedings in the above-entitled matter.

10

11  /S/ Stephanie K. Rennegarbe            09/20/2018
    Certified Shorthand Reporter
12

13

14

15

16

17

18

19

20

21

22

23

24

25