## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| DEON HAMPTON, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 3:18-CV-550-NJR-RJD |
| | ) | |
| JOHN BALDWIN, KEVIN KINK, | ) | |
| KAREN JAIMET, JOHN VARGA, | ) | |
| OFFICER BURLEY, LIEUTENANT | ) | |
| GIVENS, OFFICER CLARK, OFFICER | ) | |
| LANPLEY, OFFICER GEE, OFFICER | ) | |
| MANZANO, OFFICER BLACKBURN, | ) | |
| LIEUTENANT DOERING, SERGEANT | ) | |
| KUNDE, and JOHN DOES 1-4, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

**ROSENSTENGEL, District Judge:**

This matter comes before the Court on the Renewed Motion for Preliminary Injunction filed by Plaintiff Deon Hampton, an inmate in the Illinois Department of Corrections (IDOC) (Doc. 46). Hampton is a 27-year-old, transgender woman housed in Dixon Correctional Center, a men's prison. Hampton asks the Court to order Defendants John Baldwin, Director of the IDOC, and John Varga, Warden of Dixon, to transfer her to Logan Correctional Center, a female facility, because correctional staff and other inmates at Dixon have physically, verbally, and sexually harassed and assaulted her. She also seeks an order directing Defendants to remove her from segregation because she has been denied appropriate mental health services and her mental health is deteriorating. The Court held a three-day evidentiary hearing in September 2018. For the reasons set forth below, the Court grants the motion in part and denies it in part.

Hampton, who was anatomically born a male, has identified as a female since age five and has dressed as a female since she was eleven years old (Doc. 46-1, p. 7). At that point, her family and community treated her as a girl and referred to her by her preferred name: "Strawberry." (*Id.*) Hampton lived exclusively as a female for years prior to her incarceration and is attracted exclusively to men (*Id.*; Doc. 96, pp. 52, 62). In 2012, she was diagnosed by an IDOC psychiatrist with gender dysphoria, a significant mismatch between a person's experienced gender identity and sex assignment at birth (Doc. 98, p. 12). People with gender dysphoria often want to change their body to match their internal gender identity and to be rid of the sexual characteristics associated with their birth sex (*Id.*). Hampton also suffers from bipolar disorder (Doc. 100, p. 24).

In 2015, Hampton told mental health professionals at Hill Correctional Center that she was not transgender (Doc. 46-1, p. 7). In May 2016, however, she clarified to a mental health professional that she simply considers herself female rather than "transgender." (*Id.*) Two months later, while still in IDOC custody, Hampton began hormone treatment to physically transition to female (Doc. 96, p. 5). The hormones have feminized her looks while shrinking her muscles and male anatomy (*Id.*, p. 6). She has breasts and can no longer get an erection (*Id.*, pp. 5). Her strength also has diminished, and she can no longer lift heavy objects (*Id.*, p. 6). By January 30, 2018, Hampton's estradiol level was 397 and her testosterone was less than 3 (Doc. 46-2, p. 2). That level of testosterone is considered "castrate," in that Hampton has virtually no circulating testosterone—similar to males who have been surgically castrated (*Id.*).

At the evidentiary hearing, Hampton presented the expert testimony of Dr. George

Brown, the Associate Chairman for Veterans Affairs and Professor of Psychiatry at East Tennessee State University and a consultant nationally for the United States Department of Veterans Affairs on transgender health care issues (Doc. 98, pp. 5-8). According Dr. Brown, Hampton's high estrogen and low testosterone levels make it "exceedingly unlikely" that she could get an erection, let alone produce semen and be fertile (Doc. 98, pp. 28-31). He explained that chemical castration is most likely irreversible with continued treatment, and that Hampton has been 100 percent compliant with taking her hormones (*Id.*, p. 32). In his opinion, there is "no ambivalence in her transgender identity" and, thus, no indication she would stop taking estrogen (*Id.*, p. 32).

Over the past two years, Hampton has been housed at four IDOC male correctional centers: Pinckneyville, Menard, Lawrence, and Dixon (Doc. 96, p. 6). Hampton describes her experiences at these male prisons as feeling like a sex slave (*Id.*, p. 13). At Pinckneyville, she was called a "fag," "it," "he-she," "thing," "dick sucker," and "dick eater" on a daily basis (*Id.*, pp. 9-10). One officer pulled down her shorts and asked what genitalia she had (*Id.*, p. 10). Other officers forced her to engage in sexual acts with her cellmate for the officers' entertainment (*Id.*, p. 11). On one occasion, she and her cellmate were taken out of their cell, forced to dance, and then told to perform oral sex while the officers watched (*Id.*, p. 12). She also was forced to have phone sex with a lieutenant (*Id.*). After the incident, Hampton and her cellmate were warned to stay quiet, otherwise the officers would "make their bodies disappear" (*Id.*). Hampton did report the incident, but no action was taken to protect her from further abuse (*Id.*, pp. 13-16). Instead, she asserts, she was beaten and not allowed to shower, while the officers wrote allegedly false disciplinary tickets against her (*Id.*, p. 17).

Hampton eventually was transferred to Menard, a maximum-security prison, where

she was called the same derogatory names (*Id.*, p. 19). She again experienced physical assaults and feared for her life and safety (*Id.*, p. 22). She was forced to stick deodorant bottles up her anus, to masturbate, and to dance in her cell (*Id.*, p. 24). She testified she feared that if she told the officers no, they would have tried to kill her (*Id.*). After she filed a grievance about the officers' conduct, no action was taken to protect her (*Id.*, p. 23). Instead, the officers continued to work around her and "gay bash" her (*Id.*).

Hampton filed a lawsuit related to the conduct at Menard, which resulted in a settlement whereby she was transferred to Lawrence Correctional Center (*Id.*). But the situation was no different there. In January 2018, during yard, an inmate at Lawrence exposed his penis, masturbated, and threatened to rape Hampton (*Id.*, p. 25). When Hampton complained to staff, they blew her off because she is attracted to men (*Id.*) At that point, Hampton called the Prison Rape Elimination Act (PREA) hotline (*Id.*, pp. 25-26). After an investigation, Hampton's complaint was deemed substantiated (*Id.*, pp. 26-28; Ex. 9). Yet, Hampton asserts nothing was done to protect her. Instead, the inmate who committed these acts was placed near her in segregation, where he continued to threaten to rape her (*Id.*, pp. 28-29). Hampton made a second PREA call in February 2018, which again was substantiated (*Id.*, p. 29-30; Ex. 9). The inmate then was transferred from Lawrence, a medium to high-medium security prison to Pontiac Correctional Center, a maximum-security prison (Doc. 97, pp. 66-67; Ex. 9).

Hampton also was targeted by the staff at Lawrence. She described sexual misconduct by a lieutenant and an Internal Affairs officer, with whom she was forced to have sex on a regular basis (Doc. 96, p. 30). She claims these individuals threatened to reach her family if she said anything (*Id.*). Staff also called her names and misgendered her by using male

pronouns, which makes her feel angry, disrespected, ashamed, and humiliated (*Id.*, pp. 20, 25). Dr. Brown explained that misgendering transgender people can be degrading, humiliating, invalidating, and mentally devastating (Doc. 98, p. 16). In Hampton's records, Dr. Brown saw hundreds of incidents of misgendering, not just by correctional officers but by clinicians, nurses, and administrators (*Id.*, pp. 16-17).

