## IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEON HAMPTON (M15934),       )

                                      )

         Plaintiff,          )

                                      )

        v.               )         Case No. 18-cv-550

                                      )

WARDEN KEVIN KINK, WARDEN     )         Judge Nancy J. Rosenstengel

JOHN VARGA, OFFICER BURLEY,     )

OFFICER GEE, INTERNAL AFFAIRS    )        JURY TRIAL DEMANDED

OFFICER MANZANO, INTERNAL AFFAIRS )

OFFICER BLACKBURN, LIEUTENANT   )

DOERING, and SERGEANT KUNDE,    )

                                        )

        Defendants.         )

## SECOND AMENDED COMPLAINT

Plaintiff Deon "Strawberry" Hampton, by her undersigned attorneys, for her complaint against Warden Kevin Kink, Warden John Varga, Officer Burley, Officer Gee, Internal Affairs Officer Manzano, Internal Affairs Officer Blackburn, Lieutenant Doering, and Sergeant Kunde, alleges as follows:

### INTRODUCTION

1.     This action is brought pursuant to 42 U.S.C. § 1983 to redress the deprivation under color of law of Plaintiff's rights as secured by the Eighth and Fourteenth Amendments to the United States Constitution, and the Illinois Hate Crimes Act.

2.     Plaintiff is a 27-year-old transgender woman who was previously incarcerated in the Illinois Department of Corrections ("IDOC").  Plaintiff began living as a girl when she was five years old and continued to live as a young woman throughout her incarceration.

1

3.      Throughout her incarceration, Plaintiff was improperly housed in men's prisons; as a result, she was subjected to grave physical, mental, and emotional danger.

4.      Plaintiff has endured violent sexual and physical attacks and emotional abuse at the hands of both staff and prisoners at four different men's prisons in the last year and a half.

5.      Plaintiff was at Pinckneyville Correctional Center ("Pinckneyville") for about ten months before being transferred to Menard Correctional Center ("Menard") in retaliation for filing complaints against officers at Pinckneyville who sexually assaulted her and forced her to have sex with her cellmate for their entertainment.

6.      For nearly five months while she was housed at Menard, officers constantly verbally harassed Plaintiff and sexually and physically abused her—and had other detainees beat her—both because of her gender and in retaliation for complaints she filed against officers at Pinckneyville.  While at Menard, Plaintiff filed a lawsuit against IDOC officials over this abuse. Rather than defend the lawsuit, IDOC officials agreed to transfer Plaintiff from Menard to Lawrence Correctional Center ("Lawrence"), a medium security men's prison, on January 10, 2018.  Plaintiff agreed to this settlement because she feared for her life at Menard.

7.      However, Plaintiff did not escape sexual harassment and physical abuse at Lawrence.  Officers, mental health staff, and other prisoners subjected her to constant sexual harassment, including the use of derogatory names, as well as other verbal abuse and threats to her physical safety.  Officers at Lawrence beat her, and made it clear that they would not protect her from other prisoners who wished to harm her.  On one occasion, officers failed to protect Plaintiff from a prisoner on the yard who exposed his genitals to Plaintiff and threatened to rape her.

8.      Plaintiff has been designated as Seriously Mentally Ill ("SMI") by the Illinois Department of Corrections ("IDOC") mental health staff.  Her mental health has rapidly deteriorated as a result of the abuse she has suffered in IDOC custody.

9.      Due to the accumulation of false disciplinary tickets filed against her by the very officers who abused her at Pinckneyville, Menard, and Lawrence, Plaintiff spent approximately one year in segregation, where she was denied adequate mental health care.  Placement in segregation and the lack of mental health care caused Plaintiff's mental health to further deteriorate.  At Lawrence, Plaintiff attempted suicide in her segregation cell multiple times.

10.     While still at Lawrence, Plaintiff filed the instant lawsuit and sought emergency relief from this Court, in the form of a preliminary injunction.  After filing the lawsuit, Plaintiff was transferred to Dixon on March 16, 2018, and immediately placed in segregation.

11.     At Dixon, Plaintiff began receiving adequate mental health treatment while in segregation.  Once she was released from segregation, Plaintiff believed the changed circumstances required that she withdraw her Motion for a Preliminary Injunction without prejudice on June 8, 2018.

12.     As soon as Plaintiff withdrew her motion, Dixon staff escalated their verbal harassment and began to consistently call her "fag," "it," "he-she," and more.  They made it clear that they would not protect her from other prisoners at Dixon, and that they would do what they could to get her transferred to a different men's facility.  Officers failed to protect Plaintiff from two different prisoners who sexually assaulted her and threatened to rape her.

13.     On June 26, 2018, Plaintiff received three retaliatory tickets from Dixon officers, placing her back in segregation only one month after getting out.  Plaintiff, tired of fighting the

system that degrades her and refuses to treat her as a woman, immediately attempted suicide when placed back in segregation.

