# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF ILLINOIS

DEON HAMPTON, )
)
               Plaintiff, )
)
   vs. )        **Case No. 18-cv-550-NJR-MAB**
)
KEVIN KINK, OFFICER BURLEY, )
JOHN VARGA, TAYLOR GEE, )
ARTHUR MANZANO, )
JACOB BLACKBURN, )
CHRISTOPHER DOERING, )
and SUSAN KUNDE, )
)
            Defendants. )

# MEMORANDUM AND ORDER

**ROSENSTENGEL, Chief Judge:**

This matter is before the Court on Defendants' Motion for Partial Summary Judgment (Doc. 155). Plaintiff Deon "Strawberry" Hampton opposes the motion (Doc. 163). For the reasons set forth below, the Court denies the motion.

## BACKGROUND

Hampton is a former prisoner who filed this action pursuant to 42 U.S.C. § 1983, seeking redress for alleged civil rights violations that occurred during her incarceration and related state law claims.[1] (Doc. 138). Hampton is a 27-year-old transgender woman who was diagnosed with gender dysphoria[2] in 2012 while in the custody of the Illinois

---

[1] Hampton was incarcerated at the time she filed this action but subsequently released.

[2] Gender dysphoria is described by Hampton's expert Dr. George Brown as "a significant mismatch between a person's experienced gender identity and their sex assignment at birth ...

Department of Corrections ("IDOC"). (Doc. 138, p. 5). IDOC officials also designated her as Seriously Mentally Ill ("SMI") in July 2017 when she was diagnosed with Bipolar Disorder. (Doc. 138, p. 13). Hampton was born an anatomical male and has identified as a female since age five; she began living as a girl at that age and continued to live as a young woman throughout her incarceration. (Doc. 138, p. 1). She has been treated with cross-sex hormones since July 2016; her lab tests have shown she is no longer in the male range for testosterone levels and she is in the female range for estrogen levels. (Doc. 138, pp. 5-6).

Hampton was housed in men's prisons at all times relevant to this action, where she was subjected to sexual and physical attacks, and verbal and emotional abuse by prison staff and prisoners. (Doc. 138, pp. 2, 6-7). She filed a previous lawsuit over abuse that occurred while she was housed at Menard Correctional Center,[3] which resulted in an agreement to transfer her to Lawrence Correctional Center ("Lawrence") on January 10, 2018. She alleges that the harassment and abuse continued at Lawrence, including the filing of false disciplinary tickets against her by officers which resulted in her confinement in segregation for approximately one year, where her mental health deteriorated and she attempted suicide several times. (Doc. 138, pp. 2-3, 7-10).

Hampton filed this lawsuit on March 8, 2018, while she was imprisoned at Lawrence. On March 16, 2018, she was transferred to Dixon Correctional Center

---

caus[ing] enough distress or impairment that it reaches the level of a clinical diagnosis in psychiatry." (Doc. 98, p. 12).

[3] *Hampton v. Lashbrook, et al.*, Case No. 17-936-DRH-RJD (S.D. Ill.).

("Dixon") and was immediately placed in segregation. (Doc. 138, pp. 3, 11-13). She began to receive adequate mental health treatment at Dixon, but after her release from segregation, the harassment from Dixon officers escalated. She was given three allegedly retaliatory tickets and, after spending just one month in general population, she was sent back to segregation where she again attempted suicide. (Doc. 138, pp. 3-4, 13-18). In December 2018, Hampton was transferred to Logan Correctional Center, a women's facility, after this Court partially granted her motion for preliminary injunctive relief. (Doc. 105; Doc. 138, p. 18).

Hampton seeks relief against both Lawrence and Dixon officials in this action. Her Second Amended Complaint asserts Eighth Amendment claims against all Defendants for failure to protect her from harm inflicted on her because of her transgender status (Count I); against Varga and Kink for placing/keeping her in segregation for approximately one year despite their knowledge of her deteriorating mental health (Count II); and against Burley for excessive force on February 18, 2018, and Doering and Kunde for excessive force on June 26, 2018 (Count III). She further alleges that Burley's actions on February 18, 2018, violated the Illinois Hate Crimes Act (Count IV), and that all Defendants intentionally inflicted emotional distress on her (Count V). (Doc. 138, pp. 20-24).

Defendants seek summary judgment on the basis that they did not violate Hampton's constitutional rights, the claims against Kink are barred by the statute of limitations, they are entitled to qualified immunity, and the claim for intentional infliction of emotional distress is barred by sovereign immunity. They do not seek summary

3

judgment on the claims against Burley. (Doc. 155; Doc. 156, p. 2).

RELEVANT FACTS

Defendants' Memorandum supporting the Motion for Partial Summary Judgment sets forth their version of "Undisputed Material Facts" (Doc. 156, pp. 3-14). Hampton's Response takes issue with Defendants' factual statements on the grounds that they are either incomplete or are in dispute, and she sets forth additional factual statements. (Doc. 163, pp. 2-26).

## I.      *Lawrence Correctional Center*

The parties agree that Hampton was incarcerated at Lawrence from January 10, 2018, to March 16, 2018, and that she remained in segregation in a single cell for that entire time. (Doc. 156, p. 3; Doc. 163, p. 2). Before arriving at Lawrence, she had been housed in segregation for the previous eight months. (Doc. 163, pp. 2-3).

On January 23, 2018, Hampton made a PREA[4] complaint against inmate Sheif for exposing his genitals to her while they were outside for yard time, masturbating in her presence, throwing his semen at her, and threatening to rape her. The complaint was substantiated by Internal Affairs ("IA"), Sheif was issued a disciplinary ticket, and a Keep Separate From ("KSF") order was issued between Sheif and Hampton. (Doc. 156, p. 4; Doc. 163, p. 3). Kink took over as warden on February 1, 2018, and became aware of Hampton's transgender status at that time. (Doc. 156, p. 4). Kink approved Sheif's discipline including a transfer/KSF order. (Doc. 163, p. 3). But on February 21, 2018—one

---

[4] Prison Rape Elimination Act.

week after the KSF was issued—Sheif was placed in the shower area close to Hampton, where he continued his harassment, bragging that he had not been disciplined for the yard incident and repeating his rape threat. (Doc. 163, pp. 3-4). Kink asserts that Sheif and Hampton were inadvertently placed near each other for no more than thirty minutes. (Doc. 156, p. 7). Hampton filed a second PREA complaint on Sheif for the shower incident which was substantiated; the officer who placed Sheif in the showers admitted he was unaware of the KSF order. (Doc. 163, p. 4). Kink signed off on the IA investigation report.