On March 16, 2018, Hampton was transferred to Dixon and again placed in segregation. The recommendation to transfer Hampton to Dixon came from Dr. Shane Reister, a licensed clinical psychologist who serves as the Southern Regional Psychologist Administrator for the IDOC (Doc. 100, pp. 10, 26). In this position, Dr. Reister oversees the mental health programming at the institutions in the IDOC's southern region (*Id.*, p. 10). Dr. Reister met with Hampton in March 2018 because she is a "particularly challenging" inmate with "very clear bipolar symptoms, as well as some dissociative problems when trauma triggers occur" (*Id.*, pp. 23-24). Dr. Reister found that Hampton's manic symptoms, in addition to her gender-related concerns, made it difficult for her to adapt to her environment (*Id.*, p. 25). Accordingly, Dr. Reister recommended that Hampton be transferred to Dixon, which is a "mental health hub," has a large transgender population, and a "very functional transgender support group." (*Id.*, p. 27).

Since her transfer to Dixon, Hampton claims the name calling by IDOC staff has continued (*Id.*, p. 36). So has the sexual assault. For a week and a half in April 2018, a fellow inmate grabbed her breasts and buttocks and exposed his penis (*Id.*). When Dixon staff refused to do anything despite her complaints, she called the PREA hotline (*Id.*). An investigation ensued, and the allegation was substantiated (*Id.*). The offender appeared before the Adjustment Committee on April 27, 2018, and "was disciplined for his actions."

(Ex. 9.) He was then released from segregation on May 3, 2018 "for time served and the safety of [Hampton] due to the fact of Hampton being in segregation." (*Id.*)

Another inmate at Dixon grabbed her body, kissed her, and tried to force her to perform oral sex (*Id.*, p. 38). He also threatened physical harm and tried to come in while Hampton was showering (*Id.*, pp. 38-39). Hampton again called the PREA hotline and reported the abuse to Dixon staff, including mental health professionals and the warden (*Id.*, p. 39). Hampton asserts that staff sent the offending inmate to a minimum-security prison and retaliated against her instead of taking any action to protect her (*Id.*, p. 40).

Indeed, Justin Wilks, Assistant Warden of Operations at Dixon, could not testify to anything done to protect Hampton after her PREA allegations were substantiated (Doc. 99, p. 78). He also testified he was unaware of the claimed harassment and verbal discrimination by other inmates and officers, unaware of any measures taken after Hampton filed grievances complaining of harassment by officers, and unaware of any grievances she filed regarding sexual harassment by other offenders (*Id.*, pp. 79-81).

Because of the continued verbal and physical harassment and sexual assault by staff and male offenders, Hampton has filed numerous grievances seeking to be transferred to a female prison. To date, Hampton's repeated requests to be transferred have been denied internally by the IDOC's Transgender Care Review Committee ("the Committee"), previously known as the Gender Identity Committee and the Gender Dysphoria Disorder Committee (Doc. 98, p. 41; Doc. 100, p. 60). The Committee, which is made up of mental health providers, psychologists, medical doctors, and representatives from IDOC administration, security, and the transfer coordinator's office, is responsible for ensuring that the mental health, security, and medical needs of offenders are met, specifically regarding transgender

care (Doc. 100, pp. 14-15). It is also charged with ensuring trans people are housed appropriately within the Department of Corrections (Doc. 99, p. 5).

Dr. Steven Meeks, Agency Medical Director of the IDOC, is the chairperson of the Committee (*Id.*, p. 4). Dr. Meeks admitted he is not an expert on providing care to trans people (Doc. 99, p. 5), and he does not know the specific details of the PREA (*Id.*, p. 7). While he agrees that gender dysphoria is a real diagnosis that requires medical treatment, he also has never recommended that a trans woman be moved from the men's division to the women's division (*Id.*, pp. 5, 9).

Dr. Meeks explained that the Committee issues a full report on a transgender inmate when that individual transfers to a new facility, while periodic updates are done if there are specific requests related to that individual's care (*Id.*, p. 13). On March 17, 2017, the Committee issued an update on Hampton noting that she was housed in segregation, showered separately and in private, and was taking feminizing hormones (Ex. 18). The report further stated that since Hampton had been in segregation she had not had any individual or group therapy specifically for transgender support, but she had been attending the mental health group offered to inmates in segregation. Dr. Meeks admitted that to the extent Hampton was not receiving psychosocial support for her gender dysphoria while in segregation, her treatment violated professionally accepted standards (Doc. 99, pp. 10-11). Nevertheless, the Committee recommended continuing those provisions.

The Committee next issued a report on Hampton on January 26, 2018, after her transfer to Lawrence (*see* Ex. 18). At that time, the Committee recommended Hampton continue showering separately and in private, be permitted to use a sports bra, be referred for general support for living as a transgender in prison, be referred for individual and/or

group treatment issues related to being transgender and other mental health issues, and that all security searches be performed professionally and as least intrusive as possible—"in accordance with facility policy based upon the gender of the facility." (Ex. 18). Dr. Meeks admitted there is no documentation of any discussion regarding Hampton's PREA complaints or her disciplinary history, but testified that they discussed her "placement," meaning a potential transfer to a women's prison (Doc. 99, pp. 16-18).

The Committee issued another report on April 1, 2018, after Hampton's transfer to Dixon (Ex. 18). The report does not discuss Hampton's sense of personal safety or her history of sexual assault, and it leaves several sections blank (*Id.*, p. 21). It also makes no recommendations as to housing or showering (*Id.*, p. 19). Dr. Meeks testified that part of the reason the Committee decided not to transfer Hampton at that time was because she was adjusting well to Dixon and because she needed to be healthy from a mental health perspective before they would consider transferring her (*Id.*, pp. 23-24). While Dr. Meeks previously testified in his deposition that he would not be comfortable moving a prisoner who still has testicles to a female prison, he testified at the evidentiary hearing that "having testicles in and of itself" would not be a reason to keep Hampton out of the women's division (*Id.*, p. 25). Instead, "it's a more wholistic decision than that," which takes into account the inmate's "mental health status and whether she would function well at the women's facility." (*Id.*). Dr. Meeks admitted, however, that the Committee did not consider Hampton's substantiated PREA complaints, nor did they consider her disciplinary history or personal sense of safety at Dixon (*Id.*, pp. 24, 35). Additionally, no member of the Committee has ever met with Hampton regarding her request to be transferred to a female prison, to discuss whether she feels safe at a men's prison, or to ask how the hormones she takes affect her body

(Doc. 96, p. 45).

On July 16, 2018, the Committee met specifically to discuss Hampton's potential transfer to a women's prison (*Id.*, p. 30). IDOC Chief Attorney Camille Lindsay was present for this meeting (*Id.*). The Committee did not issue a formal update; instead, Dr. Meeks's assistant distributed a bullet-point list of topics discussed (*Id.*; *see* Ex. 18). Those issues included whether Hampton is fertile or capable of an erection, her behavioral and mental health, her assault on a staff member and another offender, her aggression level and strength as opposed to the women in Logan Correctional Center, her refusal to take Lithium for her bipolar disorder, and the potential impact on Logan should she be transferred (Ex. 18). The Committee did not recommend transferring Hampton at that time but agreed to review her situation again in November 2018 (Ex. 18).