14.     Plaintiff's physical and emotional well-being were in jeopardy at Dixon, and will be in any men's facility.  As a transgender woman with mental health needs, Plaintiff is particularly vulnerable in a men's prison.  Her vulnerability is exacerbated by the fact that her mental health deteriorated significantly during her time in segregation while officers at these various men's prisons purposefully failed in their duty to protect her from harm and in fact were often initiating the abuse because of their hatred and animus towards transgender women.

## JURISDICTION AND VENUE

15.     This Court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1367.

16.     Venue is proper in this district under 28 U.S.C. § 1391(b) because the events giving rise to the claims asserted in this complaint occurred in this judicial district.

## PARTIES

17.     Plaintiff was at all relevant times an Illinois Department of Corrections prisoner.

18.     Defendant Kevin Kink was the Warden of Lawrence Correctional Center.  At all times relevant to the events at issue in this case, Defendant Kink was employed by the Illinois Department of Corrections.  As such, he was acting under color of law.  At all times relevant to the events at issue in this case, Defendant Kink promulgated rules, regulations, policies, and procedures at Lawrence.  Defendant Kink was responsible for supervising all staff and managing all operations at Lawrence.  He is sued in his individual capacity.

19.     Defendant John Varga is the Warden of Dixon Correctional Center.  At all times relevant to the events at issue in this case, Defendant Varga was employed by the Illinois Department of Corrections.  As such, he was acting under color of law.  At all times relevant to

the events at issue in this case, Defendant Varga promulgated rules, regulations, policies, and procedures at Dixon.  Defendant Varga is responsible for supervising all staff and managing all operations at Dixon.  He is sued in his individual capacity.

20.    Defendant Officer Burley was an officer at Lawrence Correctional Center.  At all times relevant to the events at issue in this case, this defendant was acting under color of law and within the scope of his employment with the Illinois Department of Corrections.  Officer Burley is sued in his individual capacity.

21.    Defendants Officer Gee, Internal Affairs Officer Manzano, Internal Affairs Officer Blackburn, Lieutenant Doering, and Sergeant Kunde are officers at Dixon Correctional Center.  At all times relevant to the events at issue in this case, these defendants were acting under color of law and within the scope of their employment with the Illinois Department of Corrections.  These defendants are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### Plaintiff is a Transgender Woman who has Suffered Persistent, Brutal Abuse in Men's Prisons

22.    Since the young age of five, Plaintiff has identified as a female.  Her family and her community also began treating her as a female at a young age.

23.    In 2012, Plaintiff was diagnosed with gender dysphoria by an IDOC psychiatrist.

24.    Throughout the years, Plaintiff took hormones intermittently to transition her body from male to female.  Plaintiff consistently began cross-sex hormone treatment in IDOC custody in July 2016 while housed at Lawrence Correctional Center.

25.    From December 2016 to July 2017, Plaintiff's lab levels showed that her testosterone levels were dropping and her estrogen levels were increasing.  By March 2017,

Plaintiff was no longer in the male range for testosterone levels and she was in the female range for estrogen levels.

26.     Plaintiff's recent lab results from January 2018 show that her testosterone levels are currently at <3/ng/dL.  The normal reference range for testosterone levels in males is 300-1080 ng/dL.  This means that Plaintiff can no longer obtain an erection and is therefore chemically castrate and possibly permanently infertile.

27.     Plaintiff is and has always been sexually attracted exclusively to men.

28.     Plaintiff first entered IDOC custody on her current sentence in April 2015. Despite being a transgender woman, Plaintiff was placed in a men's prison, Hill Correctional Center, without receiving a formal, in-person review to determine whether she could be appropriately placed in a women's prison.

29.     Since entering IDOC custody, until December 2019, Plaintiff was exclusively housed in men's prisons and experienced persistent harassment and abuse by IDOC staff and prisoners because of her transgender status and because she has been inappropriately housed in men's prisons.

30.     Plaintiff was housed in Pinckneyville from October 2016 to August 23, 2017. While there, correctional officers sexually assaulted her on multiple occasions.  For months, officers forced Plaintiff to have sex with her cellmate for their entertainment.  When she reported this abuse, the officers retaliated by beating her and threatening to "bury her in segregation." The officers followed through on this threat by filing false disciplinary charges against her that resulted in a prolonged sentence of segregation—she was placed in segregation on May 24, 2017, and remained in segregation until May 25, 2018.  She was also transferred to Menard, a high security men's prison, as a result of these false charges.

31.     Plaintiff was housed in Menard from August 23, 2017, to January 10, 2018.  The abuse began immediately when Menard officers attacked her on the bus ride over to Menard. While at Menard, officers beat her at least three more times.  And on at least one occasion, officers stood by and allowed another prisoner to beat Plaintiff in a holding cell in the infirmary. The officers told her that the abuse and harassment was retaliation for the complaint she filed against the officers at Pinckneyville.