On February 18, 2018, Officer Burley escorted Hampton to the segregation yard. According to Hampton, Burley told her to "cuff the fuck up," tightened and twisted her handcuffs during the escort, and called her a "fag." (Doc. 163, p. 4). She informed Burley that she wanted to go to her special cage (which kept her separate from other inmates for her safety) and began walking in that direction. Burley "tried to direct [Hampton] to a different area of the segregation yard" and a "physical confrontation" ensued; the parties dispute who initiated it. (Doc. 156, pp. 5-6). Hampton asserts that Burley responded to her movement by yanking her cuffs and slamming her into a cage, then repeatedly slammed her face into the cage's gate while kneeing or kicking her leg and back. (Doc. 163, p. 5). Other officers pulled Burley off her. Her documented injuries included a black eye, swollen face, and skin abrasions. *Id.* Burley filed a disciplinary ticket against Hampton claiming that she kicked him, a charge she denies. She filed an emergency grievance over Burley's actions; Kink did not discipline Burley.[5] Hampton's ticket for

---

[5] Burley was transferred to a different facility two weeks after the incident. (Doc. 163, p. 6).

assaulting Burley was not heard until after she was moved to Dixon; she was found guilty and punished with one month in segregation and other sanctions. (Doc. 156, p. 6).

On February 21, 2018, a Lawrence officer wrote Hampton a ticket for allegedly exposing her breasts to him while she was alone in her cell; their accounts of the incident differ. (Doc. 156, p. 7; Doc. 163, p. 7). Defendants claim Hampton admits she showed the officer her breasts. Hampton denies that claim and asserts the officer came to her cell door while she had her shirt off and was wearing a sports bra; she told the officer she had nothing to say to him and requested a PREA phone call which he denied. Hampton was found guilty of the sexual misconduct ticket, and Kink approved her punishment of three months in segregation. (Doc. 156, p. 7; Doc. 163, p. 7).

## II. *Dixon Correctional Center*

Hampton was moved to Dixon on March 16, 2018, and remained there until December 21, 2018. She was housed in segregation for all but one month; between May 25 and June 26, 2018, she was in general population. (Doc. 163, p. 8). Varga was the warden of Dixon during Hampton's incarceration there. (Doc. 156, p. 8). On March 28, 2018, Varga approved the 1-month imposition of discipline for the Burley incident on February 18, 2018, at Lawrence. On May 7, 2018, Varga reduced the 3-month segregation term for the February 21 sexual misconduct ticket at Lawrence to one month because of Hampton's mental health status and improved behavior. (Doc. 156, p. 8).

Hampton describes multiple incidents of sexual harassment and assault perpetrated by eight other inmates during her approximate nine months at Dixon. (Doc. 163, pp. 8-12, 16-20).

### A. Incidents With Inmates Prombo, Clemmons, and Robinson

Inmate Prombo repeatedly groped Hampton's breasts and buttocks, exposed his genitals to her, and threatened to rape her, nearly every day over a two week period in April 2018. (Doc. 163, pp. 8-10). Hampton states officers ignored her repeated complaints and requests to be separated from Prombo. *Id*. Defendants note Hampton did not initially report Prombo's conduct to them, but she eventually told Blackburn and Manzano (Internal Affairs officers) after asking to make a PREA complaint. (Doc. 156, p. 10). Blackburn substantiated the PREA complaint against Prombo after an investigation. Prombo was disciplined but then released from segregation after a few days, while Hampton remained in segregation. (Doc. 156, p. 10; Doc. 163, p. 9). Hampton faults Manzano and Blackburn for making no recommendations to ensure her safety in their role as members of the PREA Incident Review Committee. She states Varga took no action to protect her from future assaults such as issuing a KSF order between her and Prombo when she was released into general population and saw him daily. (Doc. 163, p. 10).[6] Varga asserts that while he spoke to Hampton several times, she never made any requests of him relevant to her safety. (Doc. 156, p. 9).

Inmate Clemmons sexually assaulted and harassed Hampton in late May-early June 2018 by touching her breasts and buttocks, attempting to kiss her and to put his mouth on her breast, masturbating in front of her, demanding oral sex from her, and

---

[6] In the September 2018 hearing on Hampton's Motion for Preliminary Injunction, the Assistant Warden of Operations at Dixon, Justin Wilks, could not testify to any measures taken to protect Hampton after her PREA allegations against Prombo were substantiated. (Doc. 105, p. 6; Doc. 99, p. 78).

threatening to rape her and stab her in the face. (Doc. 163, pp. 10-11). Hampton reported these incidents to correctional officers and mental health staff, but they failed to protect her. Defendants note Hampton did not report Clemmons's conduct to them. (Doc. 156, p. 11). Hampton called the PREA hotline on June 5, 2018, after which Blackburn investigated and interviewed two inmates who corroborated her claims. Blackburn deemed her complaint unsubstantiated, however, and Varga approved the investigation report. *Id.* Defendants note Clemmons was transferred to another prison. (Doc. 156, p. 11).

Inmate Robinson began to sexually harass Hampton in late June 2018, offering her food in exchange for sex, then threatening violence when she refused. On June 25, 2018, Robinson touched Hampton inappropriately and grabbed her buttocks, she pushed his hand away, and then Robinson punched her in the face. Hampton hit him back. (Doc. 163, p. 11). This altercation was reported to officers, and Manzano interviewed Robinson, who had injuries to his face. (Doc. 156, p. 11). Robinson claimed Hampton assaulted him because he told staff that Hampton was pulling her pants down. *Id.*

Hampton later (on August 1, 2018) filed a grievance over Robinson's sexual assault on her. (Doc. 163, p. 11). The grievance officer deemed it unfounded on the basis that IA adequately addressed Hampton's claims (see next section below). Hampton alleges that Manzano and Blackburn admitted they never investigated her allegations, and Defendants prevented Hampton from filing a PREA complaint against Robinson. *Id.* Officer Gee wrote Hampton a ticket for assaulting Robinson; Hampton claims Gee never investigated her allegations that Robinson assaulted her. (Doc. 163, p. 12). Varga approved her punishment with one month of segregation as a result of that ticket.