Dr. Meeks testified that the Committee decided not to transfer Hampton because she had assaulted a staff member and an offender at Dixon, and there was some concern she was not psychologically stable enough to transfer her to Logan (Doc. 99, p. 32). Dr. Meeks did not recall discussing Hampton's own personal sense of safety at Dixon and admitted that not all women at Logan are "mentally stable." (*Id.*, pp. 33, 35-36).

Sandra Funk, the Chief of Operations for IDOC and a member of the Committee, also testified regarding the Committee's July 16, 2018 meeting. Funk stated that from a security perspective, the primary concern when considering whether to transfer a transgender prisoner is sexual potency, *i.e.*, the ability to become erect (*Id.*, p. 47). While Hampton cannot obtain an erection, Funk noted that is only because she is taking medication (*Id.*). She also implied that even if Hampton sexually prefers men, that does not mean she would never try sex with a woman (*Id.*). Funk did agree, however, that whether an inmate is a predator or

vulnerable should be considered when determining placement, and that someone who has been raped in prison and had multiple substantiated PREA complaints would be considered vulnerable (*Id.*, p. 48). Yet, according to Funk, there was no discussion as to Hampton's person safety or her fear of sexual assault while in a men's prison (*Id.*, pp. 55-56). In fact, the Committee did not discuss *any* reasons why it would be in the interest of Hampton's mental health to transfer her to Logan (*Id.*, p. 57). And while IDOC policy does not allow housing decisions to be made solely on a prisoner's sex at birth, currently all prisoners in the IDOC are housed based on their genitalia (*Id.*).

At the hearing, Hampton presented the expert testimony of Dan Pacholke, an independent consultant and former head of corrections for the Washington State Department of Corrections (Doc. 97. p. 5). Pacholke worked with the Washington State Department of Corrections for more than 33 years in a number of positions ranging from correctional officer to warden (Doc. 97, p. 5-6). According to Pacholke, under the PREA, housing decisions should not be made exclusively based on external genital anatomy (Doc. 97, p. 13). Instead, the prison must consider the individual's own sense of security when determining placement (*Id.*). And while the IDOC's policy states that it will consider the offender's perception to ensure appropriate facility placement, it does not provide any objective criteria for being placed in a women's facility (*Id.*, p. 14). Those objective standards should include the inmate's age, physical build, sexual preference, criminal history (including whether the inmate has committed sex crimes or is violent), and the inmate's own perception of vulnerability (Doc. 97, p. 79).

Pacholke was critical of the Committee's updates and reports for lacking detail as to those objective standards, as well as Hampton's history of mental health issues and sexual

assault (Doc. 97, p. 18). Pacholke testified that the Committee should have received and reviewed Hampton's substantiated PREA reports so that they could have considered the abuses occurring to her, the mental health counseling needed, and how to keep her safe (*Id.*, p. 25). Indeed, based on the omissions in several of the reports, Pacholke concluded that the Committee did no meaningful review of Hampton's housing placement (Doc. 97, p. 21).

In addition to seeking a transfer to a women's prison, Hampton also has made repeated requests to be removed from segregation. Hampton asserts she has spent much of the last two years in segregation, which causes her panic attacks, exacerbates her depression, and makes her want to kill herself (Doc. 96, pp. 8-9). Before entering segregation, Hampton participated in psychosocial support groups to help deal with her gender dysphoria. While in segregation, however, Hampton has been denied access to the transgender support group (Doc. 98, p. 9). Instead of group therapy, Hampton participates in weekly, one-hour, individual sessions with Jamie Weigand, a mental health professional, to discuss her transgender issues (Doc. 56-2, p. 4).

Weigand testified in her deposition that at almost every session Hampton has been fixated on her placement in segregation and repeatedly reported feeling depressed (*Id.*, pp. 8, 11-12). Yet, Weigand said she has not personally observed any negative effects or decompensation from Hampton being in segregation (*Id.*, p. 8). She did admit, however, that Hampton's "depression may be increased because of that extended period of time locked in her cell." (*Id.*, p. 12). Hampton has attempted suicide multiple times—at least twice since being transferred to Dixon (Doc. 99, p. 82). Assistant Warden Wilks testified that he believed Hampton was doing well at Dixon, but acknowledged he was unaware Hampton had tried to commit suicide twice (Doc. 99, p. 82). He agreed that someone who has attempted suicide

is not adjusting well (*Id.*, p. 83).

According to Dr. Brown, while she is in segregation, Hampton is not receiving the medical services necessary to support her transition, including the transgender support group, which he considers inadequate care of her gender dysphoria (Doc. 98, p. 9). Dr. Brown testified that continued placement in segregation is exacerbating Hampton's symptoms and placing her at risk of suicide or auto-castration and subsequent death by exsanguination, *i.e.*, bleeding to death (*Id.*, pp. 10-11). Dr. Brown also noted that Hampton has lost 75 pounds in prolonged segregation not due to any efforts to lose weight (*Id.*, p. 42). He explained that weight loss is a nonspecific symptom often associated with depression or decompensation (*Id.*). Based on his interview with Hampton, as well as a review of her medical records, Dr. Brown concluded that there is no medical justification whatsoever for housing her in a men's prison and that her continued placement at Dixon places her at risk both mentally and physically (*Id.*, p. 9).

With regard to the Committee's concern that she is a violent offender, Hampton acknowledges she has received numerous disciplinary tickets throughout her incarceration, but asserts they were issued as a result of defending herself or in retaliation for filing complaints. For example, while housed at Hill Correctional Center, Hampton received a disciplinary ticket related to an incident where a large man ran into her cell and began attacking her while she was on the toilet (Doc. 96, p. 47). Hampton fought back in self-defense but was charged with assaulting the other inmate (*Id.*). On another occasion in July 2017, Hampton received a disciplinary ticket for hugging and kissing her cellmate even though she told Internal Affairs that IDOC staff made them do it (*Id.*, p. 48). As a result, she was sentenced, among other things, with two months of segregation.

According to Pacholke, many of Hampton's tickets were issued for low-level violations that "support [Hampton's] own view of her gender identity" like calling an officer "hey girl," destroying state property by modifying her clothing, and making and wearing thong underwear (Doc. 97, p. 34).

Other tickets were for more serious violations. On February 18, 2018, Hampton received a ticket for kicking an officer multiple times (Doc. 97, p. 35). The officer was taking Hampton to the segregation yard when Hampton began to pull away stating that she wanted to go to her "special cage." (*Id.*) The officer attempted to regain control of Hampton and explain where she was going, but Hampton mule-kicked him in the leg (*Id.*). Pacholke testified that it was significant that Hampton wanted to go to her "special cage," because perhaps all she was trying to say was "This yard is safer for me." (Doc. 97, pp. 35-36). Yet, he acknowledged that striking the officer was inappropriate (*Id.*). He also testified that he would have considered Hampton's substantiated PREA complaint from just a few weeks prior when deciding what discipline to impose.

Hampton received another ticket on June 25, 2018, for possession of a "gaff," which, as explained by Dr. Brown, is a thong used by trans women to compress their genitals against their bodies to create a smoother appearance and keep the genitals from moving around (Doc. 98, p. 18). Dr. Brown stated that it is "unfortunate" that Hampton has been acknowledged as transgender, diagnosed with gender dysphoria, has received hormones for more than two years, and has breasts, but yet is not allowed to have female underwear (*Id.*, p. 19). Then when she modifies her underwear because of her gender dysphoria, the IDOC views it as destruction of government property (*Id.*). He testified it is very common for transgender inmates with gender dysphoria to do whatever is necessary to develop their own underwear

when it is not being provided by the prison (*Id.*). Dr. Brown concluded that Hampton's actions indicate she has inadequately treated gender dysphoria and is attempting to treat herself (*Id.*, p. 23).