32.     The officers at Menard also subjected Plaintiff to constant verbal sexual harassment because of her gender identity, and for weeks, forced her to perform sexually in her cell for their entertainment—they forced her to expose her genitalia and breasts, touch herself sexually, stick her finger in her anus, and move her body in sexually suggestive ways all while they stood outside her cell door and watched.

33.     The officers at Menard, like those at Pinckneyville, attempted to cover up their actions by giving Plaintiff false disciplinary tickets, which kept adding to her segregation time.

34.     While at Menard, Plaintiff filed a lawsuit against the IDOC and officers who were abusing her.  Pursuant to a settlement agreement reached in the lawsuit, Plaintiff was transferred out of Menard to Lawrence on January 10, 2018, where she was immediately placed in segregation.

**Plaintiff Experienced
Sexual and Physical Abuse at Lawrence and Dixon**

35.     Plaintiff was housed at Lawrence from January 10, 2018, to March 16, 2018. While there, Plaintiff was subjected to sexual harassment and threats from both other prisoners and correctional officers.

36.     Plaintiff was verbally harassed by officers at Lawrence, including the Defendant Officers as well as Lieutenant Buchanan.  The officers called her "gay," "fag," "thing," and "it."

Lieutenant Buchanan told her that she "is in a male facility" and is "still a man no matter what you or media say."

37.     On or around January 23, 2018, officers escorted Plaintiff to the yard for her recreation time.  While at the yard, another prisoner exposed his genitals to Plaintiff and masturbated, all while threatening to rape her.  Officers did nothing to protect Plaintiff from this prisoner.  Plaintiff was terrified that this prisoner would follow through with this threat and so she reported his behavior and filed a PREA complaint.  When she told officers about the incident, some officers blamed Plaintiff, telling her that if she were not gay, none of this would have happened.

38.     Prison officials eventually informed Plaintiff that video captured the prisoner exposing himself to Plaintiff and therefore her PREA complaint was substantiated.  However, the prisoner received no punishment for this incident.  IDOC officials then placed the assaultive prisoner in a segregation cell close to Plaintiff's.  He told Plaintiff that he was only in segregation for having contraband, and that Lieutenant Carry and the Adjustment Committee dropped his disciplinary ticket and did not punish him for what he did to her because the staff at Lawrence does not like her and does not want to protect her.  Lieutenant Carry was overheard talking about Plaintiff saying, "if she likes dick, why would she call PREA?"

39.     This prisoner continued to threaten Plaintiff with harm while she was at Lawrence.  Plaintiff lived in fear every day at Lawrence that this prisoner, or another prisoner, would sexually and/or physically assault her because officers at Lawrence made it clear that they would not punish prisoners for hurting Plaintiff.

40.     On or around February 18, 2018, Defendant Officer Burley came to Plaintiff's cell in Lawrence and asked her, "do you want to go to yard, fag?"  Plaintiff asked Defendant

Officer Burley to stop speaking to her so disrespectfully and told him that she wanted to go to yard.

41.     Defendant Officer Burley cuffed Plaintiff and he, along with Lieutenant Givens, Officer Clark, and Officer Lanpley led Plaintiff and a few other prisoners outside to the yard.

42.     Once they were at the yard, Plaintiff asked if she could do her recreation time in one of the cages so that she could be protected from other prisoners.  As she was walking to the cage, Defendant Officer Burley yanked her handcuffs and repeatedly slammed her face into the bars of the cage, while kneeing her in the back.

43.     Lieutenant Givens, Officer Clark, and Officer Lanpley stood by and watched while Defendant Officer Burley assaulted Plaintiff; they did not do anything to stop Defendant Officer Burley.

44.     As a result of this assault, Plaintiff suffered many injuries, including a black eye, a swollen face, and skin abrasions.  She was treated by medical staff and kept overnight in the medical unit because the medical staff believed it was not safe for her to go back to segregation. Security staff took pictures of Plaintiff's injuries.

45.     To cover up his actions, Defendant Officer Burley filed a disciplinary ticket against Plaintiff for allegedly kicking him during the assault.  Plaintiff did not kick Defendant Officer Burley.

46.     Internal Affairs Officer Molenhour was responsible for investigating this use of force incident.  The day after the incident, IA Molenhour asked Plaintiff if she gave herself the black eye and other injuries.  He threatened to extend her out date if she did not give up her complaint regarding this incident; he told her that if she gave up her complaint, he would give her some good time back.  IA Molenhour had told Plaintiff in the past that he would not

investigate any of her PREA complaints and that he would not interview any of her witnesses. Plaintiff received one month additional segregation time and one month "C grade" privilege restriction as a result of this incident.