### B.  Pepper Spray Incident

On June 26, 2018—the day after the altercation with Robinson—Manzano, Blackburn, and a third officer[7] interviewed Hampton about the incident. (Doc. 156, p. 12; Doc. 163, pp. 12-16). She told them that Robinson sexually assaulted her and they fought after Robinson hit her first; she admitted she struck Robinson. Manzano told Hampton she was going to segregation for inmate assault. (Doc. 156, p. 12; Doc. 163, p. 12). According to Hampton, Manzano told her he was tired of her PREA complaints and wanted her transferred out of Dixon. (Doc. 156, p 12). The officers sent Hampton downstairs to a waiting area. When they rejoined her, Hampton was crying and asked to speak to someone from mental health and a PREA coordinator, which Defendants refused.

Approximately seven or eight officers arrived to take Hampton to segregation, including Doering, Gee, Kunde, and Varga. (Doc. 156, p. 12). Hampton remained seated and asked again for mental health and PREA and told the officers she felt suicidal. She states she was crying and hyperventilating. Hampton's requests for a mental health and PREA staffer were again refused. (Doc. 156, p. 12; Doc. 163, pp. 12-13). Gee admitted to knowingly ignoring the request because complying with the PREA standards was not their "main priority" at the time. (Doc. 163, pp. 12-13).

Kunde and Doering testified they ordered Hampton to cuff up to go to

---

[7] Defendants note the third officer was Kraft, and Hampton believes it was Gee; regardless, Gee was later present in the lobby when Hampton was pepper-sprayed. (Doc. 156, p. 12; Doc. 163, p. 12).

segregation; Hampton stated she did not hear an order to cuff up. (Doc. 163, p. 13). She realized officers were about to spray her with pepper spray and covered her face with her hands. While Hampton remained seated, multiple officers, including Doering and Kunde, sprayed her with pepper spray. (Doc. 156, p. 12; Doc. 163, p. 13). Hampton states Doering and Manzano grabbed her hands away from her face and slammed her to the ground from her seated position. (Doc. 163, p. 13). Defendants assert an officer tried to take hold of her arm and she yanked it away. (Doc. 156, p. 12). Doering testified Hampton stood up from the chair, flailed her arms, and lightly struck Doering and Manzano in the face before they took her down to the ground. (Doc. 163, p. 14; Doc. 163-21, pp. 29-30). While Hampton was on the ground, Doering put his foot on her neck, Manzano put his foot on her head, and another officer (Arneson, not a defendant) had his knee to her back and held her ankles. (Doc. 156, p. 12; Doc. 163, p.14). Doering and Manzano put Hampton in handcuffs, and Arneson cuffed her feet. Kunde pepper sprayed Hampton's uncovered face while she was pinned to the ground, later testifying she did so because Hampton was combative and Manzano and Doering could not control and restrain her. (Doc. 163, p. 15). Hampton states she did not physically resist and Doering said he was able to apply the cuffs within 5-10 seconds of placing her on the ground. *Id.*

Gee observed the above incident but did not personally use force on Hampton; she wrote up an incident report in which she referred to Hampton exclusively with male pronouns. (Doc. 163, p. 15). Varga reviewed the report and discussed with an assistant warden the need to have staff use proper language in reports. (Doc. 156, p. 13).

Within hours of being placed in segregation, Hampton attempted suicide by

hanging and was placed on crisis watch for four days. Varga learned of the suicide attempt the next day; he spoke with the mental health supervisor regarding what should be done for Hampton and discussed the possibility of transferring her to a women's facility. (Doc. 156, p. 13). While on crisis watch, Hampton was placed in a cell with blood and mold on the walls and was seen by a mental health counselor for only ten minutes per day. (Doc. 163, p. 15). When Hampton came off crisis watch, she again attempted suicide and returned to crisis watch for another four days. *Id.*

Hampton was disciplined on tickets written by Manzano for assault and intimidation/threats on the officers and by Doering for disobeying an order and assault, in connection with the pepper spray incident. She was punished with three months in segregation, approved by Varga—despite his awareness of Hampton's suicide attempts while in segregation. (Doc. 163, pp. 15-16).

### C.     Video Surveillance and Incidents with Inmates Foreman and Jones

Following the pepper spray incident, Varga authorized video surveillance of Hampton while she was on the segregation yard on July 30, 2018. (Doc. 163, p. 17). Varga testified he initiated the surveillance because he believed Hampton was provoking inappropriate sexual behavior on the part of other prisoners. (Doc. 163, p. 17; Doc. 163-13, pp. 43-44). During approximately 53 minutes of surveillance, officers saw inmate Foreman hug Hampton and grab her breast and also saw inmate Jones grope her breasts and buttocks, but did not intervene to stop this behavior. Hampton was issued a ticket for sexual misconduct and damage or misuse of property. Varga approved the punishment of two months segregation; Hampton states Varga made no effort to

determine whether she willingly engaged in the above conduct or was forced to do so. (Doc. 163, p. 17). Varga did not discipline any of the officers who observed Hampton being touched sexually and did not intervene. *Id.*

Hampton filed PREA complaints against Foreman and Jones for groping her on July 30, 2018; Blackburn investigated but found her claims unsubstantiated despite the video evidence. Varga approved the IA investigation reports. (Doc. 163, p. 17).

### D. Incidents with Inmates Thomas, Sims, and Jackson

On October 6, 2018, inmate Thomas was housed next to Hampton in segregation and verbally threatened her with violent rape and death. (Doc. 163, p. 18). IA found Hampton's PREA complaint to be unsubstantiated without interviewing an inmate who witnessed the incident.

Inmates Sims and Jackson, who worked in dietary, sexually abused Hampton between June and October 2018 by coercing her to perform sexual acts in front of them in exchange for better meal portions and for passing kite messages. (Doc. 163, p. 19). When she stopped doing this, they gave her scant food portions, and Jackson exposed himself to her. She filed a PREA complaint on October 27, 2018; Blackburn interviewed Sims and Jackson and substantiated Hampton's claims. Varga approved the investigation report. IA did not issue a KSF order between Hampton and Sims and Jackson, despite Hampton's request. Hampton was disciplined (but not given additional segregation) for sexual misconduct and trading or trafficking. *Id.*

Blackburn and Manzano served on the PREA Incident Review Committees which reviewed Hampton's PREA complaints, several of which were substantiated. Hampton

states they nonetheless failed to identify any changes in policies or practices to improve prevention, detection, or responses to sexual abuse. (Doc. 163, pp. 9, 11, 18, 20). Hampton claims Varga likewise took no action to protect her from future assaults after reviewing the PREA investigation reports. (Doc. 163, p. 9).