On June 26, 2018, Hampton was charged with assault of another offender (*Id.*, p. 41). The Adjustment Committee later found her guilty based on witness statements that she slapped the offender on the face, threw four or five punches at him, then began choking him, telling him to say, "I'm sorry." (*Id.*). After the offender said he was sorry, Hampton let him go (*Id.*, pp. 41-42). The informants stated that Hampton was the aggressor and the other offender did not fight back (*Id.*). Hampton testified at the evidentiary hearing that this incident occurred after the other inmate touched her buttocks and got upset when she said she was not interested in him sexually (Doc. 96, p. 49). He later tried to sweet talk her and reached to grab her buttocks again, but Hampton smacked his hand away (*Id.*). She claimed the other inmate then punched her in the face, and the ticket she received was for defending herself (*Id.*, p. 50).

Hampton received yet another disciplinary ticket on June 26, 2018, for assault and disobeying a direct order for refusing to cuff up (Doc. 97, pp. 43-44). A lieutenant had to pepper spray Hampton to get her to comply with the order to cuff up and move to segregation (*Id.*, p. 44). Hampton then jumped up on a chair and began to throw closed-fist punches at a staff member and the lieutenant (*Id.*, p. 45). She was given four months of segregation for this incident. Pacholke admitted this is a serious misconduct report but opined that it should be viewed in context of her overall experience in the system (*Id.*).

In August 2018, Hampton was disciplined for sexual misconduct and damage or misuse of property when she danced in a sexually provocative way in the yard (Doc. 97, p.

29). Approximately 53 minutes of video surveillance was recorded of the incident, which shows Hampton flirting with other offenders, suggestively dancing, flashing them, kissing and hugging them, and modifying her clothing (*Id.*, p. 31). Pacholke criticized the IDOC for using the video to build a case against Hampton to keep her in segregation rather than intervening and acknowledging that this is inappropriate and unsafe conduct (*Id.*). In Pacholke's opinion, what the video shows is a woman on a male yard (*Id.*, p. 32). Pacholke opined that the IDOC has not considered that Hampton's placement—in a men's prison, in segregation, and in close range to those who have assaulted her—might be driving her behavior and misbehavior (*Id.*, p. 39). In fact, he stated, these violations reinforce his opinion that she should be housed in a women's facility (*Id.*, pp. 32, 46). Pacholke noted that the IDOC has given Hampton hormones and feminizing clothing, including a sports bra, but then does everything in its power to place her anywhere but a female facility, as if Hampton "needs to earn her way into the proper gender placement." (*Id.*)

Dr. Reister disagreed with the idea that transgender inmates must "earn their way" into a certain facility but did agree that Hampton's aggression toward peers and staff is the result of her reacting to people misgendering and mistreating her (Doc. 100, pp. 28, 38). He noted that Hampton turns to self-protection when she feels threatened to gain a sense of control over her environment (*Id.*, p. 49). Dr. Reister, who has created a four-hour training on transgender mental health care for the IDOC mental health staff, suggested that it would be beneficial for correctional officers and other staff to be trained on being trauma informed (*Id.*, p. 52).

## I.  Exhaustion of Administrative Remedies

Before addressing the merits of Hampton's motion for preliminary injunction, the Court must determine whether she has exhausted her administrative remedies with regard to the injunctive relief she seeks.

The Prison Litigation Reform Act ("PLRA") provides that "[n]o action shall be brought with respect to prison conditions under Section 1983 of this title, or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted." 42 U.S.C. § 1997e(a). Exhaustion is a precondition to bringing suit, and the Seventh Circuit requires strict adherence to the PLRA's requirements. *Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006). Failure to exhaust administrative remedies is an affirmative defense; defendants bear the burden of proving a failure to exhaust. *See Jones v. Bock*, 549 U.S. 199, 216 (2007).

Under the PLRA, an inmate must take all steps required by the prison's grievance system to properly exhaust his or her administrative remedies. *Ford v. Johnson*, 362 F.3d 395, 397 (7th Cir. 2004); *Pozo v. McCaughtry*, 286 F.3d 1022, 1023–24 (7th Cir. 2002). The purpose of exhaustion is to give prison officials an opportunity to address the inmate's claims internally, prior to federal litigation. *Kaba v. Stepp*, 458 F.3d 678, 684 (7th Cir. 2006). When officials have been afforded this opportunity, the prisoner has properly exhausted all available remedies. *Id.*

An emergency does not exempt an inmate from exhausting his administrative remedies. *Maxey v. Cross*, No. 14-CV-01263-JPG-SCW, 2015 WL 507213, at *4 (S.D. Ill. Feb. 5, 2015). Instead, Illinois has an emergency grievance procedure for prisoners who claim to be

in urgent need of attention. *Fletcher v. Menard Correctional Center*, 623 F.3d 1171, 1174 (7th Cir. 2010) (citing 20 ILL. ADMIN. CODE. § 504.840). Under that procedure, am emergency grievance is forwarded directly to the warden, who determines whether "there is a substantial risk of imminent personal injury or other serious or irreparable harm" to the inmate. *Id.* (citing § 504.840(a)). If there is such a risk, the grievance is handled on an emergency basis, and the warden is required to tell the inmate what action, if any, will be taken in response to the alleged danger. *Id.* (citing § 504.840(b)).

When prison officials fail to respond to inmate grievances, the Seventh Circuit has held that administrative remedies are "unavailable" to the prisoner. *Lewis v. Washington*, 300 F.3d 829, 833 (7th Cir. 2002). At that point, the inmate is deemed to have exhausted his claims. *See Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006) (a remedy can be unavailable to a prisoner if the prison does not respond to the grievance or uses misconduct to prevent a prisoner from exhausting his resources); *Walker v. Sheahan*, 526 F.3d 973, 979 (7th Cir. 2000) (an inmate is not required to appeal his grievance if he submits the grievance to the proper authorities but never receives a response).

How long a prisoner must wait to file suit after submitting his or her emergency grievance, however, has not definitively been decided by the Seventh Circuit. In *Fletcher*, the inmate waited only two days after filing his emergency grievance before filing his lawsuit, which the Court of Appeals found to be insufficient under the circumstances of that case. *Fletcher*, 623 F.3d at 1174-75. On the other hand, in *Muhammad v. McAdory*, the Seventh Circuit found that a genuine issue of material fact existed concerning whether prison officials thwarted the plaintiff's efforts to exhaust his administrative remedies when they did not respond to his emergency grievance 51 days after he filed it. *Muhammad v. McAdory*, 214 F.

App'x 610, 613 (7th Cir. 2007). The undersigned district judge has found that waiting sixteen days after filing an emergency grievance may be sufficient to exhaust, particularly when the inmate is in imminent danger of harm from a cellmate. *Godfrey v. Harrington*, 13-cv-0280-NJR-DGW, 2015 WL 1228829, at *7 (S.D. Ill. Mar. 16, 2015).