47.     On or around February 21, 2018, after making a PREA complaint regarding the harassment she had been experiencing at Lawrence, Officer Rue wrote Plaintiff a disciplinary ticket charging Plaintiff with sexual misconduct for allegedly playing with her breasts.  Plaintiff did not engage in any type of sexual misconduct.

48.     At her hearing on this ticket, Lieutenant Carry denied Plaintiff the opportunity to contest the allegations and found her guilty of the charge.  Plaintiff received three additional months in segregation and three months of "C grade" privilege restriction as a result.

49.     Plaintiff feared for her life at Lawrence and faced serious physical and emotional injury there.

50.     Plaintiff filed a number of grievances—including emergency grievances— regarding the denial of access to mental health services in segregation and the physical and sexual abuse she endured at Lawrence.  Plaintiff sent her emergency grievances to Director John Baldwin and to Warden Kevin Kink.  On February 26, 2018, Plaintiff received a letter from Director Baldwin's office, stating that her grievance was improperly filed with the Director.  On February 27, 2018, Warden Kink returned her grievances, rejecting them as emergency grievances and stating that she needed to file the grievances using the normal procedures.

51.     On March 8, 2018, Plaintiff filed the instant lawsuit and a Motion for a Preliminary Injunction, seeking emergency relief from conditions arising out of her placement in Lawrence, namely physical and sexual violence, unlawful discrimination, denial of mental health care, and unlawful placement in segregation.

52.     On March 16, 2018, Plaintiff was transferred to Dixon and immediately placed in segregation.

53.     On June 8, 2018, Plaintiff withdrew her Motion for a Preliminary Injunction after beginning to receive adequate mental health treatment at Dixon and being released from segregation.

54.     Since arriving at Dixon, and particularly after withdrawing her Motion for Preliminary Injunction, Plaintiff has been subject to assaults, harassment, and threats from both other prisoners and correctional officers.  Staff at Dixon have continuously failed to protect her from other prisoners.

55.     Shortly after arriving at Dixon, one prisoner began sexually harassing Plaintiff. While Plaintiff and other prisoners were on the yard, this prisoner sexually assaulted Plaintiff by groping her breasts and exposing himself.  Despite this, staff at Dixon did not do anything proactive to protect Plaintiff.  This prisoner was never disciplined for this incident and told Plaintiff that the reason he received no punishment was because "IA does not like her."

56.     For weeks from late May to early June, another prisoner sexually harassed and assaulted Plaintiff by kissing her and groping her breasts and buttocks.  He also repeatedly threatened to rape her, stab her, and cause her physical harm.  Upon information and belief, despite Plaintiff filing complaints about his behavior, this prisoner was never disciplined for his actions toward Plaintiff.

57.     Plaintiff lived every day in fear that these prisoners and others would sexually and/or physically assault her because Dixon staff made it clear that they would not protect her.

58.     Dixon correctional and medical staff constantly called Plaintiff derogatory names such as "faggot," "it," "he-she," and more.  A female officer told Plaintiff: "You're not a real

woman like me . . . I don't need surgery."  The verbal harassment escalated after Plaintiff

withdrew her Motion for a Preliminary Injunction.

59.     Plaintiff filed multiple grievances (including emergency grievances) and PREA

complaints about the officers who are verbally sexually harassing her and about the prisoners

who sexually assaulted her and threatened her.  In late June, when Plaintiff tried to talk to

Assistant Warden Nicholas about filing another PREA complaint, Assistant Warden Nicholas

told her she was filing too many PREA complaints and refused to help.

60.     Staff told Plaintiff that they do not appreciate that she writes complaints and

"makes work" for them and that they want her transferred out of Dixon.  A mental health worker

told Plaintiff that Dixon staff was mistreating her and trying to ship her out because of her

"lifestyle."

61.     On Friday, June 22, 2018, Plaintiff made another PREA complaint against

officers who were verbally sexually harassing her.

62.     On Tuesday, June 26, 2018, officers escorted Plaintiff to the Internal Affairs

Office where she met with Defendants Officer Gee, IA Officer Manzano, and IA Officer

Blackburn.  IA Officer Manzano informed Plaintiff that she was being written up for an inmate

assault and was going to segregation.  When Plaintiff asked for an investigation into the inmate

assault, IA Officer Manzano responded that he was tired of her constantly filing complaints and

that he was going to do whatever he could "to try to ship [her] out of this joint."  The officers

also threatened to give her segregation for a year and take away more of her good-time credits.

63.     When Plaintiff begged the officers not to take her back to segregation and refused

to cooperate with the officers, Defendants Lieutenant Doering and Sergeant Kunde maced her in

the face repeatedly, while Officer Gee, IA Officer Manzano, and IA Officer Blackburn stood by

and watched.  While the officers were macing Plaintiff, she rolled up into a ball on the floor and covered her face, struggling to breathe—she suffered a flashback to her prior abuse at Pinckneyville and feared for her life, cried, and begged for help.  IA Manzano responded to her cries for help by saying, "no, this is what you get for filing complaints."  Plaintiff received a second disciplinary ticket for allegedly assaulting staff while they maced her—this is a complete fabrication.  She received a third disciplinary ticket for refusing to cooperate with the officers.