Hampton faults Varga for not exercising his discretion to reduce the time she served in segregation, even though Varga was aware of her SMI designation and suicide attempts. (Doc. 156, pp. 9, 13; Doc. 163, pp. 20-21). Varga notes that he cut her segregation time by two months in May 2018 for the Lawrence sexual misconduct ticket from February 21, 2018. (Doc. 156, p. 8). Hampton criticizes Varga's approval of seven months' additional segregation time for subsequent tickets, even where mental health staff recommended no additional segregation would be appropriate. (Doc. 163, pp. 20-21).

## III.    *Issues Common to Lawrence and Dixon*

Burley and other officers at both Lawrence and Dixon called Hampton derogatory names and constantly misgendered her, referring to her with male pronouns. (Doc. 163, pp. 21-23). Burley was not disciplined for calling Hampton a "fag" before beating her at Lawrence. Hampton's PREA complaints over such name calling were not substantiated. Hampton alleges Kink and Varga never instructed their staff to use proper pronouns with her or to refrain from calling her derogatory names. *Id.* Varga asserts that IDOC employees are trained to use the correct terminology with transgender inmates and to treat them with dignity. (Doc. 156, p. 9).

Kink, Burley, Blackburn, and Doering all participated in the "Behind the Walls" Facebook group for IDOC employees, where many posts and comments hostile to

transgender prisoners, some of them violent, were shared. (Doc. 163, pp. 23-26). Burley commented on a post specifically about Hampton and publicized her housing assignment before his attack on her. Varga was aware of this group and knew that at least one Dixon officer had posted disparaging comments about Hampton, but that officer faced no discipline or other consequences. (Doc. 163, p. 25).

LEGAL STANDARDS

## I.     *Summary Judgment Standard*

Federal Rule of Civil Procedure 56 governs motions for summary judgment. "Summary judgment is appropriate only 'if the movant shows that there is no genuine dispute as to any material fact and that the movant is entitled to judgment as a matter of law.'" *Anderson v. Donahoe*, 699 F.3d 989, 994 (7th Cir. 2012) (quoting FED. R. CIV. P. 56(a)). *Accord Archdiocese of Milwaukee v. Doe*, 743 F.3d 1101, 1105 (7th Cir. 2014). The moving party bears the initial burden of demonstrating the lack of any genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Once a properly supported motion for summary judgment is filed, the adverse party "must set forth specific facts showing there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. *Accord Estate of Simpson v. Gorbett*, 863 F.3d 740, 745 (7th Cir. 2017).

In assessing a summary judgment motion, the Court views the facts in the light most favorable to, and draws all reasonable inferences in favor of, the nonmoving party. *Donahoe*, 699 F.3d at 994; *Delapaz v. Richardson*, 634 F.3d 895, 899 (7th Cir. 2011). As the

Seventh Circuit has explained, as required by Rule 56(a), "we set forth the facts by examining the evidence in the light reasonably most favorable to the non-moving party, giving her the benefit of reasonable, favorable inferences and resolving conflicts in the evidence in her favor." *Spaine v. Cmty. Contacts, Inc.*, 756 F.3d 542, 544 (7th Cir. 2014).

## II.    *Eighth Amendment Claims*

The Eighth Amendment prohibits cruel and unusual punishment of convicted persons, and safeguards inmates against pain and suffering that serves no penological purpose. *See* U.S. Const., amend. VIII; *Roe v. Elyea*, 631 F.3d 843, 857 (7th Cir. 2011) (citing *Estelle v. Gamble*, 429 U.S. 97, 103 (1976)). Prison officials have a duty under the Eighth Amendment "to protect prisoners from violence at the hands of other prisoners," *Farmer v. Brennan*, 511 U.S. 825, 833 (1994), and, by extension, correctional officers. "Omissions can violate civil rights, and 'under certain circumstances a state actor's failure to intervene renders him or her culpable under § 1983.'" *Chavez v. Illinois State Police*, 251 F.3d 612, 952-953 (7th Cir. 2001) (quoting *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)).

To succeed on claim for failure to protect, an inmate must first demonstrate she is "incarcerated under conditions posing a substantial risk of serious harm." *Farmer*, 511 U.S. at 834. Second, the inmate must show prison officials acted with deliberate indifference to that risk, which requires a subjective inquiry into a prison official's state of mind. *Farmer*, 511 U.S. at 838-39. "[T]he official must both be aware of facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Id.* at 837. A prisoner may demonstrate that prison officials were aware of a specific, impending, and substantial threat to her safety "by showing that [s]he

complained to prison officials about a specific threat to [her] safety." *Pope v. Shafer*, 86

F.3d 90, 92 (7th Cir. 1996) (quoting *McGill v. Duckworth*, 944 F.2d 344, 349 (7th Cir. 1991)).

The prison official may be held liable only if s/he knows an inmate faces a substantial

risk of serious harm and "disregards that risk by failing to take reasonable measures to

abate it." *Farmer*, 511 U.S. at 847. A plaintiff also "can establish exposure to a significantly

serious risk of harm by showing that [s]he belongs to an identifiable group of prisoners

who are frequently singled out for violent attack by other inmates." *Id.* at 843 (quotation

omitted).

Hampton also claims that Varga and Kink subjected her to cruel and unusual

punishment by extending her confinement in segregation to approximately one year

despite her deteriorating mental health. Again, a claim for unconstitutional conditions of

confinement has two elements. *McNeil v. Lane*, 16 F.3d 123, 124 (7th Cir. 1993). First, the

prisoner must show that, objectively, the conditions deny the inmate "the minimal

civilized measure of life's necessities," creating an excessive risk to the inmate's health or

safety. *Farmer*, 511 U.S. at 834; *Jackson v. Duckworth*, 955 F.2d 21, 22 (7th Cir. 1992). Not all

prison conditions trigger Eighth Amendment scrutiny—only deprivations of basic

human needs like food, medical care, sanitation, and physical safety. *Rhodes v. Chapman*,

452 U.S. 337, 346 (1981). Second, from a subjective point of view, the inmate must

demonstrate that the defendants acted with a sufficiently culpable state of mind, namely,

deliberate indifference. *McNeil*, 16 F.3d at 124. Deliberate indifference exists only where

an official "knows of and disregards an excessive risk to inmate health or safety." *Farmer*,

511 U.S. at 837-38. "'Deliberate indifference' means recklessness in a criminal, subjective

sense: disregarding a risk of danger so substantial that knowledge of the danger can be inferred." *James v. Milwaukee Cty.*, 956 F.2d 696, 700 (7th Cir. 1992). Negligence, even gross negligence, does not constitute deliberate indifference. *Garvin v. Armstrong,* 236 F.3d 896, 898 (7th Cir. 2001).