In this case, it is undisputed that Hampton filed an emergency grievance dated February 7, 2018, while housed at Lawrence Correctional Center (Doc. 37, p. 3). The emergency grievance stated that Hampton was in danger as a woman placed in a man's prison and that, while in segregation, she had not received the mental health treatment required by IDOC rules, the *Rasho* settlement agreement,[1] the Americans with Disabilities Act, the Rehabilitation Act, and the Eighth Amendment (Doc. 37-1). Hampton requested relief in the form of a transfer to a women's prison and release from segregation, an updated treatment plan, a review of her medication by a psychiatrist, and group and other therapy required to treat her serious mental illnesses (*Id.*).

The grievance contains the notation "E91 RCVD 2/8/28." (*Id.*) The grievance also contains a stamp indicating it was received by the grievance office at Lawrence on February 14, 2018 (*Id.*). There is no response from any prison official on the grievance form. Defendants state that "Plaintiff did not exhaust this grievance" but provide absolutely no argument or evidence in support of that statement.[2] Defendants reiterate that same conclusory statement in their supplemental memorandum of law in support of their motion for summary judgment on the issue of exhaustion (Doc. 86). They further argue that no grievances have been exhausted relating to Hampton's claims that she has been subject to harassment, beatings,

---

[1] *See Rasho v. Walker*, 1:07-cv-1298-MMM (C.D. Ill.).
[2] Defendants also provide no explanation as to why the grievance apparently went to the grievance office rather than to the warden despite being marked as an emergency.

threats, segregation, or a failure to protect by the IDOC, and that no grievances have been exhausted with regard to her rights to equal protection, mental health care, or accommodations under the ADA (*Id.*).

As an initial matter, the Court finds that Hampton's February 7, 2018 grievance more than adequately grieves the denial of appropriate mental health treatment while in segregation (*see* Doc. 37-1). Further, her statement that she is a woman and in danger because she is improperly housed by the IDOC in a male prison is sufficient to grieve her claim that she belongs in a female correctional center. As held by the Seventh Circuit in *Strong v. David*, 297 F.3d 646, 650 (7th Cir. 2002):

> Illinois has not established any rule or regulation prescribing the contents of a grievance or the necessary degree of factual particularity . . . When the administrative rulebook is silent, a grievance suffices if it alerts the prison to the nature of the wrong for which redress is sought. As in a notice-pleading system, the grievant need not lay out the facts, articulate legal theories, or demand particular relief. All the grievance need do is object intelligibly to some asserted shortcoming.

There is no requirement that Hampton specifically grieve her right to equal protection or a lack of ADA accommodations. It is enough that Hampton asserted the IDOC's shortcomings in the form of denying her adequate and appropriate mental health treatment and placing her in a men's prison despite being a female.

As for exhaustion of this emergency grievance, Hampton asserts—and Defendants do not dispute—that she never received a response from the warden. The warden's failure to respond to Hampton's allegations that she was in danger and was not receiving essential and required mental health treatment, within 29 days of her filing the grievance, rendered the administrative process unavailable to Hampton, and she is deemed to have exhausted her

administrative remedies.[3] *See Fletcher*, 623 F.3d at 1174-75; *Muhammad*, 214 F. App'x at 613.

## II.      Motion for Preliminary Injunction

A preliminary injunction is an "extraordinary and drastic remedy" for which there must be a "clear showing" that a plaintiff is entitled to relief. *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997). The purpose of an injunction is "to minimize the hardship to the parties pending the ultimate resolution of the lawsuit." *Faheem-El v. Klincar*, 841 F.2d 712, 717 (7th Cir. 1988). To be granted an injunction, a plaintiff has the burden of demonstrating a reasonable likelihood of success on the merits, no adequate remedy at law, and irreparable harm absent the injunction. *Planned Parenthood v. Commissioner of Indiana State Dep't Health*, 699 F.3d 962, 972 (7th Cir. 2012).

As to the first element, the Court must determine whether the "plaintiff has any likelihood of success—in other words, a greater than negligible chance of winning." *AM General Corp. v. DaimlerChrysler Corp.*, 311 F.3d 796, 804 (7th Cir. 2002). As to the second element, the absence of an adequate remedy at law is a precondition to any form of equitable relief. *Roland Mach. Co. v. Dresser Indus., Inc.*, 749 F.2d 380, 386 (7th Cir. 1984). Finally, the requirement of irreparable harm eliminates those cases where, although the ultimate relief sought is equitable, the plaintiff can wait until the end of trial to get that relief. *Id.* Only if the plaintiff will suffer irreparable harm in the interim—that is, before a final judgment—can he or she obtain a preliminary injunction. *Id.*

Once Hampton has met her burden, the Court must weigh the balance of harm to the parties if the injunction is granted or denied and evaluate the effect of an injunction on the

---

[3] This determination is limited solely to Hampton's requests in her motion for preliminary injunction to be transferred to a women's prison and to be released from segregation. Whether Hampton has exhausted her other claims will be addressed separately by Magistrate Judge Reona J. Daly.

public interest. *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013). "This equitable balancing proceeds on a sliding-scale analysis; the greater the likelihood of success of the merits, the less heavily the balance of harms must tip in the moving party's favor." *Id.*

The Prison Litigation Reform Act provides that a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm." 18 U.S.C. § 3626(a)(2). The Seventh Circuit has described injunctions like the one sought here, requiring an affirmative act by the defendant, as a mandatory preliminary injunction. *Graham v. Med. Mut. of Ohio*, 130 F.3d 293, 295 (7th Cir. 1997). Mandatory injunctions are "cautiously viewed and sparingly issued," because they require the court to command a defendant to take a particular action. *Id.* (citing *Jordan v. Wolke*, 593 F.2d 772, 774 (7th Cir. 1978)).

## A.      Success on the Merits

A party moving for preliminary injunctive relief need not demonstrate that she has a likelihood of absolute success on the merits, but rather that her chances are "better than negligible," which is a "low threshold." *Whitaker By Whitaker v. Kenosha Unified Sch. Dist. No. 1 Bd. of Educ.*, 858 F.3d 1034, 1046 (7th Cir. 2017). In this case, Hampton argues she has a greater than negligible chance of winning on her claims because Defendants have: (1) violated the Equal Protection Clause by housing her in a men's prison; (2) violated the Equal Protection Clause by constantly sexually harassing her; (3) violated the Eighth Amendment by failing to protect her from sexual and physical assault; and (4) violated the Eighth Amendment by subjecting her to cruel and unusual punishment.

### i.      Equal Protection Clause

The Equal Protection Clause of the Fourteenth Amendment directs that "all persons

similarly situated should be treated alike," thereby protecting against intentional discrimination by way of classifications that reflect "a bare . . . desire to harm a politically unpopular group." *Whitaker*, 858 F.3d at 1050 (quoting *City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 439 (1985)); *Glenn v. Brumby*, 663 F.3d 1312, 1315 (11th Cir. 2011) (quoting *Cleburne*, 473 U.S. at 446-47). "Generally, state action is presumed to be lawful and will be upheld if the classification drawn by the statute is rationally related to a legitimate state interest." *Id.* The rational basis test does not apply, however, when discrimination is alleged based on one's membership in a protected class. *Reget v. City of LaCrosse*, 595 F.3d 691, 695 (7th Cir. 2010). In those situations, heightened scrutiny applies. *See Whitaker*, 858 F.3d at 1050.