64.     Based on one or all of these tickets, Plaintiff was placed back in segregation on Tuesday, June 26, 2018.  Plaintiff was given four months segregation time as a result of these retaliatory tickets.

**Plaintiff's Mental Health Deteriorated in Segregation**

65.      Plaintiff spent over one year in segregation.  When Plaintiff was first placed in segregation back in May 2017, she was not properly classified as SMI—even though she met IDOC's criteria for SMI—and therefore no consideration was given to the impact segregation would have on her mental health.

66.     On July 14, 2017, an IDOC psychiatrist diagnosed Plaintiff with Bipolar Disorder and prescribed her Lithium.  He also labeled her as SMI.

67.     While at Pinckneyville in August 2017, Plaintiff was served two disciplinary reports that extended her segregation time.  After each incident, mental health staff was consulted and stated that placement in segregation would negatively impact Plaintiff's mental health.  Yet the medical opinions of the mental health professionals were ignored and IDOC security staff continued to leave Plaintiff in segregation.

68.     Despite being designated as SMI, Plaintiff's mental health treatment plan was not updated for months while she was in segregation at Pinckneyville and Menard.  Her treatment

plan was finally updated in January 2018 when she was moved to Lawrence.

69.     Before being placed in segregation, Plaintiff participated in psychosocial support groups to help her deal with issues facing people with Gender Dysphoria, which she requires and are necessary to treat Gender Dysphoria.  However, while she was in segregation, Plaintiff was denied these transgender support groups.  IDOC staff at Dixon informed her that she would continue to be denied these transgender support groups for as long as she remained in segregation.

70.     Plaintiff did not receive appropriate mental health services while she was in segregation at Pinckneyville, Menard, and Lawrence.  Instead of receiving the required and necessary enhanced mental health treatment to ameliorate the distress caused by being in segregation, Plaintiff received less treatment.

71.     When Plaintiff first arrived at Lawrence, she attended mental health group counseling.  However, during a group session when she expressed her frustration with the constant sexual harassment she experiences as a woman in a men's prison, she was reprimanded by the mental health counselors.  After that session, the counselors prohibited her from going to group for approximately one month.  When she was finally allowed to go to group again, the counselors continued to reprimand and verbally abuse her.  The counselors called her derogatory names and threatened her with harm—including more segregation time if she did not stop filing PREA complaints.

72.     Mental Health Counselor Basnett at Lawrence repeatedly called Plaintiff a "fag," and told Plaintiff that she would "never be a real woman."  Counselor Basnett warned Plaintiff that if she kept filing PREA complaints, she would "burry her in seg."  Counselor Basnett wrote Plaintiff a ticket on February 7, 2018, falsely claiming that Plaintiff threatened her.

73.     Medical and security staff at Lawrence and Dixon constantly used male pronouns instead of female pronouns when referring to and talking to Plaintiff.  The pervasive and continual misgendering of Plaintiff was harmful to her mental health.

74.     While in segregation at Lawrence, Plaintiff was unable to have any contact with her family, including her mother and siblings.  She was not able to call her family members or send mail out to her family.  When her mother and brother attempted to visit her on her birthday on February 16, 2018, the facility asserted that Plaintiff's unit was on lock-down, and did not allow the visit to proceed.

75.     For the most part while in segregation at Lawrence, Plaintiff was locked alone in her cell for 24 hours a day—she was occasionally let out to shower.  She was not allowed to go the yard at Lawrence from February 18, 2018, until she was transferred, despite Department rules requiring that all SMI prisoners in segregation be permitted at least six hours of yard per week.

76.     As a result of her isolation, the verbal abuse, and lack of adequate mental health treatment in segregation, Plaintiff's mental health substantially deteriorated.  She began experiencing difficulty sleeping and had reoccurring panic attacks.  She still suffers from flashbacks to her sexual assault experiences at Pinckneyville, Menard, and Lawrence.  She has high anxiety and severe depression.

77.     Plaintiff began to experience periods of high blood pressure after her arrival at Lawrence.  Her high blood pressure is due to her anxiety arising out of her mistreatment at the men's prisons.

78.     Plaintiff also began to experience suicidal ideations as a result of her isolation and untreated mental health needs.  In early February 2018, while at Lawrence, Plaintiff attempted

suicide on at least four occasions by tying a sheet around her neck.  One officer who found her with a sheet around her neck told her to "stop being a cry baby diva."  After each suicide attempt at Lawrence, IDOC staff placed Plaintiff on crisis watch for one day and then returned her to her segregation cell.  But she received no counseling or any other mental health interventions.