To succeed on a claim for excessive force, an inmate must show that an assault by a prison official was carried out 'maliciously and sadistically' rather than as part of 'a good-faith effort to maintain or restore discipline.'" *Wilkins v. Gaddy*, 559 U.S. 34, 40 (2010) (citing *Hudson v. McMillian*, 503 U.S. 1, 6 (1992)); *see also DeWalt v. Carter*, 224 F.3d 607, 619 (7th Cir. 2000). Whether the force used is excessive depends on the circumstances. *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008). Several factors are relevant to this determination: the extent of the injury, the need for force, the amount of force used, the nature of the threat being addressed by the force, and efforts made to minimize the severity of the force used, among others. *Hudson*, 503 U.S. at 7.

## ANALYSIS

The motion and response illustrate a number of disputed factual issues material to resolution of the claims. The Court will discuss the issues in the order presented by Defendants in their motion.

### I. *Excessive Force Claims against Doering and Kunde (Count III)*

Defendants argue that Doering and Kunde's deployment of pepper spray against Hampton on June 26, 2018, did not violate her constitutional rights, because Hampton was disobeying orders to cuff up and go to segregation, and officers sprayed her to induce her compliance with those orders. (Doc. 156, pp. 15-17). Citing *Soto v. Dickey*, 744 F.2d

1260 (7th Cir. 1984), they assert that the use of chemical agents to subdue recalcitrant prisoners does not amount to cruel and unusual punishment, unless chemicals are used in quantities greater than necessary or for the sole purpose of inflicting pain. They note that Hampton cannot show that Kunde or Doering used excessive pepper spray against her as several other officers were also spraying her.

Hampton counters that the evidence creates several genuine factual disputes regarding whether the use of force violated the Eighth Amendment. (Doc. 163, pp. 27-31). First, while Doering claims that Hampton refused his order to cuff up, Hampton testified she did not remember any defendant giving her an order to cuff up before she was pepper sprayed. She asked to see a PREA representative and for mental health support because she felt suicidal. According to Hampton, Doering admitted she was seated calmly on a chair, surrounded by at least four officers, and was non-threatening at the time Doering sprayed her. Hampton said she was still seated at the time the officers forced her to the floor, but Doering stated she had stood up and flailed her arms, lightly striking Doering and Manzano before they took her down. It is undisputed that Kunde sprayed Hampton's face with pepper spray at the time she was pinned to the ground by three officers. Kunde asserted Hampton was combative at the time, but Hampton claims she offered no physical resistance; Doering testified he was able to cuff her hands within 5-10 seconds of placing Hampton on the ground.

The Court agrees that a material factual dispute exists as to whether Hampton was actually noncompliant; a reasonable jury could find that she did not hear the order and thus did not intentionally refuse to comply. Further, the facts reveal a dispute as to

whether force was necessary at all. A reasonable jury could conclude it was not. Alternatively, a jury could find that the force used against Hampton—which consisted of multiple applications of pepper spray followed by physically forcing her to the floor, restraining her, and then spraying her again—was out of proportion to the need to secure Hampton's compliance and therefore excessive. *See Hudson v. McMillian*, 503 U.S. 1, 7 (1992); *Richman v. Sheahan*, 512 F.3d 876, 883 (7th Cir. 2008); *Treats v. Morgan*, 308 F.3d 467, 477-78 (8th Cir. 2002) (summary judgment not appropriate on excessive force claim for use of pepper spray and physical takedown where inmate questioned an order and asked to speak to a supervisor but otherwise posed no threat); *Barrows v. Blackwell*, No. 13-cv-1483, 2016 WL 1122838, at *2, 6 (C.D. Ill. Mar. 22, 2016) (factual dispute as to whether pepper spray was necessary precluded summary judgment).

Accordingly, summary judgment is not warranted on Count III. This claim will go forward against Doering and Kunde for the incident at Dixon June 26, 2018, and against Burley for the incident on February 18, 2018, at Lawrence.

## II.    *Deliberate Indifference Claims against Varga and Kink for Segregation Placement (Count II)*

The parties agree that Hampton was diagnosed with serious mental illness and that Kink and Varga were aware of her diagnosis. The wardens also knew that Hampton attempted suicide multiple times while she was held in segregation. Kink and Varga argue that they cannot be found to be deliberately indifferent to the risk of Hampton's condition deteriorating while she remained in segregation, because they considered and relied on the recommendations of mental health professionals each time they imposed

discipline, and because this process was approved by the court in *Rasho v. Baldwin*, Case No. 07-cv-1298 (C.D. Ill.), the class action brought by seriously mentally ill prisoners which resulted in a settlement. (Doc. 156, pp. 17-18).

Hampton points out that Defendants do not dispute the fact that they knew she faced a substantial risk of serious harm as a mentally ill inmate held in lengthy segregation, evidenced by her suicide attempts. (Doc. 163, pp. 32-33). As such, the salient question is whether Kink and/or Varga acted or failed to act with deliberate indifference to that risk of harm. Hampton notes that both Kink and Varga admitted they had the discretion to remove her from segregation or reduce her punishment, but they instead imposed additional segregation time. (Doc. 163, pp. 33-37).

Kink added three months to Hampton's segregation time for allegedly exposing her breasts when she was alone in her cell, when Hampton had already spent over nine months in segregation. Kink later admitted the 3-month punishment was excessive. (Doc. 163, p. 33).

Varga shortened the above three month segregation term to one month. But he imposed a total of seven more months in segregation on four disciplinary tickets during Hampton's time at Dixon. Hampton notes that in each case, the range of punishment recommended by a mental health professional included zero additional segregation time,[8] as well as a recommendation against imposing lengthy segregation for SMI

---

[8] On the ticket where Varga approved one month of segregation for the incident with inmate Robinson, the mental health professional recommended a range of 0-6 weeks. (Doc. 163, p. 33). Where Varga imposed three months for the pepper spray incident, the mental health

prisoners.