Neither the Seventh Circuit nor the Supreme Court has determined whether transgender individuals constitute a protected class. *See id.* at 1051 ("[T]his case does not require us to reach the question of whether transgender status is per se entitled to heightened scrutiny."). Other district courts outside the Seventh Circuit, however, have recognized transgender individuals as either a suspect or quasi-suspect class entitled to heightened scrutiny. *See, e.g., Bd. of Educ. of the Highland Local Sch. Dist. v. United States Dep't of Educ.*, 208 F. Supp. 3d 850, 872-74 (S.D. Ohio 2016) (concluding that heightened scrutiny applied to equal protection claim arising from a transgender girl being denied access to the girls' bathroom because transgender individuals are a quasi-suspect class).

Even where trans people have not been found to constitute a protected class, the Seventh Circuit has held that heightened or intermediate scrutiny applies when the complaint is based on sex discrimination. *See Whitaker*, 858 F.3d at 1050 (a sex-based classification is subject to heightened scrutiny, as sex "frequently bears no relation to the ability to perform or contribute to society"). Under intermediate scrutiny, "classifications by

gender must serve important governmental objectives and must be substantially related to achievement of those objectives" in order to be upheld. *Craig v. Boren*, 429 U.S. 190, 197 (1976). "When a sex-based classification is used, the burden rests with the state to demonstrate that its proffered justification is exceedingly persuasive," not just a hypothesized or *post hoc* justification created in response to litigation. *Whitaker*, 858 F.3d at 1050.

a.      *Discrimination by Housing Hampton in a Male Facility*

Hampton first argues that the IDOC's policy of housing cisgender women in women's prisons but forcing transgender women to be housed with men based on their assigned gender at birth, is a classification based on sex that causes her to be treated differently from similarly situated female inmates. Therefore, heightened scrutiny applies, and the State must show the classification serves important, genuine governmental objectives and that the discriminatory means employed (placing transgender females in male prisons) is substantially related to the achievement of those objectives.

Defendants make no express argument that rational basis review applies rather than heightened scrutiny,[4] although they do argue that an inmate's placement is not uniformly based on the inmate's sex at birth (the implication being there is no sex-based classification). While they acknowledge that IDOC inmates are initially housed according to their genitalia, they assert that at least two transgender inmates have been transferred to female institutions after a case-by-case determination by the Transgender Care Review Committee. Furthermore, the Committee in this case considered numerous factors, including security, Hampton's aggression toward staff and other inmates, her adjustment, her mental health,

---

[4] Defendants also make no argument that the category of "similarly situated" individuals should be other transgender inmates or other inmates with gender dysphoria rather than other female inmates. Accordingly, the Court considers that issue conceded.

and her medical health. Defendants note that an offender who is denied transfer by the Committee can be re-reviewed and follow-up meetings can be scheduled on an as-needed basis.

While the Court understands that consideration is later given to an inmate's desire to be transferred to the prison of their gender identity, the fact remains that inmates are, by default, placed in a facility based on their genitalia (*see* Doc. 59-1, p. 21-22). Therefore, a sex-based classification is used, and intermediate scrutiny must be applied. Under intermediate scrutiny, the question becomes: is the IDOC's policy of placing transgender inmates in the prison of their assigned sex at birth substantially related to the achievement of prison security?

The State has presented no evidence that transgender inmates generally pose a greater security threat than cisgender inmates, and anyway, "generalized concerns for prison security are insufficient to meet the 'demanding' burden placed on the State to justify sex-based classifications." *Doe v. Massachusetts Dep't of Corr.*, No. CV 17-12255-RGS, 2018 WL 2994403, at *10 (D. Mass. June 14, 2018) (citing *United States v. Virginia*, 518 U.S. 515, 531 (1996)).

With regard to Hampton specifically, Defendants point to her history of disciplinary problems as evidence that, in this case, placing her in a male prison is essential to maintain prison security. Defendants argue that the Committee met several times to discuss Hampton's placement, but found she had been aggressive and violent toward staff and other offenders.

The Court first notes that the Committee's reports do not reflect *any* discussion of Hampton's aggression toward others until July 16, 2018—after Hampton's motion for

preliminary injunction had been filed—indicating it may be a forbidden *post hoc* justification created in response to litigation. Moreover, as pointed out by Hampton, female inmates can be equally aggressive and violent, perhaps more so than Hampton. Yet, no one would suggest those women should be housed in the men's division. Furthermore, the Committee considered her assaults on prison staff and other inmates when reviewing her placement, but it never reviewed her disciplinary reports, grievances, or substantiated PREA complaints to have the full picture. And while the Committee considered the safety of female inmates at Logan should Hampton be transferred, it never considered whether Hampton felt safe or secure in a men's prison. In fact, the Committee never even interviewed Hampton personally.

Based on these facts, the Court is not convinced that the IDOC's policy of placing transgender inmates in the facility of their assigned sex at birth is substantially related to the achievement of prison security. Furthermore, there is some evidence that the concern about Hampton's aggressiveness could be a *post hoc* justification created in response to litigation. Accordingly, the Court finds that Hampton has a greater than negligible chance of success on the merits of her equal protection claim with regard to her placement in a male prison.

b.     *Sexual Harassment*

Hampton next argues Defendants have violated the Equal Protection Clause by intentionally subjecting her to verbal and physical sexual harassment that male inmates do not endure because she is transgender. In response, Defendants simply argue "there is no proof of discrimination against Hampton by subjecting her to constant verbal sexual harassment, insult, threat, and intimidation that males do not endure." (Doc. 55, pp. 8-9).

To succeed on her sexual harassment claim under the Equal Protection Clause, Hampton must establish (1) the harassment was intentional and based on sex and (2) the

harassment was "sufficiently severe or pervasive." *Trautvetter v. Quick*, 916 F.2d 1140, 1149 (7th Cir. 1990); *see also Adair v. Hunter*, 236 F. Supp. 3d 1034, 140 (E.D. Tenn. 2017) (while isolated incidents of verbal harassment do not rise to the level of constitutional violations, "where, as here, a plaintiff alleges ongoing harassment, the equal protection clause applies."). "[A] plaintiff wishing to sustain an equal protection claim of sexual harassment must show both 'sexual harassment' and an 'intent' to harass based upon that plaintiff's membership in a particular class of citizens." *Id.*

At the evidentiary hearing, Hampton testified to constant, severe harassment, including being called a fag, it, he-she, dick sucker, dick eater, and other derogatory terms based on her status as transgender. Defendants presented no evidence refuting that testimony, except for Correctional Counselor Brandi Hendrix, who disavowed ever using the term "fag" to refer to Hampton (Doc. 99, p. 112). Hampton also testified to multiple situations where IDOC staff forced her to engage in sexual acts with other inmates or with the staff themselves, and she complained of being groped and harassed daily by inmates.

While this Court is not blind to the fact that male inmates also face sexual and verbal harassment from other inmates and staff, Defendants presented no evidence that such abuse rises to the same level Hampton has experienced. They also make no real argument in support of their position. Accordingly, the Court finds Hampton has a likelihood of success on the merits of her equal protection claim with regard to verbal and physical sexual harassment.

ii.     **Eighth Amendment**

Hampton also asserts she will succeed on the merits of her Eighth Amendment failure to protect and deliberate indifference to conditions of confinement claims.

a.      *Failure to Protect Against Sexual and Physical Abuse*

Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and, by extension, correctional officers. "Omissions can violate civil rights, and 'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" *Chavez v. Illinois State Police*, 251 F.3d 612, 952-3 (7th Cir. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

To succeed on such a claim, an inmate must first demonstrate she is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, the inmate must show prison officials acted with deliberate indifference to that risk, which requires a subjective inquiry into a prison official's state of mind. *Farmer*, 511 U.S. at 838-39. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk or serious harm exists, and he must also draw the inference." *Id.* at 837.