79.     While Plaintiff was naked in the crisis cell at Lawrence, she was subjected to extreme cold temperatures.  The officers ignored her complaints about the cold temperatures and kept the air conditioning on.  As a result, Plaintiff became ill and developed a high fever, but officers denied her access to medical treatment.

80.     Plaintiff repeatedly told the mental health counselors and security staff at Lawrence that she was in emotional distress because of her placement in segregation, but they refuse to provide her any treatment.  Mental Health Counselor Gay told Plaintiff to "just tell her lawyer."

81.     Plaintiff saw a psychiatrist in the middle of February 2018, and she told him everything that she had been experiencing and that she was having suicidal ideations.  The psychiatrist told her that he would follow up with the mental health staff to determine why she was not receiving adequate care.  She did not hear back from the mental health staff or the psychiatrist regarding this issue.

82.     Plaintiff was in segregation for approximately one year between May 24, 2017, and May 25, 2018.  Plaintiff was then released from segregation at Dixon for approximately one month, and then placed back in segregation on June 26, 2018.

83.     On June 26, 2018, after being placed back in segregation at Dixon, Plaintiff attempted suicide by hanging.  She twisted a sheet to make a rope, tied one end around her neck, and the other around part of her bed to hang herself.  Staff found her unconscious and dragged

her out of her cell, placing her under restraint until mental health staff arrived.  She was put on crisis watch.

84.     While on crisis watch, Plaintiff was housed in a cell with mold and blood on the walls.  Upon information and belief, Plaintiff did not see or speak to the mental health counselors that have been working with her since she arrived at Dixon, Jamie Weigand and Kim Hvarre, while she was on crisis watch.

85.     On Friday, June 29, 2018, Plaintiff left crisis watch, but immediately thereafter had a panic attack and was found trying to hang herself again.  She was put back on crisis watch until on or about July 2, 2018, when she was returned to segregation.

86.     In segregation, Plaintiff again did not have access to transgender support group.

87.     Plaintiff continued to feel unstable and experience suicidal ideations.

88.     The warden at every institution is responsible for approving placements in segregation and has the authority to override any disciplinary sanction.  Defendants Warden Kink at Lawrence, and Warden Varga at Dixon approved Plaintiff's placement in segregation at their respective institutions.  Despite being aware of Plaintiff's denial of access to adequate mental health services in segregation and her deteriorating mental state in segregation, these Defendants refused to override her retaliatory disciplinary infractions and remove her from segregation.

89.     On June 29, 2018, Plaintiff sent an emergency grievance to Warden Varga, Director John Baldwin, and the Administrative Review Board, regarding her improper placement in a men's facility, the harassment and abuse she has endured at Dixon, the retaliatory discipline she has received, and her deteriorating mental state in segregation.  On July 16, 2018, Warden Varga responded to Plaintiff's emergency grievance and refused to provide her with any of the

relief she requested.

## Policy and Practice Allegations

90.     The pattern of abuse demonstrates that Plaintiff will endure cruel and unusual at any IDOC men's prison.  Plaintiff believes that the only way she will be safe in IDOC custody is if she is housed in a women's prison.  Plaintiff repeatedly requested transfer to a women's prison while in custody.  The IDOC's Gender Identity Disorder Committee reviewed Plaintiff's placement in a men's prison on April 10, 2018, and concluded that her placement was appropriate.  The IDOC eventually transferred Plaintiff to Logan Correctional Center, a women's prison, in December 2018, after the Court granted Plaintiff's motion for a preliminary injunction.

91.     According to the 2016 Prison Rape Elimination Act ("PREA") reports of IDOC facilities, there were no transgender prisoners in the two female prisons (Logan Correctional Center and Decatur Correctional Center), and 28 transgender women housed throughout the 24 male prisons.

92.     Upon information and belief, at the time this lawsuit was filed, there were still no transgender prisoners in the two female prisons.  All transgender prisoners were housed in male prisons where they are at risk of being subjected to sexual and physical abuse.

93.     According to the National PREA Resource Center, "Being transgender is a known risk factor for being sexually victimized in confinement settings.  The [PREA] standard, therefore, requires that facility, housing, and programming assignments be made 'on a case-by-case basis.'  Any written policy or actual practice that assigns transgender or intersex inmates to gender-specific facilities, housing units, or programs based solely on their external genital anatomy violates the standard.  A PREA-compliant policy must require an individualized assessment.  A policy must give 'serious consideration' to transgender or intersex inmates' own

views with respect to safety.  The assessment, therefore, must consider the transgender or intersex inmate's gender identity – that is, if the inmate self-identifies as either male or female.  A policy may also consider an inmate's security threat level, criminal and disciplinary history, current gender expression, medical and mental health information, vulnerability to sexual victimization, and likelihood of perpetrating abuse.  The policy will likely consider facility-specific factors as well, including inmate populations, staffing patterns, and physical layouts.  The policy must allow for housing by gender identity when appropriate."  National PREA Resource Center (available at https://www.prearesourcecenter.org/node/3927).