Hampton asserts that in authorizing the video surveillance on the yard, Varga actively sought out ways to add to her punishment. He approved another two months in segregation for the sexual acts caught on video in which Hampton maintains she was the victim, where mental health recommended a punishment range of zero to 90 days. (Doc. 163, p. 34). Hampton notes there is no evidence in the record that the mental health professionals took into consideration the total time Hampton had already served in segregation when making a recommendation on an appropriate range of punishment for a particular disciplinary ticket. (Doc. 163, p. 36, n.4). Ultimately, the wardens had final discretion to determine whether to impose additional segregation time and, if so, how much.

Hampton counters the wardens' argument that they followed the mental health recommendations on segregation time. She asserts that Varga's decision to impose segregation time on the higher end of the recommended range was a deviation from the medical professionals' recommendation and a failure to heed the recommendation to consider reduced segregation time and to avoid lengthy segregation for a mentally ill inmate. (Doc. 163, p. 35). She further argues that to the extent the wardens complied with the *Rasho* consent decree process, that compliance does not insulate them from liability if they failed to mitigate the risk Hampton faced from having her segregation time prolonged when her mental health had already significantly deteriorated. (Doc. 163,

---

recommendation had been for a range of 0-8 months and for consideration of reduced segregation time. (Doc. 163, p. 34).

pp. 35-36).

In light of Hampton's mental health condition, her suicide attempts, and the time she had already spent in segregation, a genuine factual dispute exists on whether increasing her segregation time amounted to deliberate indifference to her risk of suffering further decline in her mental health. Based on the facts before the Court, a reasonable jury could conclude that Varga and Kink were deliberately indifferent to a serious risk of harm in imposing further segregation time in one or more of the disciplinary cases. Summary judgment is not appropriate on this issue; Count II will proceed.

### III. Failure to Protect Claim against Kink, Burley, Varga, Gee, Manzano, and Blackburn (Count I)

With reference to the objective component of her failure to protect claim, Hampton points out that not only did she raise specific complaints against numerous inmates who threatened her safety, but her obvious feminine appearance and known identity as a transgender woman in a men's prison were sufficient to put Defendants on notice that she faced a serious risk of harm from other inmates. (Doc. 163, p. 38). *See Farmer v. Brennan*, 511 U.S. 825, 843 (1994) (inmate who belongs to an identifiable group that is vulnerable to attack by other inmates can demonstrate risk of serious harm). The facts demonstrate that Hampton was in fact threatened with serious harm by several inmates and suffered physical and sexual assaults. She also was the target of verbal harassment by prison officers based on her transgender status as well as frequent misgendering. (Doc. 163, p. 39). Based on this evidence, a reasonable jury could conclude that

Hampton's conditions of confinement exposed her to a substantial risk of serious harm. Defendants' arguments for summary judgment center on whether each individual was deliberately indifferent to the need to protect Hampton from threats to her safety.

Defendants first argue that Burley is entitled to summary judgment because, while Hampton alleges he used excessive force against her, she did not claim he failed to protect her from anyone else. (Doc. 156, p. 20). Hampton responds that she indeed stated a failure to protect claim against Burley in that he refused to allow her to go to her special cage in the yard which would give her protection from other inmates, and he verbally abused her based on her transgender status. (Doc. 156, pp. 40-41). A reasonable jury could conclude Burley failed to protect Hampton based on these facts, thus summary judgment is not warranted.

Gee is likewise not entitled to summary judgment on Count I. While Defendants assert that Gee was present during the pepper spray incident on June 26,2018, but only as an observer (Doc. 156, pp. 20-21), Hampton notes that Gee stood by without intervening while other officers repeatedly pepper-sprayed her while she was pinned to the ground. (Doc. 163, p. 44). Further, Gee refused to allow Hampton to speak with mental health or PREA staff and never investigated Hampton's report that Robinson had sexually assaulted her. *Id.* This illustrates a material factual dispute which could result in a reasonable jury finding against Gee on the failure to protect claim.

Defendants assert that Blackburn investigated Hampton's PREA complaint against inmate Prombo which resulted in his punishment with segregation, thus this incident does not support Hampton's claim that Blackburn failed to protect her.

(Doc. 156, p. 21). Further, Manzano investigated a PREA allegation of verbal abuse by staff, and his investigation of the complaint demonstrated he took it seriously even though he concluded it was unsubstantiated. *Id.* As to the June 26 incident that ended with the deployment of pepper spray, Manzano had interviewed inmate Robinson after he reported Hampton attacked him, and at the time Hampton had not yet reported the incident or made a PREA complaint against Robinson for assaulting her. Defendants argue that no evidence supports the failure to protect claim against Blackburn or Manzano related to the events of June 26, 2018. (Doc. 156, pp. 21-23).

Hampton argues that while her allegations against inmate Prombo were substantiated, Manzano's first reaction when interviewing Hampton was to belittle her complaint by asking her, "Don't you want to be touched by a man?" indicating he did not take her safety concerns seriously. (Doc. 163, p. 43). Hampton emphasizes that Manzano and Blackburn were involved as members of the PREA Review Committee in assessing not only the Prombo complaint, but also seven other PREA complaints (some substantiated and others not)—yet by their own admission they never recommended any action to improve Hampton's safety or monitoring to protect her from future abuse. (Doc. 163, pp. 40, 42-43). Like Defendant Gee, Manzano and Blackburn never investigated Hampton's sexual assault report against inmate Robinson and ignored her requests to speak to mental health and PREA staff on June 26, 2018, instead taking her to segregation. (Doc. 163, p. 44). Blackburn substantiated Hampton's PREA complaint against inmates Sims and Jackson (who coerced Hampton to perform sexual acts in order to get meals) but then refused her request for a KSF order from them. In light of these facts, a

reasonable jury could conclude that Manzano and Blackburn were aware that Hampton faced a substantial risk of harm as a transgender woman yet failed to take action to protect her from future sexual assault, harassment, and threats of bodily harm. Summary judgment in this instance is not warranted.

Wardens Kink and Varga argue that they removed specific threats to Hampton when they became aware of them, thus they were not deliberately indifferent to the risks she faced as a transgender woman. (Doc. 156, pp. 22-23). They further claim they took steps to address the general risk of harm to Hampton as a transgender woman, including impressing on subordinate staff the need to be civil and professional with transgender inmates, and relying on security and investigative staff and mental health professionals to address problems.