A prisoner may demonstrate that prison officials were aware of a specific, impending, and substantial threat to her safety "by showing that [s]he complained to prison officials about a specific threat to [her] safety." *Pope v. Shafer*, 86 F.3d 90, 92 (7th Cir. 1996) (quoting *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991)). The prison official may be held liable only if he knows an inmate faces a substantial risk of serious harm and "disregards that risk by failing to take reasonable measures to abate it." *Farmer*, 511 U.S. at 847. A plaintiff also "can establish exposure to a significantly serious risk of harm by showing that [s]he belongs to an identifiable group of prisoners who are frequently singled out for violent attack by other inmates." *Id.* at 843 (quotation omitted).

Hampton argues Defendants know she is transgender, is vulnerable, and faces a

substantial risk of serious harm from other prisoners and staff. They also are aware that she has been sexually and physically abused at other men's prisons by way of her other lawsuits, her grievances and PREA complaints, and prior Internal Affairs investigations. Yet, Defendants disregarded that risk when they failed to protect her from other prisoners who have sexually assaulted her.

In response, Defendants argue they are aware of only one alleged sexual issue with another inmate, and that inmate was separated from Hampton immediately. The only other incident of which they are aware is the incident where Hampton assaulted another inmate, which Hampton testified occurred when that inmate continually hit her on the buttocks and grabbed her breasts.

Again, the Court finds Hampton has more than a negligible chance of success on the merits of this claim. Hampton has filed numerous grievances and several PREA complaints that were ultimately found substantiated. She testified that *nothing* was done after those substantiated PREA complaints to protect her from further verbal and sexual harassment and abuse. When Hampton told Dixon staff about the inmate that was grabbing her for a week and a half, they did nothing. Instead, she had to call the PREA hotline. Defendants presented no evidence to the contrary. Indeed, the Assistant Warden of Operations at Dixon could not testify to *any* actions taken to protect Hampton after her PREA allegations were deemed substantiated (Doc. 99, p. 78). Based on this evidence, the Court finds Hampton has a likelihood of success on her failure to protect claim.

b.      *Deliberate Indifference to Conditions of Confinement*

Hampton next argues she will prevail on her Eighth Amendment conditions of confinement claim related to her prolonged stay in segregation. She asserts Defendants

housed her in conditions constituting cruel and unusual punishment when those conditions are worsening her mental illness and causing her extreme emotional pain and suffering—to the point she has attempted suicide multiple times.

In a case involving conditions of confinement in a prison, two elements are required to establish violations of the Eighth Amendment's cruel and unusual punishment clause. *McNeil v. Lane*, 16 F.3d 123, 124 (7th Cir. 1993). First, the prisoner must show that, objectively, the conditions deny the inmate "the minimal civilized measure of life's necessities," creating an excessive risk to the inmate's health or safety. *Farmer v. Brennan*, 511 U.S. 825, 834 (1994); *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Not all prison conditions trigger Eighth Amendment scrutiny—only deprivations of basic human needs like food, medical care, sanitation, and physical safety. *Rhodes v. Chapman*, 452 U.S. 337, 346 (1981). Second, from a subjective point of view, the inmate must demonstrate that the defendants acted with a sufficiently culpable state of mind, namely, deliberate indifference. *McNeil*, 16 F.3d at 124. Deliberate indifference exists only where an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*, 511 U.S. at 837-38. "'Deliberate indifference' means recklessness in a criminal, subjective sense: disregarding a risk of danger so substantial that knowledge of the danger can be inferred." *James v. Milwaukee Cty.*, 956 F.2d 696, 700 (7th Cir. 1992). Negligence, even gross negligence, does not constitute deliberate indifference. *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir. 2001).

Defendants rely on the affidavit of Jamie Weigand, a mental health professional who met with Hampton in segregation for one-hour, weekly, individual sessions to discuss her transgender issues and concerns as well as to devise a treatment plan (Doc. 56-2, p. 4). Ms. Weigand testified she has not personally observed any negative effects or decompensation

from Hampton being in segregation and explained that Hampton is social, upbeat, and smiling when she sees her (*Id.*, p. 8). Hampton also participates in group therapy for long-term segregation inmates once per week, she showers and takes care of her hygiene, she is out of her cell three to four hours per day, and she gets two hours of yard time per day.

Defendants also presented evidence that a mental health professional was consulted each time Hampton received disciplinary violations (Doc. 98, pp. 79-82). Those professionals often concluded that Hampton's behavior was *not* the result of her mental health issues (*Id.*). The mental health professionals also evaluated whether placement in segregation would present a risk of harm to Hampton, and they determined that it would not (*Id.*). Defendants then acted in accordance with the recommendations of the mental health professionals regarding discipline, often imposing less segregation time than recommended or no segregation time at all (*Id.*). Defendants argue they are entitled to rely on the recommendations of mental health professionals, even if there are others who would disagree with those conclusions.

The Court agrees that Defendants are entitled to rely on the recommendations of the mental health professionals who found that placement in segregation would not be a risk to Hampton's mental health. *See Berry v. Peterman*, 604 F.3d 435, 440 (7th Cir. 2010) (nonmedical administrators are entitled to defer to the judgment of jail health professionals). Thus, Hampton has not shown Defendants acted with the requisite deliberate difference.

Furthermore, there is no evidence that Hampton has been deprived of any life's basic necessities, as required to meet the objective prong of the test. She appears to be receiving adequate medical care, has one-on-one sessions with Weigand to address her transgender issues, attends group therapy for long-term segregation inmates several times per week, is

receiving treatment for her bipolar disorder (although she refuses to take her medication), has access to showers and proper hygiene care, and spends two hours a day at yard. The only program Hampton does not have access to is the transgender support group, which is not one of life's necessities, despite its importance to Hampton's mental health.

Accordingly, the Court finds—at this point—that Hampton has not shown a likelihood of success on the merits of this claim. *See Marion v. Columbia Corr. Inst.*, 559 F.3d 693, 697–98 (7th Cir. 2009) ("a liberty interest *may* arise if the length of segregated confinement is substantial and the record reveals that the conditions of confinement are unusually harsh"). Additionally, the Court is mindful of the *Rasho* settlement agreement, of which Hampton is a plaintiff class member, and the recent order granting permanent injunctive relief in that case. *See Rasho v. Walker*, 1:07-cv-1298-MMM (C.D. Ill. Oct. 30, 2018). The Court is optimistic that Hampton's mental health issues in segregation will be addressed by the permanent injunction and the IDOC's proposed actions to address the constitutional deficiencies addressed by the *Rasho* court.

**B.     Adequate Remedy at Law**

Hampton argues she has no adequate remedy at law because money will not make her whole or protect her from the physical and emotional abuse she is currently suffering. Defendants make no argument in opposition. Therefore, the Court considers this element conceded by Defendants.