94.     The IDOC has a de facto policy of housing transgender prisoners according to their genitalia rather than making an individualized assessment as the PREA regulations require.

95.     According to a 2014 report issued by U.S. Department of Justice's Bureau of Justice Statics, almost 40% of transgender prisoners reported sexual victimization in state and federal prisons—a rate that is ten times higher than for prisoners in general.  U.S. Dep't of Justice, Bureau of Justice Statics, *Sexual Victimization in Prisons and Jails Reported by Inmates, 2011-12*, *Supplemental Tables: Prevalence of Sexual Victimization Among Transgender Adult Inmates*, December 2014 (available at https://www.bjs.gov/content/pub/pdf/svpjri1112_st.pdf).

96.     "Transgender inmates who are assaulted or harassed are often placed in solitary confinement, which, though intended for their protection, is in fact a severe punishment.  Isolation takes an enormous psychological toll on inmates, and can put them at increased risk of assault by guards.  It deprives them of access to group therapy and educational programs that could improve employment prospects upon release."  *Prisons and Jails Put Transgender Inmates at Risk*, The Editorial Board, The New York Times, Nov. 9, 2015 (available at https://www.nytimes.com/2015/11/09/opinion/prisons-and-jails-put-transgender-inmates-at-

risk.html).

## COUNT I – FAILURE TO PROTECT
### (Eighth Amendment Claim for Damages under 42 U.S.C. § 1983)

97.     Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

98.     Count I is alleged against Defendants Officer Burley, Officer Gee, IA Officer Manzano, IA Officer Blackburn, Warden Kink, and Warden Varga.

99.     Under settled United States Supreme Court authority, and in accordance with the Eighth Amendment, Plaintiff is entitled to be free from a known and substantial risk of serious harm while in the custody of the State.

100.    The Defendants have been and continue to be deliberately indifferent to the substantial risk of harm Plaintiff faces from both prison staff and other prisoners as a transgender women in a men's prison.

101.    Officers at Lawrence and Dixon are aware that other prisoners wish to harm Plaintiff due to her gender identity, yet they disregard the substantial risk that Plaintiff will be harmed by other prisoners by failing to take any measures to abate the risk, in violation of Plaintiff's Eighth Amendment rights.

102.    Knowing that Plaintiff was vulnerable to abuse and sexual assault, officers escorted Plaintiff throughout Lawrence without ensuring her safety and protection from other prisoners.  Officers allowed Plaintiff to be subjected to harm by the prisoner on the yard who exposed his genitals to Plaintiff and threatened to rape her.  Additionally, prison officials refused to punish that prisoner for causing Plaintiff harm.

103.    Through their actions and inactions, the Defendants have made it clear to Plaintiff

and to other prisoners that they will not protect Plaintiff from harm.

104.    Officers at Lawrence were also aware that some correctional officers wished to harm Plaintiff due to her gender identity, yet they disregarded the substantial risk that Plaintiff would be harmed by officers by failing to take any measures to abate the risk, in violation of Plaintiff's Eighth Amendment rights.

105.    Defendant Officer Burley used excessive force against Plaintiff while Lieutenant Givens, Officer Clark, and Officer Lanpley stood by and watched without intervening.

106.    Officers at Dixon, knowing that Plaintiff is vulnerable to abuse and sexual assault, escorted Plaintiff throughout Dixon without ensuring her safety and protection from other prisoners.  Officers at Dixon failed to protect Plaintiff from two prisoners: one who sexually assaulted Plaintiff on the yard and exposed himself; another who, over the course of weeks, repeatedly sexually assaulted Plaintiff and threatened her with rape and physical harm.

107.    Officers at Dixon, including Defendants Officer Gee, IA Officer Manzano, and IA Officer Blackburn, further failed to protect Plaintiff by retaliating against her and threatening her for making complaints, thereby effectively denying and restricting her ability to grieve the harm she is enduring.

108.    Defendants Warden Kink and Warden Varga were aware that Plaintiff was vulnerable as a transgender woman housed in men's prisons and were aware of the harassment and sexual and physical abuse she experienced at their respective prisons, yet these Defendants failed to take any action to protect Plaintiff from the harassment and abuse she endured.

109.    The actions of the individual Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

110.    The individual Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

## COUNT II – CRUEL AND UNUSUAL PUNISHMENT
### (Eighth Amendment Claim for Damages under 42 U.S.C. § 1983)

111.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

112.    Count II is alleged against Defendants Warden Varga and Warden Kink.

113.    Plaintiff has a right to be free from cruel and unusual punishment under the Eighth Amendment.

114.    By housing Plaintiff in segregation, IDOC staff have imposed conditions on Plaintiff that have exacerbated her serious mental health problems, leading to her suicide attempts.  Plaintiff's placement in segregation constitutes cruel and unusual punishment.