Kink asserts he had no role in Hampton's exposure to inmate Sheif after the KSF order was issued and only became aware of the incident after it occurred. He further notes that Hampton had no more contact with Burley after the excessive force incident of February 18, 2018. Hampton disputes Kink's claims, noting that Kink was responsible for ensuring PREA compliance which included making sure the KSF order against Sheif was carried out by his staff after he approved the order and Sheif's discipline. (Doc. 163, pp. 41-42). She argues Kink failed to protect her from this specific known risk because Kink did not educate his staff on the existence of the KSF order or how to enforce it, which resulted in Sheif being placed in proximity to Hampton and threatening her again. When Hampton filed a second complaint against Sheif, Kink made no changes to ensure her safety. Hampton further points out that while Burley was transferred to another prison

two weeks after the incident on February 28, 2018, Kink did not discipline Burley for beating Hampton, nor did Kink take any action to address Burley's and other officers' verbal harassment of Hampton. These factual assertions are sufficient for a reasonable jury to find that Kink failed to take steps to protect Hampton from a serious risk of harm, and preclude summary judgment in Kink's favor on Count I.

Turning to Varga, he asserts that Hampton was abused by three inmates (Prombo, Clemmons, and Robinson) while at Dixon (he makes no mention here of the five other inmates who allegedly abused her there). (Doc. 156, pp. 22-23). He claims that Prombo never harmed Hampton after she told Defendants about his groping and threats. Varga states Hampton never told Defendants about Clemmons's assaults, did not make a complaint about Robinson until after he reported Hampton attacked him, and suffered no further harm after Defendants were made aware of the incidents. (Doc. 156, p. 23).

Hampton disputes nearly every aspect of Varga's assertions. (Doc. 163, pp. 44-47). She notes that Varga was aware of Hampton's substantiated PREA complaint against Prombo yet had no issue with Prombo's release from segregation after serving just a few days of his punishment, while Hampton, his victim, remained in punitive segregation. Contrary to Varga's claim that Hampton was not again harmed by Prombo after the incident, Hampton notes that Varga did not issue a KSF order between Hampton and Prombo, which meant she was forced to see Prombo regularly, including contact with him "close enough … to apologize" after her return to general population, causing her to feel physically endangered and emotionally distraught. (Doc. 156, p. 22; Doc. 163, p. 45, n. 5).

While Defendants state that Hampton did not complain to them about Clemmons's assaults and harassment, it is undisputed that she called the PREA hotline, prompting Blackburn to investigate. He interviewed two witnesses who corroborated Hampton's claims, but he found her complaint unsubstantiated. Varga approved the investigation report despite the witnesses' corroboration and took no steps to protect Hampton from future contact with Clemmons or from abuse by other inmates. (Doc. 163, p. 45).

Following these incidents and Hampton's altercation with inmate Robinson, Varga authorized the video surveillance on Hampton in the segregation yard which showed two inmates groping Hampton's breasts and buttocks. Varga took no disciplinary action against the officers who observed this but failed to intervene to stop the behavior. Hampton's PREA complaint against the inmates who groped her (Foreman and Jones) was found unsubstantiated by Blackburn despite the video evidence; Varga approved the report and punished Hampton for the incident. Hampton subsequently filed PREA complaints against inmate Thomas for threatening to rape and kill her and against inmates Sims and Jackson for extorting her to engage in sexual acts; the former was found unsubstantiated, but the latter was substantiated by IA. Varga approved both reports but took no action to protect Hampton. Additionally, Varga punished Hampton for the incidents with Sims and Jackson even though she was the victim of their abuse. (Doc. 163, pp. 45-46).

Hampton disputes Varga's claim that he took steps to ensure his subordinates treated transgender prisoners with respect, asserting he was aware of staff calling her

derogatory names and constantly misgendering her in written reports but took no action to discourage this. (Doc. 163, p. 46). On June 19, 2018, Hampton's counsel filed an emergency grievance to Varga on her behalf which informed him of the incidents of assault, harassment, and threats Hampton had endured from other inmates and from Dixon officers, but Varga still took no action to address these safety concerns. (Doc. 163, pp. 46-47). Taken together, this evidence could lead a reasonable jury to conclude that Varga was deliberately indifferent to the need to protect Hampton from the risk of serious harm she faced as a transgender woman at Dixon. Varga is not entitled to summary judgment on this claim. Count I shall proceed against all Defendants.

## IV. *Statute of Limitations as to Count I against Kink*

Defendants argue that the two year statute of limitations bars Hampton's failure to protect claim against Kink because she raised this claim for the first time in her Second Amended Complaint (Doc. 138), which was filed on April 16, 2020, more than two years after Hampton was transferred away from Lawrence in March 2018. (Doc. 156, p. 23). Hampton asserts that Defendants are incorrect because the claims in the Second Amended Complaint relate back to the date of her original pleading (Doc. 1), which was filed on March 8, 2018, and included a failure to protect claim against Kink in his official capacity. (Doc. 163, p. 47).

The original Complaint sued Kink in his individual and official capacities (Doc. 1, p. 4). Hampton asserted a failure to protect claim against Kink in his official capacity for disregarding the known risk she faced from other prisoners and from staff as a transgender woman in a men's prison (Doc. 1, pp. 16, 18). At the time, she was still

incarcerated at Lawrence, where Kink was the warden. Hampton also included a claim against Kink in his individual and official capacities for cruel and unusual punishment related to her confinement in segregation (Doc. 1, pp. 19-20). Kink was served with the Complaint on March 13, 2018 (Doc. 17).

The Court concludes that the failure to protect claim (Count I) in the Second Amended Complaint relates back to the original Complaint because it "asserts a claim … that arose out of the conduct, transaction, or occurrence set out … in the original pleading[.]" FED. R. CIV. P. 15(c)(1)(B). The Second Amended Complaint merely added the individual-capacity claim against Kink for failure to protect; he already faced an official-capacity claim based on the same conduct. This claim against Kink is therefore not barred by the statute of limitations.