**C.     Irreparable Harm**

As to the element of irreparable harm, Hampton first argues that the continuing deprivation of her Eighth and Fourteenth Amendment rights constitutes irreparable harm itself. Second, her physical safety is at risk because Defendants have refused to protect her

from other prisoners. And third, her mental health is at risk when she has been forced to endure constant sexual and physical abuse. Hampton notes that she has tried to commit suicide several times already, and there is a serious risk she will continue to have suicidal ideations.

Defendants, on the other hand, assert the evidence shows she is not suffering irreparable harm, her current needs are being met, and she is in a safe environment. They also claim her allegation that Defendants have said they will not protect her are "patently false." While she is currently in segregation, she is doing well, and she will be moved from segregation when her time is served.

Contrary to Defendants' argument, the evidence indicates Hampton is *not* in a safe environment. The Court agrees with Hampton that her physical safety is at risk when she continues to be sexually assaulted and prison officials refuse to do anything to protect her. The Court also agrees that Hampton's mental health is at risk of degrading further. Hampton testified that the verbal harassment and discrimination she endures daily from prison staff causes her to feel depressed, disrespected, and humiliated (Doc. 96, pp. 13, 20). Given these circumstances, the Court finds that Hampton may suffer irreparable harm absent injunctive relief prior to trial.

E.      *Balance of Equities*

Hampton met her burden of demonstrating a likelihood of success on the merits of her Equal Protection and failure to protect claims, she has shown she has no adequate remedy at law, and she has demonstrated irreparable harm. Accordingly, the Court must now weigh the balance of harm to the parties if the injunction is granted or denied and also evaluate the effect of an injunction on the public interest. *Korte v. Sebelius*, 735 F.3d 654, 665 (7th Cir. 2013).

The greater the likelihood of success of the merits, the less heavily the balance of harms must tip in Hampton's favor. *See id.*

Hampton argues that requiring Defendants to house her in a women's facility and protect her from harm will further the public interest and will not harm Defendants in any way. She asserts that an injunction would ensure her health and safety and protect her from abusive staff and prisoners, while causing Defendants minimal harm since transfers of inmates occur daily. To the extent Defendants claim that transferring her to a women's prison would pose a risk to the other women prisoners, she claims this position is unfounded given that she is chemically castrated. Moreover, it is in the public interest to ensure that Hampton's constitutional rights are not violated by correctional officers.

In response, Defendants argue that granting a preliminary injunction would endanger the public interest by putting the Court in a position of directing where Hampton (and other transgender inmates) should be housed, therefore interfering with the operations of the IDOC "in a situation where Plaintiff is merely attempting to manipulate the system." They again argue she is safe, in a protected area at Dixon, showers separately, is celled separately, has access to group and individual therapy, mental health counseling, library, yard, and commissary. She is escorted when out of her cell. And while she complains of verbal and sexual abuse, there is no proof of either.

Generally, "federal courts, while most reluctant to interfere with the internal administration of state prisons . . . nevertheless will intervene to remedy unjustified violations of those rights retained by prisoners." *Williams v. Lane*, 851 F.2d 867, 871 (7th Cir. 1988); *Bell v. Wolfish*, 441 U.S. 520, 547 (1979) (courts generally do not interfere with prison administrative matters in the absence of constitutional concerns). Thus, while courts usually

hesitate to interfere with a routine transfer of an inmate from one prison to another, when an inmate's constitutional rights are at issue, a district court can intervene.

Still, the Court is not convinced at this point that ordering the IDOC to transfer Hampton to Logan Correctional Center is in the best interest of the parties or the public. Transferring Hampton to Logan would not cure everything; IDOC staff are just as likely to harass Hampton at Logan, female prisoners could sexually assault Hampton, and other unforeseen problems may arise. For now, the Court reserves ruling on the issue of whether Hampton should be transferred to a women's prison until after the constitutional issues are resolved at trial. *See* 18 U.S.C. § 3626(a)(2) (a preliminary injunction must be "narrowly drawn, extend no further than necessary to correct the harm . . . ," and "be the least intrusive means necessary to correct that harm").

In the meantime, however, other action can and should be taken immediately to address the institutional problems that surfaced during the evidentiary hearing—issues that could be addressed by training prison staff on transgender issues. As explained by Dr. Reister, Hampton is particularly reactive to people who misgender her and do not recognize her as a woman. And when she feels threatened, she resorts to aggressive tactics that allow her to gain a sense of control. At the same time, both Assistant Warden Wilks and Correctional Counselor Hendrix testified they consider Hampton to be a man and repeatedly used male pronouns when referring to her (*see generally* Doc. 99). Neither of these employees were at all aware of the concept of misgendering or how it affects a trans individual's mental health (*Id.*, p. 88). And while they have had training on how to physically search transgender offenders, they have had no training on gender dysphoria or "dealing with transgender inmates" (*Id.*, pp. 92, 110-11).

It seems that training IDOC staff on a few basic concepts (as defense counsel called it, "sensitivity training") would not only improve Hampton's mental health but also reduce her aggression—and potentially address her issue of constantly being placed in segregation. This would come at little cost to the IDOC, as Dr. Reister has already developed a four-hour training program on transgender mental health for the mental health staff (Doc. 100, p. 11) and other programs are likely available. Dr. Reister indicated they are in the early stages of planning training for other staff as well (*Id.*). Implementing this training and educating staff on how to treat transgender inmates (and all inmates, for that matter) would benefit Hampton while causing little harm to Defendants.

Another action that would cause little harm to Defendants but greatly benefit Hampton is to allow her to attend the transgender support group even when she is in segregation. The Court finds credence in Dr. Reister's testimony that he recommended Hampton go to Dixon because it is a mental health hub, it is staffed by people who have experience working with manic inmates, it has a large transgender population, and it has an active transgender support group (Doc. 11, p. 27). Unfortunately, Hampton has not had access to the group while she is in segregation. That must change.

Finally, while the Court will not, at this point, order Hampton to be transferred to Logan, it strongly suggests that the Committee fully consider <u>all evidence</u> for and against a transfer when it meets this month, including interviewing Hampton herself. A review of Hampton's full mental health and disciplinary history[5] in the context of her substantiated PREA complaints and grievances may lead the Committee itself to conclude that Hampton

---

[5] This evaluation should include considering whether Hampton's conduct leading to her discipline is a result of misgendering and the staff's general ignorance of transgender issues, such as (1) refusing to provide Hampton with women's underwear and then disciplining her for modifying her undergarments, and (2) calling her names and then disciplining her for acting out in response to the harassment.

is safest in a women's prison. If not, the Court can revisit the issue after the constitutional issues have been decided at trial.

Conclusion

For these reasons, the Court **GRANTS in part** Plaintiff's Motion for Preliminary Injunction and **ORDERS** Defendants to provide an update to the Court within **14 days** as to steps it will take to: (1) train all correctional staff on transgender issues; (2) allow Hampton to attend the transgender support group while she is in segregation; and (3) ensure the Transgender Care Review Committee considers all evidence for and against transferring Hampton to a women's facility. Plaintiff may file a response to Defendants' filing on or before **November 30, 2018**.

The Court **DENIES** the Motion for Preliminary Injunction to the extent Hampton asks the Court to order Defendants to release her from segregation.

**IT IS SO ORDERED.**

**DATED:   November 7, 2018**

_____
**NANCY J. ROSENSTENGEL**
**United States District Judge**