115.    By placing and planning to keep Plaintiff in segregation for approximately one year, despite her deteriorating mental health, IDOC staff inflicted unnecessary and wanton pain on Plaintiff without any legitimate penological purpose, in violation of Plaintiff's Eight Amendment rights.

116.    By approving Plaintiff's placement in segregation and refusing to release her from segregation, Warden Varga and Warden Kink knew of and disregarded a substantial risk of serious harm to Plaintiff's physical and mental health.

117.    The Defendants' above-described actions and omissions were undertaken with malice and/or reckless disregard for Plaintiff's clearly established constitutional rights.

118.    The actions of the Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including

bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

## COUNT III – EXCESSIVE FORCE
### (Eighth Amendment Claim for Damages under 42 U.S.C. § 1983)

119.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

120.    Count III is against Defendants Officer Burley, Lieutenant Doering, and Sergeant Kunde.

121.    The actions of Defendant Officer Burley described above on February 18, 2018, constituted unreasonable and excessive force, without legal cause, in violation of Plaintiff's Eighth Amendment rights.

122.    The actions of Defendants Lieutenant Doering and Sergeant Kunde described above on June 26, 2018, constituted unreasonable and excessive force, without legal cause, in violation of Plaintiff's Eighth Amendment rights.

123.    The misconduct described in this Count was objectively unreasonable and was undertaken intentionally, with malice and knowing disregard for Plaintiff's clearly established constitutional rights, and not for any legitimate penological purpose.

124.    The actions of Defendants were the direct and proximate cause of the violations of Plaintiff's constitutional rights and of the damages suffered by Plaintiff, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

## COUNT IV – ILLINOIS HATE CRIMES ACT
### (State law claim for Damages)

125.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

126.    Count IV is alleged against Defendant Officer Burley.

127.    The Illinois Hate Crimes Act states, in relevant part, that "[i]ndependent of any criminal prosecution" victims of hate crimes "may bring a civil action for damages, injunction or other appropriate relief."  720 ILCS 5/12-7.1(c).

128.    A person commits a hate crime when "by reason of the actual or perceived . . . gender [or] sexual orientation . . . regardless of the existence of any other motivating factor or factors," he or she commits various offenses, including, inter alia, assault, battery, mob action, and disorderly conduct.  720 ILCS 5/12-7.1(a).

129.    Defendant Officer Burley committed a hate crime against Plaintiff by physically assaulting her due to her gender and sexual orientation.

130.    As a result of Defendant Officer Burley's actions, Plaintiff suffered damages, including bodily injury, pain, suffering, emotional distress, anguish, and humiliation.

### COUNT V – INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS
### (State law claim for Damages)

131.    Plaintiff repeats and realleges the preceding paragraphs as if fully set forth in this Count.

132.    Count V is alleged against all the individual Defendants.

133.    The individual Defendants' conduct described above was extreme and outrageous. The Defendants' actions were rooted in an abuse of power and authority, and were undertaken with the intent to cause, or were in reckless disregard of the probability that their conduct would cause, severe emotional distress to Plaintiff.

134.    As a direct and proximate result of the Defendants' actions, Plaintiff suffered and continues to suffer severe emotional distress.

## REQUEST FOR RELIEF

WHEREFORE, Plaintiff Deon "Strawberry" Hampton requests that this Court enter

judgment in her favor against the Defendants in the following manner:

1.      Award Plaintiff compensatory and punitive damages.

2.      Award Plaintiff reasonable attorneys' fees, costs, and expenses pursuant to 42

U.S.C. § 1988.

3.      Award Plaintiff such other and further relief as this Court may deem appropriate

and just.

## JURY DEMAND

Plaintiff demands trial by jury.

Dated: April 16, 2020

Respectfully submitted,

**DEON "STRAWBERRY" HAMPTON**

By: /s/ Vanessa del Valle
       One of her attorneys

Vanessa del Valle
Roderick and Solange MacArthur Justice Center
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-1271
vanessa.delvalle@law.northwestern.edu

Sheila A. Bedi
Community Justice Civil Rights Clinic
Northwestern Pritzker School of Law
375 East Chicago Avenue
Chicago, IL 60611
(312) 503-2492
sheila.bedi@law.northwestern.edu

Alan Mills
Elizabeth Mazur
Uptown People's Law Center
4413 N. Sheridan
Chicago, IL 60640
(773) 769-1411
alan@uplcchicago.org
liz@uplcchicago.org

## CERTIFICATE OF SERVICE

The undersigned, an attorney, certifies that she served the foregoing document upon all persons who have filed appearances in this case via the Court's CM/ECF system on April 16, 2020.

/s/ Vanessa del Valle