## V. *Qualified Immunity*

When assessing whether a defendant is entitled to qualified immunity, the Court must consider: "(1) whether the facts, taken in the light most favorable to the plaintiffs, show that the defendants violated a constitutional right; and (2) whether that constitutional right was clearly established at the time of the alleged violation." *Gonzalez v. City of Elgin*, 578 F.3d 526, 540 (7th Cir. 2009) (citing *Pearson v. Callahan,* 555 U.S. 223, 236 (2009), and *Saucier v. Katz,* 533 U.S. 194, 201 (2001)). Notably, "[w]hen the qualified immunity inquiry cannot be disentangled from disputed facts, the issue cannot be resolved without a trial." *Gonzalez*, 578 F.3d at 540 (citing *Clash v. Beatty,* 77 F.3d 1045, 1048 (7th Cir. 1996)).

Defendants present a cursory argument that the Court would change current law

if it determines that "corrections officials may not use force to compel compliance with lawful orders" or that they "may not rely on mental health professionals when making mental health decisions," and assert that no existing law put them on notice as to what steps were required to protect Hampton and avoid a finding of deliberate indifference. (Doc. 156, p. 24). Defendants oversimplify the issues in this case.

As discussed above, numerous facts are in dispute relevant to whether Defendants violated Hampton's constitutional rights, and the Court has already determined that a jury could find in Hampton's favor on these claims, precluding summary judgment. The remaining question is whether the constitutional rights at issue, within the specific circumstances of this case, were clearly established. *Saucier*, 533 U.S. at 201.

With regard to the claim of excessive force, it is undisputed that "[t]he notion that unnecessary and wanton infliction of pain constitutes cruel and unusual punishment forbidden by the Eighth Amendment is not a new or unusual constitutional principle." *Hill v. Shelander*, 992 F.2d 714, 718 (7th Cir. 1993). The question in this case is not whether officers may use force to compel an inmate to comply with a proper order, but instead whether the repeated application of pepper spray to Hampton both initially when she claims she did not physically resist,[9] and again when she was incapacitated and restrained on the floor, constituted an excessive use of force. If a jury were to believe that the application of force was wholly disproportionate to the perceived threat and that Defendants maliciously intended to cause harm, then no reasonable officer would believe

---

[9] As previously noted, there is also a factual dispute on whether Hampton heard an order to cuff up before pepper spray was deployed.

that his or her actions were lawful. *See McCoy v. Alamu*, 950 F.3d 226, 233–34 (5th Cir. 2020), *cert. granted, judgment vacated,* 141 S. Ct. 1364 (2021) (in light of *Taylor v. Riojas*, 141 S. Ct. 52, 52–54 (2020), vacating grant of qualified immunity to guard who used pepper spray on an unresisting inmate). The subjective standard inherent in an excessive force claim makes a finding of qualified immunity premature without an initial determination of the facts and Defendants' intent. Accordingly, Defendants are not entitled to qualified immunity on this issue.

Similarly, allowing Hampton's deliberate indifference claim to go forward against the wardens who extended her segregation punishment despite evidence suggesting that lengthy segregation was worsening her mental health condition does not amount to a determination that prison officials "may not rely on mental health professionals when making mental health decisions." (See Doc. 156, p. 24). The Seventh Circuit has long recognized that prolonged confinement in segregation can violate the Eighth Amendment; whether a violation in fact occurred "depends on the duration and nature of the segregation and the existence of feasible alternatives." *Walker v. Shansky*, 28 F.3d 666, 673 (7th Cir. 1994); *see also Rice ex rel. Rice v. Corr. Med. Servs.*, 675 F.3d 650, 666 (7th Cir. 2012). It is for the jury to resolve the disputed questions of Defendants' knowledge and subjective intent relevant to this claim, as well as whether the wardens in fact "relied" on mental health recommendations or disregarded them.

Finally, the law is clearly established that prison officials have a duty to protect inmates from abuse by other prisoners or officers. *See Gevas v. McLaughlin*, 798 F.3d 475, 484 (7th Cir. 2015) (citing *Farmer v. Brennan*, 511 U.S. 825, 832-34 (1994)). Whether

Defendants took adequate steps to protect Hampton from sexual abuse in light of this duty is another matter of factual dispute. Granting qualified immunity to Defendants would require the Court to improperly resolve these disputed factual issues at the summary judgment stage. *See Mordi v. Ziegler*, 770 F.3d 1161, 1164 (7th Cir. 2014). Accordingly, Defendants are not entitled to qualified immunity.

## VI. Intentional Infliction of Emotional Distress (Count V) and Sovereign Immunity

Defendants argue that sovereign immunity bars Hampton's state law claim for intentional infliction of emotional distress. Under the Illinois State Lawsuit Immunity Act, 745 Ill. Comp. Stat. 5/1, "the State of Illinois is immune from suit in any court, except as provided in the Illinois Court of Claims Act, 705 Ill. Comp. Stat. 505/8 (and other statutes not relevant here), which vests jurisdiction over state tort claims against the state in the Illinois Court of Claims." *Richman v. Sheahan*, 270 F.3d 430, 441 (7th Cir. 2001). A claim against a state official or employee is a claim against the state when "'(1) [there are] no allegations that an agent or employee of the State acted beyond the scope of his authority through wrongful acts; (2) the duty alleged to have been breached was not owed to the public generally independent of the fact of State employment; and (3) ... the complained-of actions involve matters ordinarily within that employee's normal and official functions of the State.'" *Murphy v. Smith*, 844 F.3d 653, 658 (7th Cir. 2016) (quoting *Healy v. Vaupel*, 549 N.E.2d 1240, 1247 (Ill. 1990), quoting *Robb v. Sutton*, 498 N.E.2d 267, 272 (Ill. App. 1986)). There is, however, an exception to this rule: "Sovereign immunity affords no protection when agents of the state have acted in violation of statutory or

constitutional law or in excess of their authority." *Leetaru v. Board of Trustees of University of Illinois*, 32 N.E.3d 583 (Ill. 2015); *see also Murphy*, 844 F.3d at 658-59.

Each of Hampton's federal claims involve Defendants' alleged violation of her constitutional rights. If proven, the claims fall squarely within the exception to the sovereign immunity bar. Accordingly, the intentional infliction of emotional distress claim in Count V is not barred by sovereign immunity and will proceed.

## CONCLUSION

For the above reasons, Defendants' Motion for Partial Summary Judgment (Doc. 155) is **DENIED**. A jury trial and final pretrial conference will be set by separate order.

**IT IS SO ORDERED.**

**DATED:  June 23, 2021**

_____
**NANCY J. ROSENSTENGEL**
**Chief U.S. District Judge**